**EXHIBIT 5**
**DEFENDANTS' SENTENCING OBJECTIONS**
**Case No.  CR-12-1606-SRB**

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

United States of America,       )
                                )
            Plaintiff,           )
                                )   CR12-01606-PHX-SRB
      vs.                        )   Phoenix, Arizona
                                )   May 16, 2014
Paxton Jeffrey Anderson,         )
                                )
            Defendant.           )
_____ )
                                )
Joseph John Plany,               )
                                )
            Defendant.           )
_____ )


BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #5
TESTIMONY:  MIKE BLEMASTER - PART 1
(Pages 1 through 185, Inclusive.)


Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1

2                    A P P E A R A N C E S

3    For the Government:

4            U.S. ATTORNEY'S OFFICE
             By:  Kevin M. Rapp, Esq.
5                 Monica B. Klapper, Esq.
             40 North Central Avenue, Suite 1200
6            Phoenix, AZ  85004

7    For the Defendant Paxton Jeffrey Anderson:

8            FEDER LAW OFFICE PA
             By:  Bruce S. Feder, Esq.
9            2930 East Camelback Road, Suite 160
             Phoenix, AZ  85016
10
11   For the Defendant Joseph John Plany:

             LAW OFFICE OF THOMAS M. HOIDAL, PLC
12           By:  Thomas M. Hoidal, Esq.
             7227 North 16th Street, Suite 222
13           Phoenix, AZ  85020

14

15

16

17

18

19

20

21

22

23

24

25

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1

2                      <u>INDEX OF WITNESSES</u>

3

4    MIKE BLEMASTER:

5    Direct examination by Mr. Rapp          Page   4
     Cross examination by Mr. Feder          Page 134
     Cross examination by Mr. Hoidal         Page 157
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    relevance on this one, Mr. Rapp.

2    BY MR. RAPP:

3    Q   Well, is there a discussion with you and Mr. Anderson

4    about some of the things that his mother is lacking in terms

5    of qualifying for a loan?

6    A   Yes.  It's talking about how she has good assets but does

7    not have any income.  And it's also referencing another loan

8    that she just did that another loan officer did at a different

9    bank.

10         THE COURT:  The objection is overruled.  737, page 35

11   is admitted.

12         MR. RAPP:  Just to correct you, Judge, it's 738.

13         THE COURT:  Thank you.  You're right.  It is 738,

14   page 35.

15         MR. RAPP:  Yes.  Thank you.

16      (Exhibit No. 738-35 admitted in evidence.)

17   BY MR. RAPP:

18   Q   And in this one, did you ultimately do a loan for Paxton

19   Anderson's mother, if you recall?

20   A   I know I did a loan application.  I don't recall whether

21   it closed or not.

22   Q   And do you know if she -- do you know if she was employed?

23   A   I don't believe she was.

24   Q   Did you ever have a discussion with Mr. Anderson about

25   anything that could be done with respect to her employment?

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    the pipeline and the problem is that we're -- they're not very

2    good borrowers.  So we're trying to get them through and he's

3    basically saying that if we don't get these loans done,

4    they're concerned that they're going to ruin their credit and

5    also, you know, possibly foreclose on the properties.

6    BY MR. RAPP:

7    Q   And are these loans -- are these initial loans or are

8    these refinances or do you know what the posture of these

9    particular loans are?

10   A   I think these are initial loans.

11   Q   Now, as you got into 2006, how are your properties?  How

12   are the properties that you are in agreement with Mr. Anderson

13   that you -- he would build them, you would get the loan and

14   the construction loan, he would build the properties and then

15   you would sell them once they were completed.

16           How are those going now?

17   A   They weren't going.  We had purchased some lots and we had

18   kind of a handshake agreement that we were going to split the

19   costs on the lot and then build the house and sell it and

20   split the profits.  And nothing was done to start building the

21   houses.

22   Q   When were you going -- both of you, when did you expect to

23   make money off of those deals?

24   A   These were larger houses so the turn time is usually about

25   a year-and-a-half to two years.

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1           THE COURT:  I'm sorry.  Did you say something,

2    Mr. Feder?

3           MR. FEDER:  I did, sorry.  Leading.

4           THE COURT:  Overruled.  You may answer.

5           THE WITNESS:  Can you ask the question again?  I'm

6    sorry.

7    BY MR. RAPP:

8    Q   Yes.  First of all, is the United States in any way

9    obligated to make a recommendation to the sentencing judge

10   about your cooperation?  Is there any obligation?

11   A   I don't think there's any obligation, no.

12   Q   Is the sentencing judge obligated to accept any

13   recommendation the United States makes on your behalf?

14          MR. HOIDAL:  Objection.  Calls for a legal

15   conclusion.

16          THE COURT:  Overruled.  You may answer based on your

17   understanding of your Plea Agreement.

18          THE WITNESS:  No.

19   BY MR. RAPP:

20   Q   We were just looking at 706, page 29.  Was this going to

21   be your primary residence?

22   A   If this was going to be lot 39 in Calabrea, that actually

23   was, yes.

24   Q   Okay.  You intended it to be your primary residence?

25   A   Correct.

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    A    Yes.

2    Q    Because they made money too, right?

3    A    Yes.

4    Q    And it was your dad -- I'm sorry.

5         Was it your dad that was the "P&B" for P&B

6    Enterprises?

7    A    No.  That was my father-in-law.

8    Q    And your father-in-law and you also entered into some loan

9    agreements to buy some property?

10   A    We had a -- yes.  We had one home and he bought another

11   piece of land as well.

12   Q    And false information was used in those applications?

13   A    No.

14   Q    No.

15        And would you say that you and Mr. Anderson were

16   pretty much done with each other by 2006?

17   A    I think that was the time frame, yeah.  It was right

18   after -- it was the middle of lot 18, the one where I fired

19   him from the job.

20        I think things trailed on past that just because we

21   had dealings together.  But primarily, that was -- we had a

22   lot of things to iron out and hash out so things drug on for a

23   while past that.

24   Q    He didn't have anything to do with this lot 39 Calabrea,

25   the one that you were going to build a home on, right?

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    A    I think originally when I did the loan application was

2    when I was going to have him build my house out there, but

3    that never came to fruition, obviously.

4    Q    That was well into 2006.  You were already split up and

5    unhappy with each other by then, right?

6    A    I think so.  If that's the case, then, like I say,

7    timing -- I'm not too sure about who -- because I had four or

8    five, six different builders that I worked with.

9           Paxton was primarily the builder that I was going to

10   be working with because he -- you know, he built that house

11   for my father and myself.  He did a great job.  Did it fast at

12   a good cost.  And at that point I was going to give him all my

13   business.

14   Q    By 2006 you were already exchanging unfriendly e-mails and

15   you were trying to split up your properties, right?

16   A    I'm not sure about the timing, but that's about correct.

17   Q    You were already mad at him about your dad's other lot and

18   the construction process, right?

19   A    Correct.

20   Q    You had already received this allegedly forged draw that

21   you just testified to, right?

22   A    Correct.

23   Q    So you certainly weren't going to have Mr. Anderson do

24   anything --

25   A    Like I say, I'm not sure of the timing of that

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

```
 1    application.  So if that is the case, then, no, obviously, he

 2    wouldn't be building my house.

 3    Q    Okay.  Mr. Sanchez -- or I'm sorry.

 4              Mr. Blemaster -- could the witness be shown Exhibits

 5    15 -- 1567 and 1564?

 6              While she's getting that, you've testified that

 7    Mr. Anderson was involved with the agreement in regard to lot

 8    2104 Silverleaf at DC Ranch; is that right?

 9    A    I'm sorry.  Say that again?

10    Q    The lot located at -- lot 2104 Silverleaf at DC Ranch, do

11    you remember that one?

12    A    I do.

13    Q    Have you testified that Mr. Anderson was involved in that

14    loan and that lot?

15    A    2104?

16    Q    Right.

17    A    No.

18    Q    He was not involved in that?

19    A    No.

20    Q    Look at those documents and tell me if you have ever seen

21    them before.

22    A    Which ones?  Which file number?

23    Q    Start with 1567.  Are you familiar with that?

24    A    Okay.  It's a construction contract.  Cost breakdown.

25    Q    That was your construction contract with Landmark
```

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1   Builders -- I'm sorry.  You had an agreement with Landmark

2   Builders to build your home at lot 2104 Silverleaf at DC

3   Ranch, right?

4   A    Correct.

5   Q    And this is some of those documents that were involved in

6   that?

7   A    Looks like it, yep.

8            MR. FEDER:  Move for the admission of 1567.

9            MR. RAPP:  Can you tell me what certification covers

10  this?

11           MR. FEDER:  He has indicated it's true and correct

12  copies.

13           THE COURT:  He said these were some of the documents

14  involved in that -- that was your question.  He said, "Looks

15  like it."

16  BY MR. FEDER:

17  Q    This is the construction contract you had with Landmark?

18  A    It appears to be.  I haven't had a chance to review it

19  all.

20           THE COURT:  Well, this is a -- what I have in front

21  of me is a file that appears to be more than 40 pages long.

22  And unless it's this witness's file, the 40 pages can't be

23  admitted through him.

24  BY MR. FEDER:

25  Q    Let's just start with -- is that your initial at the

UNITED STATES DISTRICT COURT

1   bottom of the first page on the Construction Agreement?

2   A   No.

3   Q   How about why don't you look at the -- see those numbers

4   in the bottom right-hand corner where it goes 1C025?

5   A   I do.

6   Q   Why don't you look at 1C025-000171.  Do you see that?

7   A   I do.

8   Q   Is that your signature where it says "owner"?

9   A   Correct, yes.

10   Q   And who is the other owner.  Is that Mr. Perry?

11   A   Looks like William Perry, yeah.

12   Q   And you signed that on September 25 of 2006?

13   A   Yep.  Yes.

14   Q   And then if you could -- I would move for the admission at

15   least of those pages which would be 167 through 171.

16       MR. RAPP:  I would object unless I know what

17   certifies it as being authentic.  I don't know what

18   certification covers this.

19       THE COURT:  Well, this is a document to which he is a

20   party that he says that he signed, so with respect to these

21   five pages, they can be admitted.  But I don't know how any

22   other pages can be admitted.

23       (Exhibit No. 1567, pages 167 through 171 admitted in

24   evidence.)

25       MR. FEDER:  Well, we're going to skip around if

1    that's okay with you, Judge.

2    BY MR. FEDER:

3    Q    Now, if you would look at the one that is page 174, 175,

4    176, 177, have you seen those documents before?

5    A    Yeah.   They look like a Construction Loan Worksheet that

6    M&I has.

7    Q    And that's for the same property that we were discussing?

8    A    I don't see the property address on here anywhere.

9    Q    Look at the top of page 174 where it says "borrower" and

10   it says "P&B Enterprises" right under where it says

11   "construction loan".

12   A    Right.   I see the borrower, but I don't see the address,

13   but to answer your question.

14   Q    And are they true and correct -- I'm sorry -- from 171

15   through -- from 174 through 179, do those look familiar to

16   you?  Are these the documents, the Construction Loan Work

17   Sheet on the property at Silverleaf that we're talking about?

18   A    It doesn't have the address on here, so I don't know if

19   these are for that particular property.

20   Q    Why don't you turn to the one that says 183.   Do you

21   recognize that?

22   A    I do.

23   Q    And is that the job site address of Silverleaf 2104?

24   A    Yes.

25   Q    And is that the Encore Design Group document that you

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    A    Sounds correct.

2    Q    Before you testified, you had an opportunity to read

3    through the summaries of the interviews that the various law

4    enforcement agents had with you, right?

5    A    I don't understand the summaries that you're talking

6    about.

7    Q    In other words, somebody -- after somebody would talk to

8    you and you would talk to them, they would type up some kind

9    of summary of the interview that they had with you, right?

10   A    I never saw a document like that, no.

11   Q    So you never reviewed any summaries of what you told the

12   FBI and the IRS back in 2010?

13   A    No.

14   Q    Never?  Okay.

15         You testified earlier that you told them all of the

16   bad things that you had done, right?

17   A    Correct.

18   Q    Do you recall telling them at least on your first

19   interview with them that Mr. Anderson did not ever personally

20   build a residence for you and Mr. Perry?

21   A    Do I recall -- can you say that again?

22   Q    Yes.  Do you recall telling the FBI -- the Internal

23   Revenue Service, Criminal Investigations Unit, that

24   Mr. Anderson didn't build anything for you and your

25   father-in-law?

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    A    He didn't build anything for me and my father-in-law.

2    Q    Okay.  Did they ask you for some records of your real

3    estate dealings?  "They" meaning IRS and FBI?

4    A    My records of my real estate dealings?  I don't believe

5    they did, no.

6    Q    No?  Okay.

7         Did you ever tell -- did you tell the -- on September

8    27, 2010, when you were talking to the FBI, did you tell them

9    that you never had any intent to be deceptive on loan

10   applications?

11   A    I don't recall.

12   Q    Did you tell them you didn't intentionally fail to

13   disclose properties on your loan applications?

14        MR. RAPP:  I object as improper impeachment.

15        THE COURT:  Overruled.  You may answer.

16        THE WITNESS:  I don't recall.

17   BY MR. FEDER:

18   Q    So you could have, right?

19   A    Possibly.  Was that my first meeting with them?

20   Q    Sorry.  You don't get to ask me questions.

21   A    Oh.  Sorry.

22   Q    Did you tell them that you didn't realize you needed to

23   list business properties under the limited liability companies

24   that you owned?

25   A    I don't recall.

CR12-01606-PHX-SRB  5-16-14  MIKE BLEMASTER - Part 1

1   Q    Do you know who Andrea Linnartz is?

2   A    I don't think so, no.

3   Q    Didn't you and Mr. Linnartz and Mr. Sanchez do some other

4   deals together exclusive of Mr. Anderson where you've

5   submitted false applications?

6   A    Andrea Linnartz?  No.

7   Q    Yes.  L-I-N-N-A-R-T-Z.

8   A    No.

9        MR. FEDER:  Your Honor, it is my understanding that

10  the loan, the loan exhibit that -- 1567 is certified with the

11  government in its Exhibit 818.

12       THE COURT:  I believe that was what Mr. Rapp was

13  asking for.

14       MR. FEDER:  Okay.

15       THE COURT:  So if they want to check it -- why don't

16  you continue with your examination and Mr. Rapp can verify

17  that.

18  BY MR. FEDER:

19  Q    You and Mr. Anderson started having problems right about

20  June of 2005.  Do you have a recollection of that?

21  A    Yes.

22  Q    And were in the process, really, of trying to start to

23  separate your business dealings, right?

24  A    Correct, yes.

25  Q    And you've testified that you made an agreement with the

1   government to plead guilty to conspiracy?

2   A   Correct.

3   Q   And your punishment under that plea is limited to five

4   years in prison, right?

5   A   I believe that's correct.

6   Q   In other words, you can get no more than that?

7   A   I believe that's correct.

8   Q   And in addition to that part of the benefit of that

9   agreement is that the amount of loss that you have -- you

10  admit to has been limited also, correct?

11  A   I believe it has.

12  Q   So the full extent of your activities that the government

13  claims caused losses to the banks is not going to be

14  considered in the sentencing?

15  A   I believe that the whole amount of losses are considered

16  in that Plea Agreement.

17  Q   So if the -- do you understand what the Sentencing

18  Guidelines are?

19  A   I have -- I have talked with my attorney briefly about

20  them.

21  Q   We don't want anything to have to do with what you talked

22  to your lawyer about.

23          So you have a general understanding?

24  A   A general, vague understanding.

25  Q   Can I go back to -- I guess it would be Exhibit 818, our

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    Q    And from what you've testified here to, sir, you had

2    falsified numerous loan applications submitted to various

3    banks, correct, sir?

4    A    Correct.

5    Q    Let's talk about those loan applications.

6          The first one I think you mentioned was Jason

7    Woodward.

8    A    Okay.

9    Q    On your direct examination.

10   A    I recognize --

11          THE COURT:  I don't think he has to remember if

12   that's the first one or not.  Why don't you just ask a

13   question about that loan, if you wish -- application if you

14   wish to.

15          MR. HOIDAL:  Yes, I will, Your Honor.  Let me just go

16   to my notes on it.

17          Yes.  Exhibit 704.  Could we have that?  I think that

18   has been admitted.  Do we have that one on the screen, Exhibit

19   704?

20          THE COURT:  I don't have an ability to put anything

21   on the screen, Mr. Hoidal.  Only the lawyers can do that.

22   BY MR. HOIDAL:

23   Q    Do you recall how much -- can we have the witness shown

24   Exhibit 704?

25          Do you know how much that loan application was, sir?

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

```
 1              THE COURT:  I'm sorry.  Are you asking him about
 2   something in 704?
 3              MR. HOIDAL:  Yes.  Exhibit 704 that's been admitted.
 4   I believe it's pages --
 5              THE COURT:  You'll have to give him a page number.
 6              MR. HOIDAL:  24 to 29.
 7              THE WITNESS:  $650,000.
 8   BY MR. HOIDAL:
 9   Q   $650,000.  Okay.
10          And then you testified about Paul Jennett, did you
11   not?
12   A   I did.
13   Q   Exhibit 708.  Do you recall how much the Jennett loans
14   were?  There were two of those, right?
15   A   I believe so.  Is that in this exhibit as well?
16   Q   No.  I would like to have the witness shown Exhibit 708,
17   pages 2 to 5.
18   A   Did you know what page that was on?
19   Q   Two to five, I believe.
20   A   $825,000.  $825,000.
21   Q   Pardon me?
22   A   $825,000.
23   Q   Sorry.  All right.
24          And there was a second Jennett loan that was Exhibit
25   714, I think, page 25.
```

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1    A    $339,000.

2    Q    $339,000.  All right.

3          And then we've got -- oh.  The Mark Acre loan.  I

4    think we know that one.  Was that $875,000?

5    A    I don't recall.

6    Q    Mark Acre loan.

7          THE COURT:  I thought it was --

8          MR. HOIDAL:  Exhibit 817.

9          THE COURT:  I thought it was just under a million

10   dollars.

11         MR. HOIDAL:  $998,000.

12         THE COURT:  Something like that.  Okay.  Is that

13   close enough?

14         MR. HOIDAL:  That's close enough.

15   BY MR. HOIDAL:

16   Q    And then we have the Sandra Anderson loan.  Do you recall

17   that one, sir?

18   A    I do.

19   Q    Is that -- I'm sorry -- it was the Marti Jo Anderson loan.

20   A    Marti Jo?

21   Q    Yes.  Do you recall the amount of that one?

22   A    I don't.

23   Q    Let's see.  Well, let's move on to another one.

24         What was your loan, the loan that you obtained with

25   the false information?  How much was that one?

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-16-14   MIKE BLEMASTER - Part 1

1   A    I think it was around -- that was a construction loan, so

2   around 750 -- $750,000.

3   Q    Okay.  And then we have the Rongstad loans.  Do you

4   remember those?

5   A    I do.

6   Q    And you remember how much those were?

7   A    I don't.

8   Q    I have 850 for one of them.  Does that sound about right?

9   A    Yes.

10  Q    Okay.  There were two loans for Jason Rongstad.

11  A    I believe so.

12  Q    And the other one I have at about $400,000.  Would that be

13  about right?

14  A    Seems low, but it could be.

15  Q    Might be more than that?

16  A    Uh-huh.

17  Q    So that's not even all the ones you testified about, I

18  don't think.  We left off Marti Jo Anderson.  But that gives

19  us an indication of the amount of the loans involved that

20  you've testified about, correct, sir?

21  A    I have testified against those, yeah.

22  Q    And that would be a loss amount of -- let's see.

23  Something over $2 million, correct, sir?  Actually, it's over

24  $4 million?

25  A    A loss amount?  No.  Not correct.

1    Q    Not correct?

2    A    No.

3    Q    And why not?

4    A    Well, for my loan, for instance, the 750 is the loan

5    amount.  That money was never drawn.  The money that was drawn

6    was for the lot itself which, I think, was maybe $150,000 or

7    maybe $200,000 for the lot.

8         The additional 550 was never constructed.  And when

9    it forecloses, the bank obviously gets -- resells the

10   property.

11        So the difference between if I bought it for $200,000

12   and they resold it for $175 a year later, the loss is $25,000.

13   Q    Well, sir, you testified earlier that you had some

14   familiarity with the Sentencing Guidelines, correct, sir?

15   A    Correct.

16   Q    You know, of course, that under the Sentencing Guidelines

17   it's "probable or intended loss," do you not, sir?

18   A    Probable or intended?  I don't know the difference between

19   the two.

20   Q    Well, "probable" or the "intended loss," if there's a

21   false --

22        MR. RAPP:  I'm going to object to this as counsel is

23   just testifying.

24        THE COURT:  Sustained.

25        Do you have any idea how the United States Sentencing

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) CR12-01606-PHX-SRB |
| vs. | ) Phoenix, Arizona |
| | ) May 20, 2014 |
| Paxton Jeffrey Anderson, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| Joseph John Plany, | ) |
| | ) |
| Defendant. | ) |

BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #6
TESTIMONY:  MIKE BLEMASTER - PART 2
(Pages 186 through 236, Inclusive.)

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1

2                        A P P E A R A N C E S

3    For the Government:

4            U.S. ATTORNEY'S OFFICE
             By:  Kevin M. Rapp, Esq.
5                 Monica B. Klapper, Esq.
             40 North Central Avenue, Suite 1200
6            Phoenix, AZ  85004

7    For the Defendant Paxton Jeffrey Anderson:

8            FEDER LAW OFFICE PA
             By:  Bruce S. Feder, Esq.
9            2930 East Camelback Road, Suite 160
             Phoenix, AZ  85016
10
     For the Defendant Joseph John Plany:
11
             LAW OFFICE OF THOMAS M. HOIDAL, PLC
12           By:  Thomas M. Hoidal, Esq.
             7227 North 16th Street, Suite 222
13           Phoenix, AZ  85020

14

15

16

17

18

19

20                              .

21

22

23

24

25

                   UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

### INDEX OF WITNESSES

MIKE BLEMASTER:

Cross examination by Mr. Hoidal (cont'd)        Page 188
Redirect examination by Mr. Rapp                Page 224

UNITED STATES DISTRICT COURT

```
1   Q    $3,226,000?

2   A    Five-five-zero.

3   Q    550.

4             And on that application you did not list all the

5   properties that you owned at that time, did you, sir?

6   A    There's quite a few pieces of property here mentioned.  I

7   don't recall whether I listed them all or not.

8   Q    Well, sir, you testified on direct examination, I believe,

9   that you had intentionally left off properties on loan

10  applications that you submitted?

11  A    That is correct.  And I did.  I don't recall if this was

12  one of them.

13  Q    Okay.  You just can't remember whether this is one of them

14  or not?

15  A    That's correct.

16  Q    Okay.  All right.  In any event, when we look at

17  the properties that you testified you were involved with where

18  false statements were made, they're a substantial sum of

19  money, correct, sir?

20  A    Yes.

21  Q    And you testified Friday that the loss, of course, would

22  not be the total amount -- your position is the loss is not

23  the total amount of the loan.  It's whatever the bank may

24  suffer -- loss the bank may have suffered after selling the

25  collateral?
```

UNITED STATES DISTRICT COURT

1    A    That is correct.

2    Q    And -- but the loss in any event from all of these

3    transactions would be substantial, would you agree?

4    A    No.

5    Q    It would not be substantial?

6    A    Depending on what you call "substantial."

7         The thing that I think that you're not taking into

8    account is some of the properties you mentioned like today,

9    Hidden Canyon, I believe it was, or Hidden Cove you were

10   talking about, that was sold at a profit.

11        The majority of those loans that I did were

12   refinanced out by, I believe, another banker at M&I Bank, so

13   there was no loss at all, which is how we calculated it.

14   Q    I see.  So even though there may be loss amounts

15   associated with these loans, you believe you should not be

16   charged with it because of the refinances -- refinancing of

17   these loans?

18   A    Well, your statement was on the loss.  If a bank -- if I

19   did a loan and a bank does not lose money and that same bank

20   refinances it with one of their loan officers, there is no

21   loss.  Am I --

22   Q    Well, you mean there's no loss at that point.  Certainly,

23   there could be a loss down the road if the property -- if the

24   payor defaults and the home is foreclosed?

25   A    Yes.  But the exact same bank that I gave the loan to with

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1   some of the misinformation refinanced that same -- that same

2   bank refinanced them, so they decided that these borrowers

3   were good enough for them.

4   Q   All right.  So your position is if the loans were

5   refinanced, that you're off the hook for any loss amount?

6           THE COURT:  I think the term "off the hook" is not

7   what you really mean to ask.  You mean does he feel that he is

8   not responsible for any loss on a refinance loan?

9   BY MR. HOIDAL:

10  Q   Yes.  That's your position?

11          That if the loan is refinanced, you're not

12  responsible for any loss that would occur at that point?

13  A   Correct, because there is no loss for the loan that I did.

14  Q   And which one of these loans were refinanced, sir?

15  A   I'd have to go through -- I would have to go through all

16  of them.  We went through all of these to make sure.  I

17  believe Jennett, Acre -- I can't read those names -- Rongstad,

18  Woodward, I believe all of those were refinanced.

19  Q   And if there is any loss suffered on those loans, you

20  don't believe you should be responsible for it?

21  A   Not considering that --

22          MR. RAPP:  Objection.  Asked and answered.

23          THE COURT:  Sustained.

24  BY MR. HOIDAL:

25  Q   How about your own loans, sir?

UNITED STATES DISTRICT COURT

1   A   My own loans I did have a loss and it is part of the

2   equation.

3   Q   Okay.  The loans that you agree you submitted false

4   information on?

5   A   Correct.

6   Q   And how many loans was that, sir?

7   A   One -- one, possibly two.  I would have to review the

8   information again.

9   Q   One or two?  Do you remember which ones those were?

10  A   I believe 39 Calabrea, which is one we reviewed today.

11       This is one where I purchased it for roughly 200,

12  225,000.  And then they resold it for -- I think about 180.

13  If memory serves me, the loss was around $20,000.

14  Q   And that's -- and when you first were given the target

15  letter though which you testified to on Friday, you were

16  concerned, were you not, that you were looking at much more

17  than that?

18  A   I'm not sure what a target letter is.

19  Q   That you were a target of the criminal investigation.

20  A   Oh, okay.

21  Q   You remember that, sir?

22  A   I remember looking at the amount of losses and thinking

23  that it was greater thank it actually was, yes.

24  Q   And you -- and what you did was you went out and hired a

25  lawyer, correct, sir?

1    Q    Okay.   So not only did you have under the Plea Agreement

2    your exposure limited to five years imprisonment, but the loss

3    amount was limited as well, correct, sir?

4            MR. RAPP:   Objection.   Asked and answered.

5            THE COURT:   Sustained.

6    BY MR. HOIDAL:

7    Q    And you know when the loss amount is limited, that reduces

8    your Sentencing Guidelines, correct, sir?

9    A    Correct.

10   Q    But you were still concerned that you might have to go to

11   prison, were you not, sir?

12   A    Still am.

13   Q    All right.   Even with your Plea Agreement?

14   A    Yes.

15   Q    So what you worked out was the cooperation -- oh, let me

16   ask you one other thing here, sir.

17           There's an agreement in the Plea Agreement for you to

18   make restitution to -- in the amount of $102,000.   Is that

19   your calculation of the loss that you would be responsible

20   for, sir?

21   A    No.   I'm not sure where that number came from.

22   Q    Well, you signed the Plea Agreement, correct?

23   A    I understand.   They said that it was some kind of --

24           MR. RAPP:   Objection.   Hearsay.   I don't know what

25   he's --

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1             THE COURT:  Sustained.

2    BY MR. HOIDAL:

3    Q    You have no information on where the $102,000 came from?

4    A    I don't.  I talked to my attorney about it and --

5             MR. RAPP:  Objection.  Privileged.

6             THE COURT:  Sustained.

7    BY MR. HOIDAL:

8    Q    But it clearly doesn't involve any losses from the ones we

9    have gone through and you have said you're not responsible

10   for?

11   A    The amount of the -- on the previous date where it said 70

12   to 120, whatever it was?

13   Q    Yes.

14   A    We calculated the losses from the loans that foreclosed

15   under my applications.  The dollar amount of the loss fit

16   within those parameters is how we came up with my Plea

17   Agreement.

18   Q    The ones that you had admitted engaging in fraud?

19   A    We went through them, yes.  We went through all of them.

20   Q    Now, in -- you testified you were still concerned about

21   going to prison, correct, sir?

22             MR. RAPP:  Objection.  Asked and answered.

23             THE COURT:  Sustained.

24   BY MR. HOIDAL:

25   Q    So what you worked out was the cooperation agreement with

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1    the government, correct?

2           THE COURT:  Well, I just -- I'm sure it was all

3    worked out at the same time, Mr. Hoidal.  You make it sound

4    like one was done and then the other.  My experience and yours

5    would tell us that's not true.

6           MR. HOIDAL:  Yes.

7           THE COURT:  Was it all one package at one time with

8    the cooperation addendum at the same time as the Plea

9    Agreement?

10          THE WITNESS:  Yes.

11   BY MR. HOIDAL:

12   Q   And this is your -- the cooperation addendum is your

13   get-out-of-jail-free card, isn't it, sir?

14   A   No.

15   Q   Well, it allows you to avoid going to prison, does it not,

16   sir?

17   A   No.

18   Q   Well, sir, under the cooperation addendum the government

19   can make a motion to -- for what's called a "downward

20   departure" below the Sentencing Guideline range and to a range

21   of probation for you; isn't that true?

22   A   There is a possibility, yes, but I have a possibility of

23   going to jail as well.

24   Q   But you certainly hope that it's going to be probation,

25   don't you, sir?

UNITED STATES DISTRICT COURT

```
1    A    Of course.

2    Q    Absolutely.  And -- because that's what you have been

3    concerned about the whole time here, isn't it true, sir?

4    Going to prison?

5    A    I didn't want to go to prison, no.

6    Q    Absolutely.  So in the cooperation addendum, you have

7    agreed to meet with the government whenever they want to talk

8    to you, isn't that true, sir?

9    A    Yes.

10   Q    And to answer all their questions, isn't that true, sir?

11   A    Yes.

12   Q    And you've also agreed to deliver to the United States any

13   documents or other items which you have access, correct?

14   A    Correct.

15   Q    We had some of those documents on Friday, did we not, sir?

16        THE COURT:  Are you asking if he delivered documents

17   to the government that we looked at on Friday?

18        MR. HOIDAL:  We had some of the documents that you

19   delivered to the government on Friday?

20        THE WITNESS:  I'm confused.

21   BY MR. HOIDAL:

22   Q    Well, Exhibit 737 and 738 were e-mails involving you,

23   correct?

24   A    E-mails, yes.

25   Q    And those are the ones that you delivered to the
```

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1    the attention of the sentencing judge, correct, sir?

2    A    I believe so.

3    Q    All right.  And the sentencing judge is not Judge Bolton,

4    correct, sir?

5    A    From my understanding, that is correct.

6    Q    All right.  And let's talk about what's in your additional

7    thing that's in your Plea Agreement.

8         You did a Factual Basis for your guilty plea to

9    conspiracy, correct, sir?

10   A    I remember that, yes.

11   Q    The Factual Basis of your plea on the second paragraph

12   indicates that you recruited buyers, including Sandra and

13   Marti Jo Anderson and other straw buyers, and facilitated --

14   do you see that five property transactions?

15   A    I do.

16   Q    Was that another attempt to limit your possible exposure,

17   sir?

18   A    That was the number that we came up where there was a

19   loss.

20   Q    Oh, I see.  So even though you may have been involved in

21   many more than five transactions, you only believe you needed

22   to include those where there was a loss?

23   A    That's correct.

24   Q    So the agreement is not accurate then, is it, sir?

25   A    How so?

UNITED STATES DISTRICT COURT

1   Q   Well, it doesn't say that it's only those where there's a

2   loss, does it, sir?

3   A   It doesn't say anything about a loss, no.

4   Q   And clearly, you were involved in more than five property

5   transactions in the mortgage fraud scheme that you've

6   testified about or claimed, correct?

7   A   Correct.

8   Q   So this was another attempt to reduce your potential

9   sentence; is that correct, sir?

10  A   Yes.  We had put in the five properties as those were the

11  loss, so that's what we had as liable.

12  Q   And in -- and the government was complicit in that, isn't

13  that true, sir?

14          MR. RAPP:  Objection.  Argumentative.

15          THE COURT:  Sustained.

16  BY MR. HOIDAL:

17  Q   The government agreed to that, did they not, sir?

18  A   Correct.

19  Q   All right.  And you hope that the government will make

20  that motion for downward departure so you can be sentenced to

21  probation; isn't that true, sir?

22          MR. RAPP:  Objection.  Asked and answered.

23          THE COURT:  Sustained.

24  BY MR. HOIDAL:

25  Q   The prosecutor is going to get up here as soon as I'm

1   Q   You signed the Plea Agreement and a Factual Basis

2   contained in the Plea Agreement?

3   A   Correct.

4   Q   And did you acknowledge that you were telling the truth in

5   that Factual Basis?

6   A   Yes.

7   Q   And you have sworn to tell the truth in your testimony

8   today and last week?

9   A   Yes.

10  Q   And in that Plea Agreement/Factual Basis that the defense

11  admitted and showed to you, did you acknowledge that these two

12  gentlemen, Mr. Plany and Mr. Anderson, were involved in the

13  conspiracy to defraud the banks?

14  A   Yes.

15  Q   Were they?

16  A   Yes.

17  Q   Now, there's been a lot of talk about loss.  Let me ask

18  you a few questions.

19          In each one of these properties where Mr. Anderson

20  brought you the borrower, was there any collateral underlying

21  those loans?

22  A   The real estate; the land.

23  Q   Right.  So when we talk about "the loss," the loss is not

24  just the entire loan amount that Mr. Hoidal has written next

25  to each one of these borrowers, is it?

CR12-01606-PHX-SRB   5-20-14   MIKE BLEMASTER - Part 2

1    A    No.   It's not even close.   Like a $825,000 loan is for the

2    land and also the construction of the house.   The construction

3    of the house never happened.

4            So let's say Jennett for $825,000, maybe the land was

5    $200,000.   That's all that was ever done.   There was no house

6    built on it.   So when they were refinanced out or the lot

7    sold, if it foreclosed, there's a value to that lot.

8            If you bought it for 200 and the bank foreclosed on

9    it and it sold for 175, there's obviously a $25,000 loss.   So

10   those numbers are very confusing if you're not in the loan

11   business thinking that there's a $825,000 loss.   It's not even

12   close.

13           If the house was built, yes; but the houses were not

14   built.

15   Q    Well, let's talk about that.

16           When Mr. Anderson brought you these borrowers, did

17   you believe that he was going to build these houses?

18   A    Of course, yes.

19   Q    Did you think that he was going to take the money that was

20   provided by the lenders for construction and use it on

21   something else?

22   A    No.

23   Q    As a matter of fact, how long after you were involved with

24   Mr. Anderson did you figure out that he wasn't using the money

25   to build the houses?