**EXHIBIT 10**
**DEFENDANTS' SENTENCING OBJECTIONS**
**Case No.  CR-12-1606-SRB**

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among the following parties (collectively "Parties" and individually "Party") as of the Effective Date (as defined below):

| | |
|---|---|
| MAP: | Mark Acre Properties, L.L.C., an Arizona limited liability company |
| Acre: | Mark Acre |
| Acres: | Mark Acre and Dominique Acre, husband and wife |
| Acre Parties: | MAP, Acre, and the Acres (collectively) |
| Anderson: | Paxton J. Anderson, a married man dealing with his sole and separate property |
| Dynamite: | Dynamite Custom Homes, LLC, an Arizona limited liability company |

## RECITALS

A.      The Acre Parties are the record owners of the following real property parcels (collectively "Parcels"):

(1)      Mirabel Lot 28, owned by the Acres, located at 37475 North 104th Place, Scottsdale, Arizona 85262 ("Mirabel Lot 28");

(2)      Mirabel Lot 138, owned by Acre, located at 10890 East Sundance Trail, Scottsdale, Arizona 85262 ("Mirabel Lot 138");

(3)      Apache Peak Lot 148, owned by Acre, located at 41606 North 113th Place, Scottsdale, Arizona 85262 ("Apache Peak").

(4)      Hideaway Lot 7/8C owned by Acre, located at 52503 Via Savona, La Quinta, California 92253 ("Hideaway"); and

(5)      Lexington on Broadway owned by MAP, located at 502-526 S. Broadway, Lexington, Kentucky ("Lexington").

B.      MAP is owned and controlled by Acre.

C.      Dynamite is owned and controlled by Anderson.

D.    The Acre Parties and Anderson had informal joint venture agreements or understandings, whereby all of the costs of acquiring, maintaining, improving, and selling the Parcels and all profits derived therefrom would be shared equally among the respective Acre Parties and Anderson.

E.    The Acre Parties will have paid and advanced the following Carrying Costs (as defined below) for the Parcels as of March 1, 2007, no portion of which have been reimbursed by loan proceeds from any of the Secured Loans described in Recital G:

      (1)    Mirabel Lot 28: $81,697.21;

      (2)    Mirabel Lot 138: $99,031.14;

      (3)    Apache Peak: $81,047;

      (4)    Hideaway: $107,269.29; and

      (5)    Lexington: $235,400.

F.    As of March 1, 2007, Anderson has advanced or incurred the Carrying Costs for the Parcels as described in Exhibit A attached hereto, no portion of which have been reimbursed by loan proceeds from any of the Secured Loans described in Recital G.

G.    The respective Acre Parties are the borrowers and obligors under the following loans secured by the Parcels ("Secured Loans"):

      (1)    Loan from TierOne Bank in the principal amount of $1,467,844, secured by Mirabel Lot 28 ("TierOne Loan");

      (2)    Loan from M&I Marshall and Isley Bank ("M&I Bank") in the principal amount of $369,000, secured by Mirabel Lot 138 ("M&I Mirabel Loan");

      (3)    Loan from M&I Bank in the principal amount of $1,724,524, secured by Apache Peak ("M&I Apache Peak Loan");

      (4)    Loan from Indymac Bank in the principal amount of $2,160,000, secured by Hideaway ("Indymac Loan"); and

      (5)    Loan from Traditional Bank in the principal amount of $1,120,000, secured by Lexington ("Traditional Loan").

H.    The Acre Parties have made the debt service payments required under the Secured Loans, and Anderson has not made or contributed to any of those debt service payments.

I.      The Acres have obtained an extension of the maturity date of TierOne Loan until April 1, 2007.  The Parties acknowledge that an additional extension of the maturity date of the TierOne Loan or the refinancing of Mirabel Lot 28 and the Mirabel House will be required before the construction of the Mirabel House is completed.

J.      In conjunction with the joint venture arrangement between the Acres and Anderson, the Acres agreed orally with Anderson ("Construction Contract") that Dynamite would construct a residence on Mirabel Lot 28 ("Mirabel House"); the Construction Contract is a "cost only" contract whereby Dynamite would be responsible for all construction costs relating to the Mirabel House ("Construction Costs") and would be paid or reimbursed by the Acres (from construction loan proceeds or otherwise) for the actual Construction Costs actually incurred by Dynamite.

K.      Although the Acres, directly or through draws under the TierOne Loan, have paid at least $1,363,329.21 toward the acquisition of Mirabel Lot 28, design costs, debt service, and Construction Costs as of March 1, 2007, Dynamite has not paid all of the Construction Costs, and the amounts described in Exhibit B are claimed to be due and unpaid by subcontractors, suppliers, consultants, and designers identified on Exhibit B ("Subcontractor/Supplier Claims").  Exhibit B also contains the amounts that Anderson and Dynamite acknowledge are the undisputed Subcontractor/Supplier Claims ("Undisputed Claims")

L.      The construction of the Mirabel House is not complete, its construction having been halted in December 2006.

M.      Anderson and Dynamite have advised the Acre Parties that the cost to complete the Mirabel House is approximately $500,000, and the unfunded amount of the TierOne Loan is approximately $170,000, leaving a shortfall of approximately $330,000 ("Construction Shortfall").

N.      Mirabel Lot 138 is subject to a sale contract with Daryl Wagner ("Wagner") for a purchase price of $590,000 ("Wagner Contract"), but Wagner has been unable or unwilling to close the sale transaction.

O.      Anderson has been paid in full for the costs of the plans and the scale model for the residence that was designed to be constructed on Apache Peak, as a result of draws made from the M&I Apache Peak Loan.  The Parties acknowledge that Anderson has been paid the design costs relating to Mirabel Lot 28 and the Mirabel House and that Anderson has not been paid for the design costs that he has incurred in regard to Mirabel Lot 138.

P.      Acre and Anderson each paid $5,000 as an earnest money deposit toward the anticipated purchase by Acre and Anderson of the Rose and Jim's Bar in Lexington, Kentucky ("Bar"); when the anticipated purchase of the Bar was cancelled, $5,000 of the deposit was forfeited, with $5,000 being refunded solely to Anderson ("Refund").

Q.      Acre and Anderson are the co-owners of two horses, Cap & Gown and Dyna Girl, which are currently located in Kentucky and New York, respectively ("Horses").

R.      Anderson contends that he has personally loaned Acre the sum of $25,000, and Acre contends that he has personally loaned Anderson the sum of $82,000, resulting in a net difference payable by Anderson to Acre in the amount of $57,000 ("Net Loan Due").

S.      The Parties understand and acknowledge that the terms of this Agreement are binding upon each of the Parties and their respective successors and assigns.

T.      The Parties are voluntarily entering into this Agreement upon the understanding that, and with the intention and understanding of disposing of, any disputes between them concerning the matters described in this Agreement shall be fully and finally concluded.

U.      The Parties understand that this Agreement is a compromise of various disputes and is entered into in order to avoid the expense, inconvenience, and uncertainty of further litigation.  Each Party represents and acknowledges that it has read this Agreement thoroughly and has had an opportunity to have this Agreement fully explained by its legal counsel.

## COVENANTS

In consideration of the mutual promises, recitals, covenants, and conditions contained herein, and for other good and valuable consideration, and expressly intending to be legally bound hereby, the Parties to this Agreement agree as follows:

**1.      Recitals.** The foregoing Recitals are incorporated as a part of the Covenants of this Agreement, and the Parties ratify, stipulate, and agree to and warrant the truth of all that is contained in the Recitals.

**2.      Mirabel Lot 28.**

2.1      The Mirabel House shall be appraised, on a "to be built" basis ("Appraised Value"), by Rose Mohr of Appraisals ASAP, which appraisal shall be completed by no later than March 31, 2007; the cost of the appraisal shall be shared equally by the Acre Parties and Anderson.

2.2      Upon the issuance of a certificate of occupancy by the City of Scottsdale, which Anderson and Dynamite shall cause to occur no later than 120 days from the Effective Date, the Mirabel House shall be co-listed initially with DPR Realty (Dominique Acre) and Mirabel Properties (Bob Lomax) at a listing price of $3,200,000; provided, however, DPR Realty and Dominique Acre shall not receive any commission

from the sale of the Mirabel House. The Acres may market and sell the Mirabel House at prices determined by the Acres after providing Notice & Opportunity to Anderson.

2.3     By no later than the 90th day following the Effective Date ("Sale Deadline"), Anderson may market, sell, and close on the Mirabel House to his investors and related parties at 80% of the Appraised Value; if the sale has not closed and has been fully funded by the Sale Deadline, Anderson shall have no further right to market or sell the Mirabel House, and all decisions relating to the marketing and sale of the Mirabel House shall be held and exercised solely by the Acres after providing Notice & Opportunity to Anderson.

2.4     Except as provided in Section 2.9.1 below, if the Mirabel House is not sold by Anderson by the Sale Deadline, then the Acres and Anderson shall be equally responsible for and shall timely pay the monthly payments to TierOne Bank and other Carrying Costs related to Mirabel Lot 28 and the Mirabel House until the Mirabel House is sold to a third party.  The Acres are authorized, and will attempt in good faith, to refinance the Mirabel House, by either a permanent or other loan or loans ("Replacement Loans"), provided that the proceeds are used to satisfy the TierOne Loan and any costs and fees associated with the Replacement Loans, with any excess proceeds from the Replacement Loans being used by the Acres for Construction Costs and interest reserves, maintenance, taxes, assessments, and insurance relating to the Mirabel House and Mirabel Lot 28. The Acres and Anderson shall be equally responsible for and shall timely pay the monthly payments under the Replacement Loans.

2.5     Immediately prior to the Effective Date of this Agreement, the Acre Parties and their designated representatives and agents shall have been permitted to review any and all the records and documents of Dynamite and Anderson relating to the Construction Costs of the Mirabel House, including, without limitation, all subcontractor and supplier bids, contracts, invoices, billings, notices, liens, and statements, all documents and information regarding the receipt of construction funding from TierOne Bank, all documents relating to the payment, use, or disbursement of such funds to subcontractors, suppliers, consultants, and designers and all documents relating to the estimated cost of completion ("Review and Investigation").

2.6     Upon completion of the Review and Investigation, and the resulting written report thereof, Anderson and Dynamite shall immediately pay to all Undisputed Amounts to the respective subcontractors and suppliers, providing evidence of such payments to the Acres. The remaining amount of the Subcontractor/Supplier Claims shall be placed (within 30 days after the Effective Date of this Agreement) by Dynamite and Anderson in a segregated bank account in the name of Dynamite, the identity of the account, bank, and amount being immediately provided to the Acres, and Dynamite will not use or disburse the funds in that account without the prior written consent of the Acres ("Mirabel Fund").

2.7     As to any unpaid subcontractors, suppliers, consultants, or designers involved in the construction of the Mirabel House, where their bills or invoices

have remained unpaid for 30 days or more and where there is no dispute over the work or services they have provided, Dynamite and Anderson shall immediately pay, from available construction loan funds and the Anderson Funding (as defined below), all such outstanding amounts, providing the Acres with evidence of payment and of the release of all liens asserted or assertable by the subcontractors, suppliers, consultants, or designers.

2.8     Provided that Dynamite timely complies with its obligations under this Agreement, the Acre Parties will not attempt to terminate Dynamite as the contractor for the Mirabel House. If for any reason a contractor other than Dynamite is required to complete the construction of the Mirabel House, the Acre Parties shall select and retain, after reasonable consultation with Anderson, a replacement contractor to complete construction of the Mirabel House, and Anderson and Dynamite shall fully cooperate with and provide all plans, specifications, drawings, documents, and other information relating to the Mirabel House to the Acres and the replacement contractor.

2.9     Because the remaining balance of the TierOne Loan is insufficient to complete construction of the Mirabel House, the costs to complete the construction and to pay the Subcontractor/Supplier Claims shall be funded as follows:

2.9.1     Starting no later than the first (1st) day of the calendar month to occur after the Effective Date, and on or before the first (1st) day of each calendar month thereafter, and subject to Section 2.9.4 below, Anderson shall pay to Acre the monthly interest payments due TierOne Bank on the TierOne Loan or that are due under the Replacement Loans until the sale of the Mirabel House has closed.

2.9.2     The Acres shall allow, with the consent of TierOne, the use of the any remaining balance of the TierOne Loan for completion of the construction and the payment of the Subcontractor/Supplier Claims, with Acre being required to approve all valid draw requests within 48 hours after being presented with appropriate supporting documents relating to the draw requests.

2.9.3     After any of the available funds from the TierOne Loan have been applied, then Anderson shall pay the next $114,000 of the Construction Costs for the completion of the construction of the Mirabel House, for the interest payments required by Section 2.9.1 above, and for the payment of the Subcontractor/Supplier Claims ("Anderson Funding").

2.9.4     Upon Anderson's full payment and application of the Anderson Funding as required by this Agreement,  (a) the Net Loan Due shall be deemed satisfied and paid in full; and (b) the Acres and Anderson shall thereafter be equally responsible for and shall timely pay the then remaining Construction Costs and the monthly payments to TierOne Bank or for the Replacement Loans.

2.9.5     Except as provided in Section 2.9.1, and after the Anderson Funding has been made and applied, the Acres and Anderson, on an equal

basis, shall pay and shall be responsible for any Carrying Costs related to Mirabel Lot 28 and the Mirabel House, until the Mirabel House is sold.

2.10   In no event shall any funds be paid to or retained by Dynamite as overhead or profit in regard to the Construction Contract or the Mirabel House, with all funds advanced by the Acre Parties, directly or through the TierOne Loan, being used solely by Dynamite for Construction Costs.

2.11   When the sale of the Mirabel House closes escrow, and provided that Anderson has fully and timely complied with his obligations under this Section 2, the outstanding balance of the TierOne Loan or the Replacement Loans shall be paid in full, then the closing costs and expenses, including real estate commissions, shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Mirabel Lot 28 and the Mirabel House. Thereafter, the balance of the net proceeds from the sale, if any, shall be distributed equally to Acre and Anderson within 10 days of closing ("Mirabel House Profits").  If there are no Mirabel House Profits, then Acre and Anderson shall bear equally the combined Losses that Acre and Anderson have incurred in regard to Mirabel Lot 28 and the Mirabel House, and Anderson shall immediately pay Acre for any Losses incurred by Acre in excess of Acre's share of the Losses.

2.12   Notwithstanding anything herein to the contrary, Anderson and Dynamite, at their sole cost and expense, shall jointly and severally indemnify and hold harmless the Acre Parties from any claims, liability, losses, costs, and damages of any subcontractor, supplier, consultant, and designer, including the Subcontractor/Supplier Claims, and monies sufficient to cover and satisfy all such claims (including the anticipated attorneys' fees and court costs of the respective claimants and of the Acre Parties) shall be retained, from any available net proceeds from the sale of the Mirabel House, by the Acre Parties and shall not be distributed to Anderson until all such claims are finally resolved.  After the settlement of all such claims, any remaining funds shall be distributed equally to MAP and Anderson.

## 3.   Mirabel Lot 138.

3.1   Anderson shall cause Wagner to close and acquire title to Mirabel Lot 138 under and pursuant to the Wagner Contract no later than 45 days following the Effective Date ("Wagner Closing Deadline"). If Wagner does not so close by the Wagner Closing Deadline, then Anderson shall cause the Wagner Contract to be cancelled, and all rights and claims of Wagner in and to Mirabel Lot 138 and under the Wagner Contract shall be relinquished and waived.

3.2   When and if the sale to Wagner under the Wagner Contract closes, the outstanding balance of the M&I Mirabel Loan shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Mirabel Lot 138. Thereafter, the balance of the net proceeds from the sale to Wagner, if any, shall be distributed solely to Acre ("Wagner Sale Profits").

3.3     If the sale to Wagner pursuant to the Wagner Contract does not close by Wagner Closing Deadline, Mirabel Lot 138 shall be co-listed with DPR Realty (Dominique Acre) and Mirabel Properties (Bob Lomax) at an initial listing price of $595,000; provided, however, DPR Realty and Dominique Acre shall not receive any commission from the sale of Mirabel Lot 138. Acre may market and sell Mirabel Lot 138 at prices determined by Acre after providing Notice & Opportunity to Anderson.

3.4     If a bona fide offer to purchase Mirabel Lot 138 is received from a bona fide third-party buyer at a cash purchase price of not less than $535,500, the Party, if any, refusing to sell Mirabel Lot 138 for that proposed purchase price shall thereafter pay and be responsible for all the Carrying Costs associated with Mirabel Lot 138, including the monthly payment due M&I Bank, until Mirabel Lot 138 is sold.

3.5     When any sale of Mirabel Lot 138 closes (other than to Wagner), the outstanding balance of the M&I Mirabel Loan shall be paid in full, then the closing costs and expenses, including real estate commissions, shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Mirabel Lot 138. Thereafter, the balance of the net proceeds from the sale, if any, shall be distributed equally to Acre and Anderson ("Mirabel Lot 138 Profits").  If there are no Mirabel Lot 138 Profits, then Acre and Anderson shall bear equally the combined Losses that Acre and Anderson have incurred in regard to Mirabel Lot 138, and Anderson shall immediately pay Acre for any Losses incurred by Acre in excess of Acre's share of the Losses.

3.6     Beginning on the first day of the calendar month following the Effective Date, and until the Mirabel Lot 138 is sold, Acre and Anderson, on an equal basis, shall be responsible for and shall pay the monthly interest payments to M & I Bank and other Carrying Costs relating to Mirabel Lot 138.

## 4.     **Apache Peak 148**.

4.1     Apache Peak shall initially be listed with DPR Realty (Dominique Acre) at a listing price of $895,000; provided, however, DPR Realty and Dominique Acre shall not receive any commission from the sale of Apache Peak. Acre may market and sell Apache Peak at prices determined by Acre after providing Notice & Opportunity to Anderson.

4.2     When the interest reserve under the M&I Apache Peak Loan has been fully drawn upon, and until Apache Peak is sold, Acre and Anderson, on an equal basis, shall be responsible for and shall pay the monthly interest payments to M & I Bank and other Carrying Costs relating to Apache Peak (including the Desert Mountain golf membership fees).

4.3     If a bona fide offer to purchase Apache Peak is received from a bona fide third party buyer at a cash purchase price not less than $805,500, the Party, if any, refusing to sell Apache Peak for that proposed purchase price shall thereafter pay

and be responsible for all of the Carrying Costs associated with Apache Peak, including the monthly payment due M&I Bank, until Apache Peak is sold.

4.4     When any sale of Apache Peak closes, the outstanding balance of the M&I Apache Peak Loan shall be paid in full, then the closing costs and expenses, including real estate commissions, shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Apache Peak. Thereafter, the balance of the net proceeds from the sale, if any, shall be distributed equally to Acre and Anderson ("Apache Peak Profits"). If there are no Apache Peak Profits, then Acre and Anderson shall bear equally the combined Losses that Acre and Anderson have incurred in regard to Apache Peak, and Anderson shall immediately pay Acre for any Losses incurred by Acre that are in excess of Acre's share of the Losses.

4.5     If the Acre Parties obtain a buyer for Apache Peak, Anderson shall immediately deliver to Acre the plans and scale model for the residence that was designed to be constructed on Apache Peak, which shall become solely the property of buyer at closing and for which Anderson shall not be entitled to any compensation or reimbursement of any kind. If the sale to the buyer does not close, then Acre shall return the plans and scale model to Anderson.

5.     **Hideaway 7/8C**.

5.1     Hideaway shall initially be listed with Hideaway Properties (Bob Ravis) at a listing price of $1,075,000. Acre may market and sell Hideaway at prices determined by Acre after providing Notice & Opportunity to Anderson.

5.2     When the interest reserve under the Indymac Loan has been fully drawn upon, and until Hideaway is sold, Acre and Anderson, on an equal basis, shall be responsible for and shall pay the monthly interest payments to Indymac Bank and other Carrying Costs relating to Hideaway (except for the Hideaway golf membership fees, which shall be paid by Acre).

5.3     If a bona fide offer to purchase Hideaway is received from a bona fide third-party buyer at a cash purchase price of not less than $967,500, the Party, if any, refusing to sell Hideaway for that proposed purchase price shall thereafter pay and be responsible for all of the Carrying Costs associated with Hideaway, including the monthly payment due Indymac Bank, until Hideaway is sold.

5.4     When any sale of Hideaway closes, the outstanding balance of the Indymac Loan shall be paid in full, then the closing costs and expenses, including real estate commissions, shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Hideaway. Thereafter, the balance of the net proceeds from the sale, if any, shall be distributed equally to Acre and Anderson ("Hideaway Profits").  If there are no Hideaway Profits, then Acre and Anderson shall bear equally the combined Losses that Acre and Anderson have incurred in regard to Hideaway, and Anderson shall immediately pay Acre for any Losses incurred by Acre that are in excess of Acre's share of the Losses.

5.5     Upon the sale of Hideaway, the Acre Parties shall be entitled to retain and/or sell the golf course membership at the Hideaway Golf Club; if sold, the Acre Parties shall solely be entitled to and shall retain all proceeds.  The fees paid by the Acre Parties and relating to said golf membership shall not be included in Carrying Costs.

6.     **Lexington on Broadway.**

6.1     Anderson (or an Anderson affiliate) shall have a right to purchase Lexington from MAP on the following exclusive terms:

6.1.1  By either (a) the assumption of the Traditional Loan, with the Acre Parties being fully novated and released as to any obligations under the Traditional Loan, or (b) the refinancing and satisfaction of the Traditional Loan; and

6.1.2  By the reimbursement of MAP for any and all of its Carrying Costs relating to Lexington ("MAP Carrying Costs"); and

6.1.3  By payment of $100,000 to MAP.

6.2     The MAP Carrying Costs shall include all Carrying Costs paid and incurred by the Acre Parties and relating to Lexington, but shall not include any funds which the Acre Parties have received from Kerry Woodson ("Woodson").

6.3     The escrow for the purchase by Anderson (or his affiliate) on the foregoing terms shall be opened within 30 days of the Effective Date, with an earnest money deposit of at least $25,000 ("Deposit"), and escrow must close no later than 90 days from the Effective Date.

6.4     In the event that Anderson (or his affiliate) fails to timely open or close escrow in accordance with the foregoing terms, (a) Anderson (and his affiliate entity) shall forfeit, without further notice, any right to purchase Lexington, and (b) MAP may market and sell Lexington at prices determined by MAP after providing Notice & Opportunity to Anderson.

6.5     Following a forfeiture of Anderson's right to purchase Lexington pursuant to Section 6.4 above, (1) MAP and Anderson shall be equally responsible for and shall pay the monthly interest payments to Traditional Bank and other accruing expenses, costs, assessments, and taxes relating to Lexington, and  (2) when any sale of Lexington closes, the outstanding balance of the Traditional Loan shall be paid in full, then the closing costs and expenses, including real estate commissions, shall be paid in full, and then Acre and Anderson shall be reimbursed for their respective Carrying Costs relating to Lexington. Thereafter, the balance of the net proceeds from the sale, if any, shall be distributed 33.33% to Acre, 33.33% to Woodson, and 33.34% to Anderson ("Lexington Profits").  If there are no Lexington Profits, then Acre and Anderson shall bear the combined Losses that Acre and Anderson have incurred in regard to Lexington

in accordance with the same percentages as the Lexington Profits, and Anderson shall immediately pay Acre for any Losses incurred by Acre that are in excess of Acre's share of the Losses.

6.6     Notwithstanding anything herein to the contrary, Anderson, at his sole cost and expense, shall indemnify and hold harmless the Acre Parties from any claims, liability, losses, costs, and damages of Woodson arising under or relating to Lexington.

**7.      Forfeiture for Non-Payment of Obligations**.  In the event that either the Acre Parties or Anderson fails to timely make any payments as required by this Agreement and the other Party makes those payments, then if the non-paying Party fails to reimburse and pay the paying Party for any of those payments within 30 days following written notice thereof, the non-paying Party's share of the net profits from the respective Parcel shall be permanently reduced from fifty percent (50%) to ten percent (10%) as to all Parcels except Lexington; as to Lexington, the net profits payable to MAP (if it is the non-performing Party) shall be permanently reduced from 33.33% to 6.7%, and the net profits payable to Anderson (if he is the non-performing party) shall be permanently reduced from 33.4% to 6.7%

**8.      Earnest Money Refund**. No later than 10 days following the Effective Date, Anderson shall pay to Acre the sum of $2,500, in the form of a cashier's check or wire transfer, as and for fifty percent (50%) of the Refund.

**9.      Horses**. No later than June 1, 2007, Anderson shall pay Acre the sum of $25,000 in order to acquire all of Acre's interest in the Horses.  Anderson shall be responsible for all costs and expenses and shall be entitled to all winnings relating to the Horses.

**10.     Releases**.

10.1     Effective upon receipt of the Refund Payments, and except with respect to (a) the Net Loan Due and (b) the rights and obligations arising under this Agreement, the Acre Parties (and each of their respective affiliates, successors, and assigns) release and forever discharge Anderson and his respective affiliates, parents, subsidiaries, successors, assigns, employees, agents, attorneys, officers, directors, members, partners, shareholders, beneficiaries, trustees, fiduciaries, and administrators ("Anderson Released Parties"), from any and all claims, liens, demands, obligations, actions, causes of action, counts, damages, liabilities, losses, fees, costs, or expenses, of any nature whatsoever, whether based in or on tort, contract, statutory, administrative, or other legal theory of recovery, and whether for compensatory (both general and specific), extra-contractual, punitive (or exemplary), statutory or other form of damages or legal relief of any nature whatsoever, known or unknown, ascertained or not ascertained, suspected or unsuspected, existing or claimed to exist, arising out of or in any way related to the Parcels, the Horses, the Bar, and the Refund. Notwithstanding anything herein to the contrary, Dynamite shall not be released from any of its duties and obligations under the Construction Contract.

10.2     Except with respect to the rights and obligations arising under this Agreement, Anderson and Dynamite (and each of its respective affiliates, successors, and assigns) release and forever discharge the Acre Parties and Woodson, along with and their respective affiliates, parents, subsidiaries, successors, assigns, employees, agents, attorneys, officers, directors, members, partners, shareholders, beneficiaries, trustees, fiduciaries, and administrators ("Acre Released Parties"), from any and all claims, liens, demands, obligations, actions, causes of action, counts, damages, liabilities, losses, fees, costs, or expenses, of any nature whatsoever, whether based in or on tort, contract, statutory, administrative, or other legal theory of recovery, and whether for compensatory (both general and specific), extra-contractual, punitive (or exemplary), statutory or other form of damages or legal relief of any nature whatsoever, known or unknown, ascertained or not ascertained, suspected or unsuspected, existing or claimed to exist, arising out of or in any way related to the Parcels, the Horses, the Bar, and the Refund.

## 11.    Disputes.

11. 1  Any and all disputes and/or claims arising under or related to this Agreement shall be first submitted to mediation before a single mediator selected by the Parties. The mediation shall be commenced by written demand upon the other Party for mediation. If the Parties cannot agree upon a mediator within ten (10) days of the written demand, the American Arbitration Association ("AAA") shall select the mediator. The mediation shall occur within thirty (30) days of the written demand for mediation, unless all of the Parties agree, in writing, to a longer period of time.

11. 2   The Parties shall submit any dispute and/or claim, not resolved through mediation pursuant to Section 11.1 above, to be resolved through binding arbitration conducted according to the then current Construction Industry Arbitration Rules of the AAA, but not administered or conducted by the AAA, which arbitration shall be held in Phoenix, Arizona, utilizing a single arbitrator selected by the Parties, unless the Parties agree, in writing, to an alternative arbitration procedure. If the Parties cannot agree on a single arbitrator, the arbitrator shall be selected according to the AAA rules. In relation to claims in which the amount in controversy is less than $100,000, no discovery other than exchange of documents, designation of witnesses and detailed disclosure of claims and defenses (including specifically a detailed basis for calculating all claims), and no more than 3 depositions and 1 expert per side, shall be allowed, subject to disclosure of such other information as approved by the arbitrator. Otherwise, discovery shall be allowed and/or limited as decided by the arbitrator. The award entered by the arbitrator shall be final and judgment may be entered thereon in the Superior Court of Arizona, Maricopa County. The prevailing party in any arbitration or court proceeding under this Agreement shall be entitled to an award of its attorneys' fees, costs, and expenses (including expert witness fees) incurred.

## 12.    Additional Documents. The Parties shall execute any and all necessary documents to effectuate and carry out the intent of this Agreement.

13.    **Third-Party Beneficiaries**.  The Acre Parties, Woodson, Anderson, and Dynamite, including their affiliates, successors, and assigns, are intended beneficiaries and third-party beneficiaries to and of this Agreement.

14.    **Representations and Warranties**.   Each Party to this Agreement represents, warrants, and covenants to the other as follows, all of which are true and correct as of the Effective Date and shall survive the Effective Date:

14.1.  Each Party has taken and will take all necessary action to authorize the execution, delivery, and performance of this Agreement and all of the transactions and actions contemplated hereby, and the signatories for the warranting Party hereto have the requisite authority to execute, deliver, and perform this Agreement and all the transactions and actions contemplated hereby.

14.2.  There are no actions, suits, or proceedings pending against the warranting Party in any court or by or before any governmental agency or instrumentality and there are no existing judgments, orders, or other restraints, which would materially affect the ability of the warranting Party to carry out the transactions contemplated by this Agreement.

14.3.  Each of the Parties is the owner and holder of the claims, rights, interests, and causes of action set forth herein and has not assigned, transferred, or encumbered those claims, rights, interests, and causes of action.

14.4.  Anderson represents and warrants to the Acre Parties that Anderson's spouse has no right, title, claim, or interest in any the Parcels, in Dynamite, in the Horses, or in matter referenced in this Agreement.

15.    **Notices and Change of Address**.  All notices, requests, demands, and other communications required, permitted, or to be made under this Agreement shall be in writing and shall be delivered either by (a) hand, (b) facsimile, (c) electronic mail, (d) deposit with the United States Postal Service, postage prepaid, or (e) delivery by courier or personal delivery, addressed as follows:

If to Anderson and Dynamite:    Paxton J. Anderson
223 West Desert Flower Lane
Phoenix AZ  85045
Fax:
E-mail: paxton@dynamitecustomhomes.com

with copy to:    David C. Tierney
Sacks Tierney P.A.
4250 North Drinkwater Blvd., Fourth Floor
Scottsdale AZ 85251-3647
Fax: 480.425.4920
E-mail: tierney@sakstierney.com

If to MAP and Acre:                    Mark Acre
                                       1588 West Yosemite Place
                                       Chandler AZ 85248
                                       Fax: 480.855.8602
                                       E-mail: markacreproperties@cox.net

with copy to:                          Richard Friedlander
                                       Mariscal, Weeks, McIntyre & Friedlander, P.A.
                                       2901 North Central Avenue, Suite 200
                                       Phoenix AZ 85012
                                       Fax: 602.285.5100
                                       E-mail: richard.friedlander@mwmf.com

All notices shall be deemed delivered two (2) business days after deposit with the United States Postal Service, or if delivered by hand, facsimile, electronic mail, or courier or personal delivery, then notice is deemed delivered upon the date and time of actual receipt or of the refusal of delivery by the Party to whom it is given or any of its representatives, agents, or employees. Any Party or its counsel may alter its address or addresses to which communications or copies are to be sent by giving written notice of such change of address in conformity with the provisions of this Paragraph for the giving of notice.

**16.** **Attorneys' Fees**. Should any proceedings (including arbitration proceedings) or litigation be commenced between the Parties concerning the terms of this Agreement or the rights and duties of the Parties hereto, the prevailing party in such proceeding or litigation shall be entitled, in addition to such other relief as may be granted, to payment of all of its costs, expenses (including, but not limited to, expert fees), and reasonable attorneys' fees incurred in connection therewith. Notwithstanding anything herein to the contrary, the attorneys' fees and costs incurred by each or any of the Parties as of the Effective Date shall not be recoverable or collectible from the other Parties and shall not constitute any portion of the Carrying Costs.

**17.** **Controlling Law**. This Agreement and all questions relating to its validity, interpretation, performance, and inducement shall be governed by and construed, interpreted, and enforced in accordance with the substantive laws of the State of Arizona (exclusive of its laws governing conflict of laws).

**18.** **Choice of Forum.** Any action involving or arising from this Agreement shall be commenced and maintained in the Superior Court of Arizona, County of Maricopa.

**19.** **Indulgences Not Waivers**. No failure or delay on the part of a Party to exercise any right, remedy, power, or privilege under this Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or

privilege under this Agreement operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege under this Agreement preclude any other or further exercise thereof or any other right, remedy, power, or privilege.

20.    **Modifications**.   This Agreement may not be amended or modified in whole or in part or any right or condition hereunder waived, except by written instrument signed by all of the Parties.

21.    **Construction**.   The terms of this Agreement were reached between the Parties represented by legal counsel.   Because the Parties have each reviewed the terms of this Agreement and have relied upon the advice of their respective attorneys as to its terms and provisions, the Agreement shall not be construed or interpreted against the drafter, but shall be given its plain meaning.

22.    **Binding Effect**.   This Agreement and all of its terms, including the releases set forth in Section 10 above, shall inure to the benefit of and shall bind the successors and assigns of the Parties.

23.    **Entire Agreement**.   This Agreement contains the entire agreement between the Parties relating to the transactions contemplated hereby, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged and fully integrated into this Agreement.   The Parties acknowledge and declare that this Agreement is entered into in good faith, for no collusive purpose, and the terms hereof are contractual and not mere recitals.

24.    **Additional Instruments and Acts**.   The Parties agree to execute such other documents and to take such other actions as may reasonably be necessary to further the purpose of this Agreement.

25.    **Time Is of the Essence**.   Time is of the essence for this Agreement and each term and provision thereof.

26.    **Miscellaneous**.

26.1   The headings used in this Agreement are used for administrative purposes only and do not constitute substantive matter to be considered in construing the terms of this Agreement.

26.2   Words used herein, regardless of the number and gender specifically used, shall be deemed or construed to include any other number, singular or plural, or other gender, masculine, feminine, or neuter, as the context requires; the words "including," "includes," and "include" shall mean without limitation by reason of enumeration.

26.3   "Affiliate" or "affiliates" as used in this Agreement shall have the same meaning as set forth in 11 U.S.C. § 101(2).

26.4    "Carrying Costs" as used in this Agreement shall mean all costs and expenses relating to the Parcels, including down payments, loan fees and costs, closing costs, broker's and real estate commissions, property taxes and assessments, interest and principal payments, owner association dues and charges, insurance premiums, maintenance expenses, and the costs relating to zoning, design, and permits; provided, however, "Carrying Costs" shall not include any costs and expenses that have been reimbursed to the respective Parties by loan proceeds from the Secured Loans described in Recital G.

26.5    "Effective Date" as used in this Agreement shall be the last date that this Agreement is signed below by the signatories.

26.6    "Losses" as used in this Agreement shall be calculated by deducting the actual sale price of any Parcel from the (a) the outstanding balance at the time of the sale closing of any loan secured by the Parcel, and (b) the closing costs and expenses, including broker's and real estate commissions, relating to the sale of the Parcel, and (c) the combined Carrying Costs of the Parties relating to the Parcel.

26.7    "Notice & Opportunity" as used in this Agreement shall mean seven (7) days written notice to Anderson regarding the proposed listing price, listing agent, marketing, or sale price and terms of any of the Parcels by the Acre Parties, during which time Anderson may provide to the Acre Parties his objection in writing (providing specific support for his objection) to any proposed listing price, listing agent, marketing, or sale price and terms of the respective Parcel or Parcels by the Acre Parties; if Anderson fails to so object within said 7-day time period, Anderson will be deemed to have irrevocably consented to the proposed listing price, listing agent, marketing, or sale price and terms of the relevant Parcel or Parcels by the Acre Parties; and if Anderson does so object within said 7-day time period, Anderson will not be deemed to have irrevocably consented to the proposed listing price, listing agent, marketing, or sale price and terms of the relevant Parcel or Parcels by the Acre Parties

27.    **Remedies**.  If Anderson or the Acre Parties fail to comply with their various and respective financial obligations described in this Agreement, each of the non-defaulting Parties shall have all remedies at law and equity to enforce and collect amounts that the defaulting Party or Parties has failed to pay or perform, and the non-defaulting Parties shall be entitled to offset and recoup and to charge the defaulting Party or Parties for all such obligations from and against the proceeds of the sale of any of the Parcels, including any amounts that the defaulting Party or Parties (such as the reimbursement of their respective Carrying Costs) would otherwise be entitled to receive under this Agreement. Under no circumstances may Anderson, Dynamite, or anyone claiming by or through them have any right to assert, claim, file, or record a lien, encumbrance, notice, or other interest of any kind or nature in or to any of the Parcels, and any such claim, filing, or recording shall be null and void.

28.    **Counterparts and Facsimile**.    To facilitate execution, this Agreement may be executed as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgement of, or on behalf of,

each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart.  All counterparts shall collectively constitute a single instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures and acknowledgement of or on behalf of, each of the parties hereto.  Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto.  A facsimile copy shall be deemed to be an original.

Executed by the Parties as of the respective dates set forth below.

*[signatures appear on next pages]*

**MAP**:

Mark Acre Properties, LLC

DATE: 3/9/07

By: _____
Mark Acre
Its: Member

**Acre**:

DATE: 3/9/07

_____
Mark Acre

**Acres**:

DATE: 3/9/07

_____
Mark Acre

_____
Dominique Acre

**Dynamite:**

DATE: _3 - 8 - 07_

Dynamite Custom Homes, LLC

By: _____
Name: _____
Its: President

**Anderson:**

DATE: _3 - 8 - 07_

_____
Paxton Anderson

**ACKNOWLEDGED**:

_____
Richard Friedlander
Attorney for Acre Parties

_____
David Tierney
Attorney for Anderson and Dynamite

U:\ATTORNEYS\WN\Acre\Settlement Agreement v8.doc

# EXHIBIT A

## To the Settlement Agreement Between
## MARK ACRE, ACRE PARTIES, PAXTON ANDERSON and
## DYNAMITE CUSTOM HOMES LLC
### (*See* Recital F)

The "Carrying Costs" invested in the Projects (and not reimbursed by any secured loans on the Projects) by Dynamite Custom Homes LLC and Paxton Anderson through February 28, 2007, are as follows:

| | | |
|---|---|---|
| 1. | Lot 28 Mirabel | $-0- [1] |
| 2. | Lot 138 Mirabel | $89,100 |
| 3. | Lot 148 Apache Peak | $-0- [2] |
| 4. | Lot 7/8 C Hideaway | $83,050 |
| 5. | Lexington on Broadway | $67,730 |

This **Exhibit A** to the foregoing Settlement Agreement has been reviewed by Mark Acre and professional(s) of his selection. Acre and his professionals have had access to the Dynamite Custom Homes' records and files relating to the Projects listed in the foregoing Settlement Agreement. By signing below, Mark Acre for the Acre Parties indicates that he has agreed that the above figures represent the Dynamite/Anderson "Carrying Costs" referred to in Recital paragraph F of the Settlement Agreement and other paragraphs, and as defined in the Settlement Agreement. Mark Acre, individually and on behalf of the Acre Parties, waives any rights to later challenge the foregoing amounts (just as Anderson and Dynamite have waived their rights to challenge the Acre Parties' "Carrying Costs" set forth in the Settlement Agreement). The Acre Parties/Acre understand that Dynamite/Anderson have relied upon that waiver in executing the Settlement Agreement.

---

[1]  Acre / Acre Parties agree that the sum of $609,000 has been properly spent (from loan proceeds) on this property through February 28, 2007.
[2]  Likewise, Acre / Acre Parties agree that the sum of $97,840 has been properly spent (from loan proceeds) on this property through February 28, 2007.

# EXHIBIT B

To the Settlement Agreement Between
MARK ACRE, ACRE PARTIES, PAXTON ANDERSON and
DYNAMITE CUSTOM HOMES LLC
(*See* Recital K)

Payments due to or claimed by Subcontractors and suppliers for Mirabel 28 House Construction:

|  |  |
|---|---|
| Roofing Subcontractors (payment <u>has</u> been settled and will be paid by Dynamite on March 9, 2007: | $26,400 |
| Electrical (disputed) | $21,000 |
| Fireplace (disputed) | $2,480 |
| Stucco (undisputed; to be paid by Dynamite upon completion) | $10,000 |
| Drywall (undisputed; to be paid by Dynamite upon completion) | $10,000 |
| Pool (undisputed; to be paid by Dynamite upon completion) | $3,000 |

Received by:

_____
Mark Acre

Dated this ___9th___ day of March, 2007

## FIRST SUPPLEMENT TO SETTLEMENT AGREEMENT

THIS FIRST SUPPLEMENT TO SETTLEMENT AGREEMENT ("Supplement") is entered into by and among the following parties (collectively "Parties" and individually "Party") and supplements and amends that Settlement Agreement dated effective as of March 9, 2007 ("Original Agreement"), a copy of which is attached hereto as **Exhibit A** and made a part hereof:

| | |
|---|---|
| MAP: | Mark Acre Properties, L.L.C., an Arizona limited liability company |
| Acre: | Mark Acre |
| Acres: | Mark Acre and Dominique Acre, husband and wife |
| Acre Parties: | MAP, Acre, and the Acres (collectively) |
| Anderson: | Paxton J. Anderson, a married man dealing with his sole and separate property |
| Dynamite: | Dynamite Custom Homes, LLC, an Arizona limited liability company |

### RECITALS

A.      All of the terms and conditions of the Original Agreement are incorporated herein as if fully set forth here. All defined terms in the Original Agreement shall have the same meanings in this Supplement. The effective date of this Supplement is the date that the last Party executes this Supplement.

B.      Since the Effective Date of the Original Agreement, the Acre Parties have sold Mirabel Lot 138 and Hideaway. The M&I Mirabel Loan and the Indymac Loan were paid in full from the proceeds of those sales or by advances made by the Acre Parties.

C.      Following the sale of Mirabel Lot 138 and Hideaway, the Acre Parties provided an accounting to and demand upon Anderson dated June 12, 2007, in the form of **Exhibit B** hereto and relating to net amounts allegedly due and owing to the Acre Parties by Anderson under the Original Agreement ("Accounting & Demand"), which Anderson disputes and has not paid.  Anderson has claimed that amounts are due to him from the Acre Parties and that the Acre Parties dispute that claim and will not pay any amount to Anderson.

D.      One or more of the Acre Parties remain the record owners of the following Parcels: Mirabel 28 (including the Mirabel House), Apache Peak, and Lexington.

Acre                                Dynamite          Anderson

Page 1 of 11

ANDERSON DISCLOSURE 000012

E.    The construction of the Mirabel House has not been completed.

F.    The Parties understand and acknowledge that the terms of this Supplement are binding upon each of the Parties and their respective successors and assigns.

G.    The Parties are voluntarily entering into this Supplement upon the understanding that, and with the intention and understanding of disposing of, any and all disputes between them concerning the matters described in this Supplement shall be fully and finally concluded.

H.    The Parties understand that this Supplement is a compromise of various disputes and is entered into in order to avoid the expense, inconvenience, and uncertainty of litigation. Each Party represents and acknowledges that it has read this Supplement thoroughly and has had an opportunity to have this Supplement fully explained by its legal counsel.

## COVENANTS

In consideration of the mutual promises, recitals, covenants, and conditions contained herein, and for other good and valuable consideration, and expressly intending to be legally bound hereby, the Parties to this Supplement agree as follows:

1.    **Recitals.**    The foregoing Recitals are incorporated as a part of the Covenants of this Supplement, and the Parties ratify, stipulate, and agree to and warrant the truth of all that is contained in the Recitals.

2.    **Mirabel Lot 28 and Mirabel House.**  Effective upon the timely occurrence of all Contingent Events:

A.    Anderson releases, waives, and relinquishes any right, title, claim, or interest in or to Mirabel Lot 28 and Mirabel House, the Mirabel Lot 28 and Mirabel House Profits or losses; and

B.    All interests of Anderson in and to Mirabel Lot 28 and Mirabel House shall be deemed conveyed and transferred to MAP.

C.    Anderson shall have no further liabilities related to Mirabel Lot 28 and Mirabel House.

D.    Anderson and Dynamite will transfer and deliver to the Acre Parties all rights to any plans relating to the Mirabel Lot 28 and the Mirabel House, but Anderson makes no representations or warranties related thereto.

_____
Acre

_____
Dynamite

_____
Anderson

Page 2 of 11

ANDERSON DISCLOSURE 000013

    **3.**    **Apache Peak 148.**  Effective upon the timely occurrence of all Contingent Events:

    A.    Anderson releases, waives, and relinquishes any right, title, claim, or interest in or to Apache Peak, the Apache Peak Profits or losses.

    B.    All interests of Anderson in and to Apache Peak shall be deemed conveyed and transferred to MAP.

    C.    Anderson shall have no further liabilities related to Apache Peak.

    D.    Anderson and Dynamite will transfer and deliver to the Acre Parties all rights to plans relating to Apache Peak, but Anderson makes no representations or warranties related thereto.

    **4.**    **Lexington.**

    A.    Anderson shall cause an investor, nominee, or buyer selected by Anderson ("Buyer") to acquire from the Acre Parties, and close on the purchase of the Lexington Property ("Closing"). The Lexington Property is to be purchased by the Buyer at a price of approximately $2,300,000.00. Within ten (10) business days after the Planning Commission's written approval of the zoning change, Buyer will deposit with the Traditional Bank an Escrow Deposit of $30,000.00. Within seven (7) business days of the execution of this Agreement by all parties, the Dynamite Parties will provide Acre with a written Purchase Agreement from the Buyer.

    B.    This Buyer shall acquire the Lexington property within thirty (30) days from the final granting and recording of the MU-2 zoning change to B2A (now underway), or by November 15, 2008, whichever is later, at the Buyer's sole discretion (hereafter "the Lexington Deadline").

    C.    Upon the signing of this First Supplement to Settlement Agreement, the Acre Parties will provide Anderson with the last available loan pay-off statement from Traditional Bank.

    D.    The Lexington property will be transferred by Quit Claim Deed on an "as is," "where as" basis, with no warranties of any kind, expressed or implied, or on some other basis as may be required by Buyer or Buyer's lender.

    E.    At and upon the sale of the Lexington Property, Anderson shall receive from escrow any portion of the Purchase Price which is over and above $1,550,000 ("Acre Proceeds"). Acre will sign an Irrevocable Assignment of Funds, assigning all monies over and above Acre Proceeds ($1,550,000) of the Escrow proceeds to Anderson, within five (5) days of receiving the Purchase Agreement. In no

ANDERSON DISCLOSURE 000014

event shall the Acre Proceeds be less than $1,550,000.  The Acre Proceeds shall be used by the Acre Parties to pay or reimburse the following encumbrances:

    (1)  Traditional Bank Loan Pay-off (estimated to be $1,200,000);

    (2)  Acre Parties out-of-pocket expenses (estimated to be $272,000);

    (3)  Woodson out-of-pocket expenses (estimated to be $210,000);

    (4)  Additional Traditional Bank monthly payments at $7,750 per month plus late fees beyond September 25, 2008;

    (5)  City of Lexington Property Taxes (estimated to be $30,000);

    (6)  Closing Costs and Fees (estimated to be $5,000);

    (7)  City of Lexington Lien for building upkeep fines for Popeye Sign Co. building (estimated to be $10,000); and,

    (8)  All other expenses (including additional insurance coverage, advertising expenses; estimated to be $5,000).

    F.    Anderson will be responsible only for and shall pay at closing all sums due to CMW, Inc. and shall cause any lien or claim of lien by CMW, Inc. to be released from the Lexington Property.

    G.    If, due to the actions of Anderson, the Closing does not occur on or before the Lexington Deadline and in accordance with the foregoing terms, including the payments and release to or in favor of the Acre Parties, as described above in Sections 4(A), (B), (D), and (E) (collectively "Contingent Events"), then this Supplement shall be of no further force or effect, and the Parties shall return to their respective positions under the Original Agreement as if this Supplement had never been entered into by the Parties.

    **5.**    **Releases.**

    A.    Effective upon Anderson's compliance with the requirements set forth above, and except with respect to the rights and obligations arising under this Supplement, the Acre Parties (and each of their respective affiliates, successors, and assigns) release and forever discharge Anderson, Dynamite, and their respective affiliates, parents, subsidiaries, successors, assigns, employees, agents, attorneys, officers, directors, members, partners, shareholders, beneficiaries, trustees, fiduciaries, and administrators ("Anderson Released Parties"), from any and all claims, liens, demands, obligations, actions, causes of action, counts, damages, liabilities, losses, fees, costs, or expenses, of any nature whatsoever, whether based in or on tort,

Acre

Dynamite

Anderson

Page 4 of 11

ANDERSON DISCLOSURE 000015

contract, statutory, administrative, or other legal theory of recovery, and whether for compensatory (both general and specific), extra-contractual, punitive (or exemplary), statutory or other form of damages or legal relief of any nature whatsoever, known or unknown, ascertained or not ascertained, suspected or unsuspected, existing or claimed to exist, against the Anderson Released Parties, including, without limitation, arising out of or in any way related to the Parcels, the Horses, the Bar, the Refund, the Construction Contract, the Carrying Costs, and the Accounting & Demand.

B.    Effective upon the timely occurrence of all Contingent Events, and except with respect to the rights and obligations arising under this Supplement, Anderson and Dynamite (and each of its respective affiliates, successors, and assigns) release and forever discharge the Acre Parties, along with and their respective affiliates, parents, subsidiaries, successors, assigns, employees, agents, attorneys, officers, directors, members, partners, shareholders, beneficiaries, trustees, fiduciaries, and administrators ("Acre Released Parties"), from any and all claims, liens, demands, obligations, actions, causes of action, counts, damages, liabilities, losses, fees, costs, or expenses, of any nature whatsoever, whether based in or on tort, contract, statutory, administrative, or other legal theory of recovery, and whether for compensatory (both general and specific), extra-contractual, punitive (or exemplary), statutory or other form of damages or legal relief of any nature whatsoever, known or unknown, ascertained or not ascertained, suspected or unsuspected, existing or claimed to exist, against the Acre Released Parties, including, without limitation, arising out of or in any way related to the Parcels, the Horses, the Bar, the Refund, the Construction Contract, the Carrying Costs, and the Accounting & Demand.

6.    **Disputes.**

A.    Any and all disputes and/or claims arising under or related to this Supplement shall be first submitted to mediation before a single mediator selected by the Parties. The mediation shall be commenced by written demand upon the other Party for mediation. If the Parties cannot agree upon a mediator within ten (10) days of the written demand, the American Arbitration Association ("AAA") shall select the mediator. The mediation shall occur within thirty (30) days of the written demand for mediation, unless all of the Parties agree, in writing, to a longer period of time.

B.    The Parties shall submit any dispute and/or claim, not resolved through mediation pursuant to Section 5(A) above, to be resolved through binding arbitration conducted according to the then current Construction Industry Arbitration Rules of the AAA, but not administrated or conducted by the AAA, which arbitration shall be held in Phoenix, Arizona, utilizing a single arbitrator selected by the Parties, unless the Parties agree, in writing, to an alternative arbitration procedure. If the Parties cannot agree on a single arbitrator, the arbitrator shall be selected according to the AAA rules. In relation to claims in which the amount in controversy is less than $100,000, no discovery other than exchange of documents, designation of witnesses and detailed

Acre

Dynamite                    Anderson

Page 5 of 11

ANDERSON DISCLOSURE 000016

disclosure of claims and defenses (including specifically a detailed basis for calculating all claims), and no more than 3 depositions and 1 expert per side, shall be allowed, subject to disclosure of such other information as approved by the arbitrator. Otherwise, discovery shall be allowed and/or limited as decided by the arbitrator. The award entered by the arbitrator shall be final and judgment may be entered thereon in the Superior Court of Arizona, Maricopa County. The prevailing party in any arbitration or court proceeding under this Supplement shall be entitled to an award of its attorneys' fees, costs, and expenses (including expert witness fees) incurred.

     7.    **Third-Party Beneficiaries.** The Acre Parties, the Acre Released Parties, Anderson, Dynamite, and the Anderson Released Parties are intended beneficiaries and third-party beneficiaries to and of this Supplement.

     8.    **Representations and Warranties.** Each Party to this Supplement represents, warrants, and covenants to the other as follows, all of which are true and correct as of the execution of this Supplement and shall survive that date:

     A.    Each Party has taken and will take all necessary action to authorize the execution, delivery, and performance of this Supplement and all of the transactions and actions contemplated hereby, and the signatories for the warranting Party hereto have the requisite authority to execute, deliver, and perform this Supplement and all the transactions and actions contemplated hereby.

     B.    There are no actions, suits, or proceedings pending against the warranting Party in any court or by or before any governmental agency or instrumentality and there are no existing judgments, orders, or other restraints, which would materially affect the ability of the warranting Party to carry out the transactions contemplated by this Supplement.

     C.    Each of the Parties is the owner and holder of the claims, rights, interests, and causes of action set forth herein and has not assigned, transferred, or encumbered those claims, rights, interests, and causes of action.

     D.    Anderson represents and warrants to the Acre Parties that Anderson's spouse has no right, title, claim, or interest in any the Parcels or in matter referenced in this Supplement.

     E.    Under no circumstances may Anderson, Dynamite, or anyone claiming by or through them have any right to assert, claim, file, or record a lien, encumbrance, notice, or other interest of any kind or nature in or to any of the Parcels, and any such claim, filing, or recording shall be null and void.

///

_Acre_

_Dynamite_    _Anderson_

Page 6 of 11

ANDERSON DISCLOSURE 000017

9.  **Confidentiality; No Admission of Liability; Non-Disparagement.**

A.    All parties to this First Supplement to Settlement Agreement understand and agree that the terms and conditions of this Supplement shall be kept strictly confidential by and between the Parties, and that none of the Parties or their attorneys, representatives, or agents shall disclose the terms and conditions of this Supplement to any person or entity not a party to this Supplement, (i) except upon the prior written consent of all Parties, and then only in a manner so as to preserve confidentiality, and (ii) except as otherwise authorized or permitted in this Section 8. These confidentiality provision shall not be construed to prevent any party from revealing the terms of this Supplement to the extent: (iii) necessary to enforce the terms of this Supplement; (iv) requested by any financing sources, including any of the lenders described in the Original Agreement; and (v) after written notice to all of the Parties and their counsel, to comply with the order of any court of competent jurisdiction, or any other governmental agency with authority to compel production; provided, however, in the event that any party receives a subpoena or other legal demand for the production of this Supplement, all of the Parties shall be given an opportunity to object to or to move to quash the subpoena.

B.    This First Supplement to Settlement Agreement is a compromise of each and all disputed claims among the Parties, whether now known or unknown, whether now asserted or unasserted, whether arising at law, in equity or otherwise, whether sounding in tort, contract or otherwise, and neither the execution of, nor compliance with the terms of this Settlement Agreement shall be used, construed, or interpreted as an admission of liability or that any agent, employee, or former employee of the Parties violated any statute, law, or regulation, or engaged in the conduct alleged by the other.

C.    Effective upon and following the occurrence of the Contingent Events, the Parties shall not make any public disparaging statements concerning any of the other Parties or their businesses or operations; provided, however, the foregoing shall not in any way restrict or prevent any of the Parties from making statements or disclosing any and all information about any of the other Parties to the extent permitted by Section 9 (A), (B) and (C) above.

10.   **Notices and Change of Address.** All notices, requests, demands, and other communications required, permitted, or to be made under this Supplement shall be in writing and shall be delivered either by (a) hand, (b) facsimile, (c) electronic mail, (d) deposit with the United States Postal Service, postage prepaid, or (e) delivery by courier or personal delivery, addressed as follows:

/ / /

/ / /

Acre

Dynamite          Anderson

Page 7 of 11

ANDERSON DISCLOSURE 000018

| If to Anderson and Dynamite: | Paxton J. Anderson<br>c/o David C. Tierney, Esq.<br>Sacks Tierney P.A.<br>4250 North Drinkwater Blvd., 4th Floor<br>Scottsdale AZ 85251-3647<br>Fax: (480) 425-4920<br>E-mail: paxton@flagshipdevelopment.net |
|---|---|
| with copy to: | David C. Tierney, Esq.<br>Sacks Tierney P.A.<br>4250 North Drinkwater Blvd., 4th Floor<br>Scottsdale AZ 85251-3647<br>Fax: (480) 425-4920<br>E-mail: tierney@sackstierney.com |
| If to MAP and Acres: | Mark Acre<br>1588 West Yosemite Place<br>Chandler AZ 85248<br>Fax: (480) 855-8602<br>E-mail: markacreproperties@cox.net |
| with copy to: | Richard Friedlander, Esq.<br>Mariscal, Weeks, McIntyre & Friedlander, P.A.<br>2901 North Central Avenue, Suite 200<br>Phoenix AZ 85012<br>Fax: (602) 285-5100<br>E-mail: richard.friedlander@mwmf.com |

All notices shall be deemed delivered two (2) business days after deposit with the United States Postal Service, or if delivered by hand, facsimile, electronic mail, or courier or personal delivery, then notice is deemed delivered upon the date and time of actual receipt or of the refusal of delivery by the Party to whom it is given or any of its representatives, agents, or employees. Any Party or its counsel may alter its address or addresses to which communications or copies are to be sent by giving written notice of such change of address in conformity with the provisions of this paragraph for the giving of notice.

11. **Attorneys' Fees.** Should any proceedings (including arbitration proceedings) or litigation be commenced between the Parties concerning the terms of this Supplement or the rights and duties of the Parties hereto, the prevailing party in such proceeding or litigation shall be entitled, in addition to such other relief as may be granted, to payment of all of its costs, expenses (including, but not limited to, expert fees), and reasonable attorneys' fees incurred in connection therewith. Notwithstanding

Acre          Dynamite     Anderson

Page 8 of 11

ANDERSON DISCLOSURE 000019

anything herein to the contrary, the attorneys' fees and costs incurred by each or any of the Parties as of the execution of this Supplement shall not be recoverable or collectible from the other Parties.

12. **Controlling Law.** This Supplement and all questions relating to its validity, interpretation, performance, and inducement shall be governed by and construed, interpreted, and enforced in accordance with the substantive laws of the State of Arizona (exclusive of its laws governing conflict of laws).

13. **Choice of Forum.** Any action involving or arising from this Supplement shall be commenced and maintained in the Superior Court of Arizona, County of Maricopa.

14. **Indulgences Not Waivers.** No failure or delay on the part of a Party to exercise any right, remedy, power, or privilege under this Supplement shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege under this Supplement operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege under this Supplement preclude any other or further exercise thereof or any other right, remedy, power, or privilege.

15. **Modifications and Construction.** This Supplement may not be amended or modified in whole or in part or any right or condition hereunder waived, except by written instrument signed by all of the Parties. The terms of this Supplement were reached between the Parties represented by legal counsel. Because the Parties have each reviewed the terms of this Supplement and have relied upon the advice of their respective attorneys as to its terms and provisions, the Supplement shall not be construed or interpreted against the drafter, but shall be given its plain meaning.

16. **Binding Effect.** This Supplement and all of its terms, including the releases set forth in Section 5 above, shall inure to the benefit of and shall bind the successors and assigns of the Parties.

17. **Entire Agreement.** This Supplement contains the entire agreement between the Parties relating to the transactions contemplated hereby, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged and fully integrated into this Supplement. The Parties acknowledge and declare that this Supplement is entered into in good faith, for no collusive purpose, and the terms hereof are contractual and not mere recitals.

18. **Additional Instruments and Acts.** The Parties agree to execute such other documents and to take such other actions as may reasonably be necessary to further the purpose of this Supplement.

19. **Time Is of the Essence.** Time is of the essence for this Supplement and each term and provision thereof.

Acre                              Dynamite          Anderson

Page 9 of 11

ANDERSON DISCLOSURE 000020

20.     **Miscellaneous.**

        A.     The headings used in this Supplement are used for administrative purposes only and do not constitute substantive matter to be considered in construing the terms of this Supplement.

        B.     Words used herein, regardless of the number and gender specifically used, shall be deemed or construed to include any other number, singular or plural, or other gender, masculine, feminine, or neuter, as the context requires; the words "including," "includes," and "include" shall mean without limitation by reason of enumeration.

        C.     "Affiliate" or "affiliates" as used in this Supplement shall have the same meaning as set forth in 11 U.S.C. § 101(2).

        D.     To facilitate execution, this Supplement may be executed as many counterparts as may be convenient or required. It shall not be necessary that the signature and acknowledgement of, or on behalf of, each party, or that the signature and acknowledgment of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single instrument. It shall not be necessary in making proof of this Supplement to produce or account for more than a single counterpart containing the respective signatures and acknowledgement of or on behalf of, each of the parties hereto. Any signature and acknowledgment page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures and acknowledgments thereon and thereafter attached to another counterpart identical thereto. A facsimile copy shall be deemed to be an original.

        EXECUTED by the Parties as of the respective dates set forth below:

Date: _____, 2008      **MAP:**     Mark Acre Properties, LLC

                                  By: _____
                                       Mark Acre, Member

Date: _____, 2008      **Acre:**

                                  _____
                                  Mark Acre

_____
Acre

_____       _____
Dynamite            Anderson

                                  Page 10 of 11

ANDERSON DISCLOSURE 000021

Date: June 25 , 2008

**Acres:**

Mark Acre

Dominique Acre

**ACKNOWLEDGED:**

Richard Friedlander, Esq.
William Novotny, Esq.
Attorneys for the Acre Parties

Date: 25 June , 2008

**Dynamite:**

Dynamite Custom Homes LLC

By:

Paxton J. Anderson
Its:  Member

Date: 25 June , 2008

**Anderson:**

Paxton J. Anderson
Acting on behalf of his sole and separate property

ACKNOWLEDGED:

David C. Tierney

David Tierney, Esq.
Attorney for Dynamite and Anderson

664181

_____      _____   _____
  Acre           Dynamite    Anderson

Page 11 of 11

ANDERSON DISCLOSURE 000022