**EXHIBIT 11**
**DEFENDANTS' SENTENCING OBJECTIONS**
**Case No.  CR-12-1606-SRB**

CR12-01606-PHX-SRB    5-09-14    MARK ACRE - Part 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | CR12-01606-PHX-SRB |
| vs. ) | Phoenix, Arizona |
| ) | May 9, 2014 |
| Paxton Jeffrey Anderson, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| Joseph John Plany, ) | |
| ) | |
| Defendant. ) | |

BEFORE: THE HONORABLE SUSAN R. BOLTON, JUDGE
EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #2
TESTIMONY: MARK ACRE - PART 1
(Pages 1 through 113, Inclusive.)

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

UNITED STATES DISTRICT COURT

CR12-01606-PHX-SRB   5-09-14   MARK ACRE - Part 1

```
 1                    A P P E A R A N C E S

 2    For the Government:

 3          U.S. ATTORNEY'S OFFICE
            By:  Kevin M. Rapp, Esq.
 4               Monica B. Klapper, Esq.
            40 North Central Avenue, Suite 1200
 5          Phoenix, AZ  85004

 6    For the Defendant Paxton Jeffrey Anderson:

 7          FEDER LAW OFFICE PA
            By:  Bruce S. Feder, Esq.
 8          2930 East Camelback Road, Suite 160
            Phoenix, AZ  85016
 9
      For the Defendant Joseph John Plany:
10
            LAW OFFICE OF THOMAS M. HOIDAL, PLC
11          By:  Thomas M. Hoidal, Esq.
            7227 North 16th Street, Suite 222
12          Phoenix, AZ  85020

13

14

15

16

17

18

19

20

21

22

23

24

25
```

### INDEX OF WITNESSES

**MARK ACRE:**

| | |
|---|---|
| Direct examination by Mr. Rapp | Page 4 |
| Cross examination by Mr. Feder | Page 73 |

1   Mr. Acre, had you done any ventures or speculation through
2   Mark Acre Consulting, LLC as of July 2005 when you sent this
3   to the Traditional Bank?
4   A    No.
5   Q    Thank you.  And then you listed Dynamite Custom Homes,
6   LLC.  Were you in any way a member of Dynamite Custom Homes,
7   LLC?
8   A    No.
9   Q    What was the purpose of you putting in that company as if
10  you had some connection to Dynamite Custom Homes, LLC?
11  A    Those were all the projects that Paxton and I were doing
12  together, so we both talked about when I was putting this
13  document together to put all of our projects in there.
14  Q    And those are the only projects that you ever had with
15  Mr. Anderson, right?
16  A    One of the Desert Mountain properties was just a lot that
17  I owned.
18  Q    That you sold, right?
19  A    No.  It foreclosed.
20  Q    Did Mr. Anderson have anything to do with that lot?
21  A    No.  No.  He saw it with me when I looked at it at first,
22  but that was a lot that I had separate.
23  Q    So you speculated in a lot -- another lot in Desert
24  Mountain that you were going to try to sell, flip basically
25  the lot, or build a home by yourself, or what was the plan?

1  A   All those things.  Those were all possibilities.  Paxton
2  was going to build, if I planned on building on that lot.  It
3  was lot 57.
4  Q   And do you know which -- there's two Desert Mountain
5  properties there, one worth $4.5 and the other one $3 million.
6        Do you know which one it was that we're talking about
7  that did not involve Mr. Anderson?
8  A   I believe it was the $3 million property.
9  Q   And you got a separate loan for that one?
10 A   Correct.
11 Q   And then didn't you have two lots at Mirabel?
12 A   Yes.
13 Q   One of them did not have anything to do with Mr. Anderson,
14 correct?
15 A   No.  They both did.
16 Q   Was the other Mirabel lot purchased after July 2005?
17 A   I believe the Mirabel 28 closed in September, the document
18 that we looked at earlier, so it would be after, yes.
19 Q   You indicated that your history was that you -- the
20 Diamondbacks did a look-see of you but you decided you wanted
21 to go back to Japan because you were going to make more money,
22 right?
23 A   Yes.
24 Q   What was your salary when you went back to Japan that
25 year?

CR12-01606-PHX-SRB   5-13-14   MARK ACRE - Part 2

```
              UNITED STATES DISTRICT COURT

              FOR THE DISTRICT OF ARIZONA
                _____

United States of America,      )
                               )
          Plaintiff,           )
                               )   CR12-01606-PHX-SRB
     vs.                       )   Phoenix, Arizona
                               )   May 13, 2014
Paxton Jeffrey Anderson,       )
                               )
          Defendant.           )
_____)
                               )
Joseph John Plany,             )
                               )
          Defendant.           )
_____)




     BEFORE:  THE HONORABLE SUSAN R. BOLTON, JUDGE
     EXCERPT OF REPORTER'S TRANSCRIPT OF PROCEEDINGS
                JURY TRIAL - DAY #3
          TESTIMONY:  MARK ACRE - PART 2
           (Pages 114 through XXX, Inclusive.)




Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona 85003-2150
(602) 322-7247

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription
```

## APPEARANCES

**For the Government:**

    U.S. ATTORNEY'S OFFICE
    By: **Kevin M. Rapp, Esq.**
        **Monica B. Klapper, Esq.**
    40 North Central Avenue, Suite 1200
    Phoenix, AZ 85004

**For the Defendant Paxton Jeffrey Anderson:**

    FEDER LAW OFFICE PA
    By: **Bruce S. Feder, Esq.**
    2930 East Camelback Road, Suite 160
    Phoenix, AZ 85016

**For the Defendant Joseph John Plany:**

    LAW OFFICE OF THOMAS M. HOIDAL, PLC
    By: **Thomas M. Hoidal, Esq.**
    7227 North 16th Street, Suite 222
    Phoenix, AZ 85020

1
2                        **INDEX OF WITNESSES**
3
   **MARK ACRE:**
4
   Cross examination (cont'd) by Mr. Feder        Page 117
5  Cross examination by Mr. Hoidal                Page 174
   Redirect examination by Mr. Rapp               Page 189
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  BY MR. FEDER:
2  Q  Are you familiar with that?
3  A  Yes.
4  Q  Is that your name on that document?
5  A  Yes.
6  Q  Did you purchase lot 98, Eagle's Nest, in Fountain Hills?
7  A  Yes.
8  Q  Did you purchase that November of 2005?
9  A  Yes.
10 Q  Was that also -- I'm sorry, I didn't ask you the question.
11         On Sundance was that for investment purposes and not
12 a primary residence?
13 A  Yes.
14 Q  And was Eagle's Nest for investment, not primary
15 residence?
16 A  Yes.
17 Q  And you checked "primary residence" --
18         THE COURT:  This is not yet in evidence.
19         MR. FEDER:  I'm sorry.  I would move for the
20 admission of 1642.
21         THE COURT:  Is there any objection?
22         MR. RAPP:  I do not have this from the defense on the
23 recently disclosed nor the initially disclosed.  I would have
24 to see it.
25         THE COURT:  Just show it to Mr. Rapp because he can

```
 1  probably tell by markings on it whether it was --
 2          MR. FEDER:  I gave them the written exhibits before
 3  trial began.  They have the same notebooks that I do, so.
 4          THE COURT:  Well, I don't have anything higher than
 5  1641, so I'm not sure they do either; and this is 1642.
 6      (Discussion had off the record.)
 7          THE COURT:  All right.  Could you possibly sort this
 8  out later or move on?  This is wasting a lot of time to have
 9  counsel conferring over this piece of paper.
10          MR. FEDER:  Is the Court denying the admission?
11          THE COURT:  I haven't heard whether there's an
12  objection or not yet.
13          MR. FEDER:  I mean, this is --
14          THE COURT:  Mr. Rapp?
15          MR. RAPP:  I don't have an objection.
16          THE COURT:  1642 is admitted.
17      (Exhibit No. 1642 admitted in evidence.)
18  BY MR. FEDER:
19  Q   So Mr. Anderson didn't accompany you to sign this document
20  either, right?
21  A   Nobody took me to Eagle's Nest to show me the lot.
22          MR. RAPP:  I do have an objection.  I have asked for
23  the biographical information be taken offer these exhibits and
24  it remains on.
25          MR. FEDER:  Sorry.  Sorry.
```

1      THE COURT: Are you offering it in evidence? I'm not
2  following what you're -- what you want me to do.
3      MR. FEDER: Let's try this.
4  BY MR. FEDER:
5  Q    You purchased another lot at Desert Mountain?
6  A    Besides which one -- yes. Yes.
7  Q    You testified on Friday there were a couple of lots that
8  you bought without Mr. Anderson having anything to do with
9  your purchases, correct?
10 A    No. I was taken up there by him. It was the first time I
11 had ever been there.
12 Q    I understand that. You bought these on your own without
13 there being any partnership interest by Mr. Anderson, correct?
14 A    I believe 57 was one that I wanted to do something
15 separate but wanted him to build on, yes.
16 Q    And was the -- what about 148?
17 A    Yes. 148 he was going to build on, yes.
18 Q    What about these other ones that are listed?
19 A    Yes. Yes.
20 Q    And the reason that you didn't list all of your properties
21 on all of your respective investments was based on advice you
22 received from Mr. Anderson, Mr. Blemaster, and Mr. Slater?
23 A    Absolutely.
24      MR. FEDER: May I approach, Your Honor, and have him
25 look at 1657 to see if it is accurate and correct.

1  A    Yes.
2  Q    Had a written settlement agreement that you both signed,
3  right?
4  A    Yes.
5  Q    That settlement agreement clearly said that you had been
6  joint venturers?
7           MR. RAPP:  Objection.  Hearsay.
8           THE COURT:  Sustained.
9  BY MR. FEDER:
10 Q    Was there -- did you acknowledge in that settlement
11 agreement that you were a joint venturer with Mr. Anderson?
12 A    We were partners, yes.
13 Q    So not trying to hide anything, correct?
14 A    No.
15 Q    And you recall that Mirabel 28 was going to be listed for
16 $3.2 million?
17 A    I can't recall.
18 Q    Do you recall in that document that the things -- there
19 were only a few things left to do on lot 28 Mirabel to get it
20 to completion?
21 A    I can't recall.
22          MR. FEDER:  Could the witness be shown Exhibit 1398,
23 tab 99.
24          THE COURT:  I think it's up there in front of you.
25          THE WITNESS:  Which one?  I'm sorry.

```
 1              THE COURT:  1398.
 2   BY MR. FEDER:
 3   Q   Take a moment and try to leaf through that and familiarize
 4   yourself with it.
 5   A   You want me to read the whole thing?
 6   Q   Leaf through it, if you could.
 7   A   Excuse me?
 8   Q   Just leaf through it, if you could, to get familiar with
 9   it.
10   A   Okay.  I scanned through it.
11   Q   When was the settlement agreement?  2007 March?
12   A   When was it signed?
13   Q   Yes.
14   A   I see June 25th on the last page.
15   Q   Would you look at page 000778 of that document?
16   A   7780?
17   Q   000778.
18   A   Okay.  I see it.
19   Q   Did you also sign that document in March of 2007?
20   A   Yes.
21   Q   And as of the time of that signature, the only lots in
22   Arizona at least that you owned as joint venturer with
23   Mr. Anderson were Mirabel 28, Mirabel 138, and Apache Peak
24   148, right?
25   A   Where is that listed?
```

```
 1   Q   This page.
 2   A   Yes.
 3   Q   Those were the only things that you and Mr. Anderson were
 4   dividing up, right?
 5   A   According to this, yes.
 6   Q   This was the final settlement agreement between you and
 7   Mr. Anderson, right?
 8   A   Yes.
 9   Q   So all these other properties that we've talked about,
10   they weren't with Mr. Anderson, correct, or they had been
11   sold?
12   A   No.  It hadn't been sold.  It might have been negotiated
13   out of this if you're talking about 57.
14   Q   This settlement agreement was going to be the end-all,
15   be-all, split-the-sheets with Mr. Anderson, right?
16   A   We hoped, yes.
17   Q   And everything that was going to be split up, agreed upon,
18   was in this document, correct?
19   A   I believe so, yes.
20   Q   And the only three properties listed in this document,
21   this settlement agreement that you signed, at least, were that
22   you had a joint venture with Mr. Anderson was lot --
23              MR. RAPP:  I object to the extent he's reading from a
24   document that's not an admission.
25              THE COURT:  Sustained.
```

1      Ladies and gentlemen, we're going to take our morning
2  break at this time.  We'll reconvene in approximately 15
3  minutes at 10:35.
4      You are reminded of the admonition not to discuss the
5  case or form any conclusions about it until you have heard all
6  the evidence and begun your deliberations.
7      Court is in recess.
8      (Recess taken at 10:22 a.m.; resumed at 10:40 a.m.)
9      THE COURT:  Thank you, ladies and gentlemen.  Please
10 sit down.
11     The record will show the presence of the jury,
12 counsel, and the defendants.
13     Mr. Feder, you may continue.  I said you may
14 continue.
15 BY MR. FEDER:
16 Q   Mr. Acre, this settlement agreement was to resolve all of
17 the transactions, et cetera, that you had in regard to the
18 business relationship that you had with Mr. Anderson and
19 Dynamite Homes, right?
20 A   Yes.
21     MR. FEDER:  Move for the admission of 1398.
22     MR. RAPP:  I object, Judge, based upon hearsay.
23     THE COURT:  The hearsay objection is overruled and
24 the exhibit is admitted.
25     (Exhibit No. 1398 admitted in evidence.)

1  BY MR. FEDER:
2  Q    So as of 2008, Mr. Acre, those are the only properties
3  that you admittedly had in common with Mr. Anderson, correct?
4  A    For the agreement, yes.
5  Q    Well, are you claiming that there is some other unwritten
6  agreement that involved other properties?
7  A    No.
8  Q    So these are it, right?
9  A    Yes.
10 Q    This was the way to wipe your hands of each other,
11 correct?
12 A    Yes.
13 Q    And there's only three listed there, right, at least in
14 Arizona.  The two, 4 and 5, Hideaway is in California and
15 Lexington On Broadway is in Kentucky, correct?
16 A    Yes.
17 Q    And you agreed that you had paid a bunch of money and
18 Mr. Anderson had paid some money and you agreed at least as to
19 the figures of who had what money in what project, correct?
20 A    Yes.
21 Q    And you agreed your wife was going to be the real estate
22 agent to sell at least the Arizona properties that you had in
23 common, correct?
24 A    To try to, yes.
25 Q    And you agreed Mr. Anderson had put those figures into

1    these lots out of his own pocket, correct?

2    A    Out of his own pocket?

3    Q    Yes.

4    A    I don't believe so.

5    Q    See where it says: The carrying costs invested in the

6    project and not reimbursed by any secured loans on the

7    projects by Dynamite Homes.

8    A    Yes.

9    Q    So these are the amounts that Mr. Anderson or Dynamite

10   Homes put into these projects, right?

11   A    Yes.

12   Q    And you agreed to that, right?

13   A    Yes.

14   Q    You had a lawyer advise you on that, right?

15   A    Yes.

16   Q    And then you also agreed that these were the only

17   contractors that had unpaid balances, right?

18   A    Yes.

19   Q    And as you can see, many of them are disputed, meaning

20   that the quality of their work or the completeness of their

21   work was disputed, correct?

22   A    Yes.

23   Q    And these are your signatures on all of these pages,

24   correct?

25   A    Yes.

```
1   Q   Now, Mr. Acre, you saw the house at lot 28 Mirabel going
2   up, correct?
3   A   Yes.
4   Q   You were there frequently, correct?
5   A   Yes.
6   Q   You talked to the contractors if there were people onsite,
7   right?
8   A   Yes.
9   Q   Did you have any discussions with your bank along the way
10  other than this time where they call you up and say, Here are
11  all these draw requests?
12  A   I can't recall.
13  Q   But you will agree, won't you, that you knew that work was
14  being done and you knew that, consequently, money was being
15  paid to these contractors that were working on your lot 28,
16  right?
17  A   That was my perception, yes.
18  Q   And you knew that the -- according to your agreements with
19  the bank, that the process was there would be a draw request
20  and then somebody hired by the bank would come out and inspect
21  it and decide how much, if any of that draw request, would be
22  paid, right?
23  A   That was my understanding, yes.
24  Q   And your understanding was that that inspector would
25  decide if the work had been done or not, right?
```