JOHN S. LEONARDO
United States Attorney
District of Arizona

KEVIN M. RAPP
Assistant U.S. Attorney
Arizona State Bar No. 014249
Email: kevin.rapp@usdoj.gov

MONICA B. KLAPPER
Assistant U. S. Attorney
Arizona State Bar No. 013755
E-mail: Monica.Klapper@usdoj.gov

Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona  85004
Telephone:  602-514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>1. Paxton Jeffrey Anderson,<br>2. Joseph John Plany,<br><br>Defendants. | CR-12-1606-PHX-SRB-(DKD)<br><br>**UNITED STATES' RESPONSE TO DEFENDANTS' OBJECTION TO RESTITUTION (CR 36)**<br><br>(Restitution Hearing:  December 16, 2014) |

The United States submits the following restitution memorandum for this Court's consideration.  For the reasons set forth in the Memorandum of Points and Authorities below, the United States requests this Court to award $11,199,452.05 in restitution as follows:    M&I   Bank   ($5,050,820.50),   FDIC   ($1,048,498.16),   Bank   of America/Countrywide ($1,312,473.41), JP Morgan Chase ($3,787,659.98), Dominque and Mark Acre ($1,004,326.00), and Tasha and Will Henstein ($137,033.13).  The United States further requests this Court to hold Defendants jointly and severally liable for the restitution amounts to each victim.

**Memorandum of Points and Authorities**

**I.     Legal Standard**

Federal law requires criminal defendants in certain cases, including cases (such as this one) involving property offenses under Title 18 committed by fraud or deceit, to pay restitution to the "victims of the offense." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). The restitution analysis involves three inquiries: (1) determining who qualifies as a "victim"; (2) identifying the amount of each qualifying victim's "loss"; and (3) apportioning responsibility for paying restitution between the defendants.

**A.     The Victims**

As for the first inquiry, the term "victim" is defined by statute to mean "a person directly and proximately harmed as a result of the commission of [the] offense." 18 U.S.C. § 3663A(a)(2). *See also United States v. Andrews*, 600 F.3d 1167 (9th Cir. 2010)("'A victim for restitution purposes is a person who has suffered a loss caused by the specific conduct that is the basis of the offense of conviction.'") (citation omitted). By adopting this formulation, Congress sought to "construe the term 'victim' broadly." *United States v. Jackson*, 982 F.2d 1279, 1283 (9th Cir. 1992). The burden of proof rests on the United States to show that a particular person or entity qualifies as a victim. *United States v. Waknine*, 543 F.3d 546, 556 (9th Cir. 2008).

**B.     Loss Amount**

As for the second inquiry, Congress has specified that each victim is entitled to restitution "in the *full amount* of each victim's losses . . . without consideration of the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A) (emphasis added). Although the government bears the burden of demonstrating the applicable loss amount by a preponderance of the evidence, *id.* § 3664(e),[1] the Ninth Circuit has emphasized that

---

[1] As this Court has pointed out, the loss analysis for restitution purposes is different than the loss analysis conducted under U.S.S.G. § 2B1.1(b) when calculating a defendant's offense level. *United States v. Catherine*, 55 F.3d 1462, 1464 (9th Cir. 1995) ("Although . . . the guidelines . . . and 18 U.S.C. § 3663, governing restitution, both involve a calculation of loss to the victim, the method of calculating loss is different in each.").

"'the primary and overarching goal [of the restitution statute] is to make victims of crime *whole*, to *fully* compensate . . . victims for their losses and to restore . . . victims to their original state of well-being.'" *United States v. Gordon*, 393 F.3d 1044, 1053 (9th Cir. 2004) (citation omitted) (emphasis added by Ninth Circuit). Thus, district courts are granted a "degree of flexibility" in calculating restitution losses. *Id.* Notably, victim-impact statements and affidavits are generally sufficient to satisfy the government's burden of proof. *Waknine*, 543 F.3d at 557 ("[V]ictim affidavits will generally provide sufficient, reliable evidence to support a restitution order.").

### C. Apportioning Liability

As for the third inquiry, Congress has specified that "[i]f the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and the economic circumstances of each defendant." 18 U.S.C. § 3664(h). This provision "explicitly gives a district court discretion as to whether joint and several liability should apply or whether liability should be apportioned among the defendants based on their economic circumstances and their respective contributions to the victim's losses." *United States v. Squirrel*, 588 F.3d 207, 212 (4th Cir. 2009).

Finally, it bears emphasizing that, because each defendant was found guilty of an offense that has a "conspiracy" or "scheme" element, the Court may hold each defendant liable for the losses associated with *all* of the fraudulent transactions in which he participated. *See* 18 U.S.C. § 3663A(a)(2); *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999) ("'[R]estitution may be ordered for losses to persons harmed in the course of the defendant's scheme even beyond the counts of conviction' . . . . [W]hen the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element

---

Defendants take the position that loss should be proven by clear and convincing evidence. The standard is for loss is not addressed in this motion.

of the offense . . . the restitution order [may] include acts of related conduct for which the defendant was not convicted.") (citation omitted); *United States v. Lam Thanh Pham*, 294 Fed.Appx. 330, (9th Cir. 2008) ("Because Pham admitted in his plea agreement to participating in a 'scheme and artifice' to commit bank fraud, notwithstanding the fact that the one count to which he pled guilty only involved approximately $4,500 in loss, the district court did not abuse its discretion in imposing a $1 million restitution obligation on him when the full amount of loss resulting from the scheme in which Pham admitted being involved exceeded $1.6 million.").

### D.  The Qualifying "Victims" Are M&I Bank, the FDIC, JP Morgan Chase, Bank of America/Countrywide, the Acres and the Hensteins.

This Court should find that eight individuals and entities qualify as "victims" entitled to restitution in this case: lenders M&I Bank, the FDIC, JP Morgan Chase, Bank of America/Countrywide; and borrowers Dominique and Mark Acre, and Tasha and Will Henstein.

This Court should find that the lenders qualify as victims because, as shown at trial, Defendants used lies to dupe the lenders into providing more than $10 million in mortgage financing and construction draws.  These lies were contained in the mortgage applications that where facilitated by Defendant Anderson for friends and family using co-conspirator loan officers who prepared and submitted applications and supporting documents on behalf of borrowers.  Among other things, the conspirators lied about the borrowers' income, assets, employment, and intent to use the properties as a primary residence. Furthermore, after closing the loans, Defendant Plany continued the deception by making sure that mortgage payments were made by Dynamite Custom Homes on behalf of many of the borrowers.

Defendants were responsible for a variety of false documents that were used either to originate the loans or obtain construction draws from loans. They included, among other things, falsified invoices for soft costs and false invoices that misrepresented that work and materials were provided when in fact they were not.

Additionally, at Anderson's direction, Plany forged or cut-and-pasted signatures on draw requests to obtain construction draws, unbeknownst to the borrower and the lenders. After many of the unqualified borrowers inevitably defaulted, the lenders were left holding undeveloped lots or lots with partially-completed homes that were worth a fraction of the outstanding loan balances. The lenders easily qualify as "victims" entitled to restitution under these circumstances. *See, e.g., Catherine*, 55 F.3d at 1463-65 (in mortgage fraud case, lending institution qualifies as victim).

This Court should also find that four of the individual borrowers (married couples Dominique and Mark Acre and Tasha and Will Henstein) also qualify as victims. Both couples have made specific requests for restitution, under the theory that they were fraudulently induced to acquire undeveloped lots, used Anderson as the general contractor (where he diverted funds that were supposed to be used for construction of the homes and were not), and suffered financial harm when the lots fell into foreclosure. Because these borrowers' losses were directly and proximately caused by Defendants' conduct, they qualify as victims. *Cf. United States v. Innarelli*, 524 F.3d 286, 288-89 (1st Cir. 2008) (awarding restitution, in an amount to be determined, to a group of "unwitting and typically unsophisticated" borrowers in a mortgage fraud case in which the defendant mortgage brokers had "generated documents falsely representing to lending institutions that the buyers had the financial wherewithal to afford mortgage loans" and the borrowers suffered losses when they "were predictably unable to pay their mortgage loans and defaulted").

**II.  Losses and Restitution Attributable to Cooperating Co-conspirators Blemaster and Sanchez are Irrelevant.**

Defendants' argument that the methodology used to arrive at stipulated loss amounts for cooperating co-conspirators Blemaster and Sanchez should be used in calculating Defendants' restitution is unavailing. This Court has already rejected that argument at the October 27, 2014, status conference, finding that the stipulated losses for Blemaster and Sanchez are irrelevant to the losses and restitution attributable to

Defendants Plany and Anderson. Nevertheless, Defendants raise this issue several times throughout their objection to both loss amount and restitution.

As previously argued, Blemaster and Sanchez's involvement in the offense is distinguishable from the leadership roles that Defendants Anderson and Plany played in the fraud. Neither Blemaster nor Sanchez was the proximate cause of the vast majority of the losses sustained by the lenders and borrowers. The evidence at trial demonstrated that Blemaster and Sanchez were *not involved* in the most important components of the fraud that proximately cause the losses to the lenders and borrowers – namely, the falsification of draw requests, the submission of false invoices, the use of draw money to pay mortgages of "straw" buyers, and the diversion of loan proceeds for horseracing and personal expenses.

Defendants' conduct in falsifying draw requests and diverting money for personal expenses was an intervening event that broke the causal chain between any false information on the loan applications (e.g. employment, seasoning of accounts, false invoices for soft costs, etc.) that may have been facilitated by Sanchez and Blemaster on some of the loans. *United States v. Gamma Tech Indus., Inc.,* 265 F.3d 917, 928 (9th Cir.2001); *see* 18 U.S.C. § 3663(a)(2) (defining "victim" as "a person directly and proximately harmed"). Although "[t]here may be multiple links in the causal chain" "between the defendant's offense conduct and the victim's specific losses," "the chain may not extend so far ... as to become unreasonable." *Kennedy,* 643 F.3d at 1262-63. Moreover, "any ... intervening cause *must be directly related to the defendant's conduct.*" *Id.* (emphasis added).

Additionally, Defendants' failure to complete construction on the homes because money was diverted for personal expenses was not a reasonably foreseeable pecuniary harm. Blemaster and Sanchez could not have possibly foreseen that the Defendants would divert the construction draw money for personal expenses and mortgages in lieu of paying the subcontractors and other construction expenses. *See e.g.* U.S.S.G. § 2B1.1, Loss Under Subsection (a)(1)(A) (iv) (a)(1).

Finally, Defendants Anderson and Plany forged draw requests related to both Blemaster and Sanchez. They are arguably victims of Defendants' fraud similar to the Acres and the Hensteins. The Court should again reject any argument that the stipulated losses and restitution for Blemaster and Sanchez are irrelevant to the losses and restitution attributable to Defendants.

### III.     Response to Defendants' Specific Objections to Restitution

Defendants object to specific transactions detailed in the United States chart that details both loss and restitution. (*See* exhibit 1.) The United States agrees that *some* of these losses contained on Exhibit 1, for various reasons, should not be attributable to Defendants for either loss or restitution. In responding to Defendants specific objections regarding loss and restitution the United States follows the format set forth in the Defendants Objections.[2]

####       A.     The Losses Sustained by TierOne/FDIC

As a threshold matter, Defendants mistakenly believe the letter from FDIC seeks $443,014 in restitution. It is unclear what letter Defendants are relying on for this amount. The letter provided by the FDIC (and disclosed to the Defendants) actually seeks in restitution of $1,161,594.00. (*See* exhibit 2.)   Additionally, the FDIC is *not* seeking restitution, as argued by Defendants, for Lot 46 Coyote Way (Marti Jo Anderson) and 106 Zorra Way (Jeff Anderson). (*Id.*)

####           1.  Desert Wash (Lot 11 Fire Rock)

Regarding the loss of $393,750 for Desert Wash (Lot 11 Fire Rock), the United States has provided Defendants the deed of trust and the resale affidavit demonstrating

---

[2] The United States has attached Exhibit 17, which sets forth all loans with associated losses and designates which loans that Defendants have not challenged, which loans the United States agrees should not be included in the restitution analysis, and which loans the parties are disputing in the restitution analysis.

- 7 -

1    that the principle amount of the loan was $1,293,750.00, and the trustee deed
2    demonstrating it was sold for $900,000, resulting in a loss of $393,750. (*See* Exhibit 3.)

### 2. Counts 6, 11-14,16-19,20-23, 25 and 32 (104th Place Acre)

These counts correspond to the fraudulent construction draws submitted by Defendants for the 104th Place home, for which the Acres were the borrowers. The property was never completed, the Acres defaulted on the loan, and it foreclosed. The successor lender to TierOne was Great Western. The FDIC took over as the receiver for the loan in December 2010. Defendants argue that the restitution sought by FDIC in the amount of $767,844 is overstated for several reasons.

First, Defendants complain that the FDIC held the property for several years and did not sell it in until 2010. Defendants, citing *Robers v. United States*, argue that the property was held by FDIC for too long and Defendants therefore were not the proximate cause of the loss. 134 S.Ct. 1854, 1860 (2014). This argument is flawed because TierOne was actively trying to sell the property after taking the property back in foreclosure. The first trustee sale was on 6/18/08. (*See* Exhibit 4.) It was first listed for sale in January 2009. The difficulty with selling the property was due to it not being completed. This was circumstance was not caused by the lender but directly caused by Defendants. Indeed, nearly 600 pages of the lender file detail numerous attempts to sell the property but to no avail. (*See* Trial Exhibit 817, pp. 241-883.) Not only was the home not complete, but the real estate market also crashed making it difficult to sell for any reasonable price, let alone $1.4 million. The house was completed and ultimately sold in 2011.

Second, Defendants argue that the Acres had entered a civil settlement and agreed that $609,000 had been properly spent from loan proceeds on this property through February 28, 2007. (*See* Trial Exhs. 130-1, 1398, 1641.) Defendants miss the point for a couple of reasons. A civil settlement does not impact the amount of restitution owed on the property. More importantly, Acre testified at trial that Anderson only made a single payment on the settlement and then defaulted. In any event, it is irrelevant to restitution

owed as a result of a criminal conviction involving the fraud on the loan.

Third, the argument that Defendants should only be held accountable for the construction draws is unavailing. Because the property was not completed – due to the diversion of construction draw proceeds – the house could not be sold and Acre could not move into the home. Defendants should be held for the difference between the loan amount and what the home was sold for in 2011, which is $1,296,171.78.

## IV. M&I Alleged Losses and REO Resale Files

There are a total of 29 M&I loans that should be included in the restitution analysis. Defendants challenge some of those loans for purposes of loss and restitution, and Defendants also address several other loans that have not been included in the analysis because they have no corresponding loss.

### 1. Sixteen M&I Properties that Defendants were not Associated with Defendants.

Defendants reference 16 loans that they argue Defendants were not involved with and therefore any loss associated with these loans should not be attributable to them. (*See* Doc. 316, exh. 14.) If the 16 loans to which Defendants refer are those set forth in Defendants' exhibits 13, 14, and 15, then the United States agrees that all but 2 of those loans should *not* be included in the restitution analysis. The 2 exceptions are contained in Defendant's exhibit 15, and are loans designated at 26 – Lombardo and 39 – Woodson.

### 2. Talking Rock Properties

Regarding the Talking Rock loans that are contested by Defendants, Defendants are correct that *some* of these loans did not involve fraudulent loan applications and/or draw requests and therefore any loss sustained by the lenders is not attributable to Defendants. However, two of these loans involve Marti Jo (Lot 44) and Sandra Anderson (Lot 74). With respect to these two loans, Anderson was involved in the fraud at loan origination and his sister and mother were nothing more than straw buyers. (*See* exhibit 5.) Accordingly, Defendants are responsible for $1,297,921.88 in restitution on these two loans.

### 3. Blemaster and P & B Properties

Defendants are correct that the Blemaster loans for Windrunner Drive and 31st Way properties should be deducted from the restitution because Defendants were not involved with those loans and there was no apparent fraud related to these loans. Accordingly, the total loss on these two properties of $1,145,624.28 should be deducted from the overall loss/restitution. Additionally, losses related to borrowers Madore, Chen, or Leono should likewise be deducted from the loss because there is no evidence that Defendants participated in any fraud associated with these loans.

### 4. The Four M & I Properties that Were Dismissed by the Government or Resulted in Acquittal.

Defendants are correct that the losses associated with Count 15 (31st Way-borrower Blemaster) and Count 3 (Centennial Drive-borrower Sanchez) are not attributable to Defendants. With respect to those counts, both Blemaster and Sanchez testified either that Defendants were not involved with the origination of the loans or that there was no apparent fraud involved with the loans. Accordingly, the United Sates dismissed counts 15 and 3 and is not seeking restitution for any losses that may resulted from those loans.

The same is not true, however, for the loans related to counts 7, 28 and 29. The United States dismissed those counts because no evidence was presented *at trial* that the three loans involved fraud. But again, these loans involved Anderson's mother and sister as straw buyers, and they are included within the fraudulent activity and should be included restitution purposes.

Defendants argue that Sandra Anderson never owned 15050 N. Four Creek and, therefore, any loss on the loans associated with that property cannot be attributed to Defendants. Defendants further allege that the United States misled the grand jury when presenting evidence of Anderson's involvement on these two loans, among other transgressions. Thus, Defendants conclude, they should not be held accountable for the losses and any restitution associated with the property loan (count 28) and the

construction draw (count 29). This is a flawed analysis because it is based on erroneous facts.

As a threshold matter, the discrepancy in the address for this property is of no moment. The address of 15050 N. Four Creek was listed on Sandra Anderson's TierOne loan application signed July 27, 2005. (*See* Exhibit 6.) This address was used in the indictment to support counts 27 and 28. Blemaster originated the loan through TierOne using loan officer Joe Carroll. Subsequently, the loan was refinanced with M &I on January 30, 2007. For some unexplained reason, the address changed to 14185 N. Centennial but the legal description of Lot 74 Talking Rock Ranch Phase 8-C remained the same. Sandra Anderson omitted a liability on her application by failing to disclose another property known as Lot 6, Superstition (Count 8). Lot 74 foreclosed in the same manner as the other Sandra Anderson properties facilitated by Defendants, resulting in a loss to M & I of $381,288.15.

Similarly, 14252 E. Zorra Way was purchased by Marti Jo Anderson (Count 7) and the loan was originated on October 27, 2005. Defendant Anderson provided money to season his sister's bank account and there were three undisclosed properties that were omitted as liabilities. (Exhibit 7.) The property foreclosed resulting in a loss of $420,000.

**5. M&I Alleged Losses Relating to Other Properties: Count 32 Overt Act 23(Wagner) (loss claimed $231,985.41)**

Defendants argue that the United States failed to establish false construction loans and any involvement by Defendants in the loan origination for borrower Wagner. Defendants are incorrect for at least two reasons.

First, Anderson was involved in the loan origination by working with Slater to manipulate the prepaid soft costs that would qualify for the loan. (*See* Exh. 8; emails between Anderson and Slater.) Ultimately the loan was originated by misrepresenting that $91,000 was pre-paid for soft costs. (*Id*.) Indeed, Anderson lumps the Wagner loan in with loans that were fraudulently originated for borrowers Baily, and Marti Jo and Sandra Anderson. (*Id*.) Second, Defendants made some mortgage payments for Wagner.

1  Thus, the restitution associated with the Wagner loan, $231,985.51, is attributable to
2  Defendants.

### 6. Count 32, Overt Act 32 (Hayden) (Loss Claimed $305,716.13)

The United States agrees that the loss attributable to Defendants for the Hayden loan should be deducted from the restitution analysis.

### 7.&8. Acre Loans: Apache Peak, 41606 N. 113th Place

Defendants incorrectly claim there is no casual connection between Anderson and the loans that foreclosed related to this purchase by Acre. Anderson received $107,000 at closing for non-prepaid soft costs. (*See* Exhibit 9.) The loan was originated by Slater, who was referred to Acre by Anderson; and the application omitted liabilities, namely Lots 138 and 28 Mirabel. (*See* Exhibit 10.) Additionally, Anderson worked with Slater to originate this loan. (*See* Exhibit 11.; emails between Anderson and Slater) Accordingly, the loss and corresponding restitution associated with this loan is attributable to Defendants.

### 9.&10. Losses related to Acre Loans for White Fang and 97th Desert Mountain

Regarding the losses for Acre loans corresponding to White Fang and 97th Street Desert Mountain, the United States is not seeking restitution for these loans.

### 11. Counts 24, 26-27, 30-31 Act 15 (Henstein) (Loss Claimed $596,741.55)

Defendants argue that the Hensteins' loan application contained no fraudulent misrepresentations and therefore this loss should not be included. This is incorrect. Tasha Henstein testified to the false prepaid receipts (Trial Exh. 819-152) and an email between Slater and Anderson (Trial Exh. 844). Both of these exhibits demonstrate that Slater and Anderson were fraudulently misrepresenting prepaid receipts in order for the Hensteins to qualify for the property. Fraud was involved not only at the loan origination stage, but also with the forged construction draw requests. Ultimately, the property was never completed and the both the lender and the Hensteins sustained a loss of $596,741.55.

**V.     Losses to Bank of America, Countrywide and Chase**

   **1.     Bank of America/Countrywide**

Bank of America/Countrywide is seeking restitution for only 2 loans. (*See* exhibit 12.) Both loans involve Sandra Anderson as the borrower, and they are a first mortgage and a HELOC. As was the case with the other Sandra Anderson loans, she had neither sufficient assets nor the income or employment to qualify for a loan. The Court may recall that Sanchez testified that he had to misrepresent that Sandra Anderson worked for his company Digigroup in order for her to qualify for a loan. Additionally, for this specific loan, Defendant Anderson made the monthly mortgage payments. (*See* Trial Exh. 16-22.) For the restitution request related to this loan Bank of America included approximately $3,000 in fees that they are not entitled to recover as restitution. Accordingly, the United States has prepared a summary of their expenses related this loan and deducted the fees, so the corresponding restitution amount is $1,312,473.41. (*See* Exhibit 13.)

   **2.     JP Morgan Chase**

JP Morgan Chase is seeking restitution for four loans.[3] Three of the loans include borrowers who testified at trial (Oliver Adams, Tasha Henstein and Jason Rongstad). The Chase loan for Adams was the second property he purchased through Defendant Anderson. The fraud occurred at the loan origination, when Defendant Anderson worked with the loan officer (Tom Markopoulos at Great Southwest Mortgage) to misrepresent that Adams provided $240,000 in prepaid soft costs. (*See* Trial Exh. 829 p. 166.) Additionally, draws were taken on this property but absolutely no work was ever done. The restitution requested by Chase is $676,272.31.

Additionally, Chase requests $636,363.40 for the loss on the Hensteins' loan. The

---

[3] Three of the four loans are addressed herein for purposes of restitution. The United States is obtaining the loan files for the fourth loan and, with this Court's permission, will address the restitution related to the fourth loan at the February 2, 2014, sentencing hearing.

fraud on this loan involved the cut and pasting of signatures on loan origination documents. (Trial Exh. 26.) Construction never commenced on Lot 249 despite JR Customs Home receiving an $113,600 draw.

Finally, Chase seeks restitution on the loan obtained by Jason Rongstad for $1,275,704.03. The fraud involving this loan was apparent at trial because Rongstad testified that he did not have the income or assets to qualify for this loan.

**VI.     Restitution Request by the Acres and the Hensteins**

    **1.     Acres**

The Acres are seeking the following restitution related to their losses on the various Anderson loans, and Defendants have not challenged these amounts:

- Desert Mountain, Apache Peak Lot 148 - $147,362 (Down Payment, Hard Costs, Plans, Taxes, HOA, Interest Payments)
- Mirabel Lot 28 - $261,324 (Down Payment, Hard Costs, Taxes, Plans, HOA, Interest Payments)
- Lexington Property, Traditional Bank - $323,924 (Down Payment, Hard Costs, Plans, Taxes, Interest Payments)
- The Hideaway @ La Quinta - $271,716 (Down Payment, Hard Costs, Plans, Taxes, Interest Payments, Fees - Includes a $150,000 Club Membership that was forfeited)

The support for these restitution figures can be found at in their Bankruptcy Petition. (*See* Trial Exh. 1448.) The total restitution request by the Acres is $1,004,326. (*See* Exhibit 15; Summary Exhibit)

    **2.     Hensteins**

The Henstein are seeking $137,033.13. (*See* Exhibit 16; Summary Exhibit.) They request recompense for wages that were garnished for 2 years for failure to pay Miller Wholesale Lumber because Defendant Anderson never paid this vender.  They also seek compensation for the Wells Fargo HELOC that they took out to make mortgage payments.

Respectfully submitted this 12th day of December, 2014.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/Kevin M. Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of December, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

*s/Zachry Stoebe*
U.S. Attorney's Office