**Joy Bertrand, Esq.**
PO Box 2734
Scottsdale, Arizona 85252-2734
Telephone:  480-656-3919
Fax:  480-361-4694
joyous@mailbag.com
www.joybertrandlaw.com
Arizona State Bar No. 024181

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

United States of America,

    Plaintiff,

    v.

Joseph Plany, et al.,
    Defendants.

**Case No.  CR-12-1606-SRB**

**JOINT PSR OBJECTIONS (CORRECTED)**

NOW COME the Defendants, Joseph Plany and Paxton Jeffrey Anderson, to submit their objections to the draft PSR.

## INTRODUCTION

On 9/11/12 the government indicted Anderson and Plany for 31 substantive counts of bank fraud involving M&I Bank and Tier One as the lenders [Dkt 3]. The government also indicted the defendants for conspiracy to commit bank Fraud in Count 32 alleging 33 overt acts involving 31 separate properties than those alleged in Counts 1-31.  Tier One was the named lender in 14 of 32 counts: Count 2 13684 Coyote Way (Marti Anderson);

Count 6, 11-14, 16-19, 20-23 and 25 (37465 N. 104th Place- Marc Acre) and Count 32, Overt Act 6 (14353 E. Zorra Way) (Jeff Anderson).

The remaining fourteen substantive bank fraud counts of the Indictment involve M&I as the lender.  In Count 33, M&I was named the lender for 32 of 33 overt acts. All loans (other than the wholesale loans) were originated by the same M&I mortgage corporation officer Greg Slater.  The Government at trial presented no documentary evidence as exhibits to prove 24 of the 33 overt acts listed in Count 33 for conspiracy to commit bank fraud);[1]  Defendants were found guilty of all counts except Count 3; Mr. Plany was found not guilty of Counts 2 and 8.

## ARGUMENT

No matter what a Defendant's sentence ultimately is, the trial court must "still properly calculate the advisory guidelines-sentencing range for use in deciding the sentence to impose."  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).

### I.     Role in Offense

Mr. Anderson's PSR gives him a leader/organizer role in the offense.  Mr. Plany's PSR gives him a manager role in the offense.  The scheme in this case does not meet the letter or spirit of the "complex scheme" guidelines.  The commentary to the "sophisticated means" guideline provides:

> For purposes of subsection (b)(9)(C), "sophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or

---

[1] No evidentiary exhibits were admitted for the following overt acts in Count 32: 4, 5, 7-10, 12-14,16-23, 26-33. The jury was given a general verdict as to Count 32 so it is unknown which overt act(s) they convicted the defendants upon.

concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Here, the PSR gives no explanation as to why this guideline should apply to the scheme in the present case.  Without more explanation in the PSR, it is difficult to object in-depth to this guideline application.  Reviewing the scheme set forth in the indictment, however, it is clear that this scheme was far from "complex."  The scheme involved no shuffling of assets between jurisdictions, fictitious entities, or other intricate financial activities.  Rather, the scheme involved lying on loan applications to fund real property purchases.  The scheme was not any more complex than a simple theft by trick.

The Government can present no evidence that supports its contention that, by clear and convincing evidence, Mr. Anderson was the leader and/or organizer and Mr Plany a manager of the mortgage fraud for which he was convicted and that that criminal activity included five or more participants. " '[S]ome degree of control or organizational authority over *others* is required in order for [U.S.S.G.] section 3B1.1. to apply.' " *United States v. Bonilla-Guizar*, 729 F.3d 1179, 1186 (9th Cir. 2013) (emphasis in original) (quoting *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990)).  The Government's evidence shows that both were equal participants with Sanchez (over 30 property transactions), Blemaster (at least 10 property transactions and Greg Slater ( M&I mortgage corporation loan officer for at least 15transactions), not a leader or organizer.  For example, the fact that Mr. Anderson would bring deals and recruit participants to co-

conspirators , does not support some degree of organizational authority, but rather supports that Defendants were only a component to the mortgage fraud itself.  The Government ultimately failed to show by clear and convincing evidence that Mr. Anderson exerted "some degree of control or organizational authority over *others*." Rather the evidence demonstrates that both Plany and Anderson were average participants, like their co-conspirators, where each participant had an independent role in the criminal activity.

## II.    Complex Scheme

The government's contention that the district court's two-level enhancement for sophisticated means was proper is without merit. Defendants' fraudulent scheme was not "sufficiently more complex" than the routine offense for which he was convicted, mortgage fraud. *See United States v. Aragbaye*, 234 F.3d 1101, 1108 (9th Cir. 2000) (in tax evasion case, concluding that "Appellant's scheme was 'sufficiently more complex' than routine tax evasion."). In contending that the enhancement was warranted, the government only points to the necessary conduct **\*31** that constituted the fraud. The conduct that is necessary for the commission of the crime cannot be the basis for the enhancement. *See United States v. Montano*, 250 F.3d 709, 715 (9th Cir. 2001).

In *United States v. Tanke*, 743 F.3d 1296, 1307-08 (9th Cir. 2014), this Court upheld a sophisticated means enhancement where the district court found "a high level of planning and concealing of defendant's theft" and further noted the means to execute and conceal the fraud "as a whole were sufficiently sophisticated to support the district court's decision." *Id.* at 1307 ("Although [defendant] did not use 'fictitious entities,

corporate shells, or offshore financial accounts,' as the Sentencing Commission's commentary contemplates, he created at least six false invoices and falsified carbon copies of checks in [business's] check register on at least 10 occasions to conceal the payments.") The Court also emphasized the defendant's position as vice president of the company for which he worked, and that he "carefully engaged in dozens of various acts... to execute and conceal three separate types of fraud." *Id.*

Here, Defendants' conduct did not rise to the level of sophistication as the scheme was not "highly complicated," "many sided" or "complex." Nor did Anderson or Plany carefully engage in dozens of various acts to execute and conceal the mortgage fraud that could arguably be seen as sophisticated. Further, Mr. Anderson's company Dynamite Construction was not a shell corporation as the company conducted legitimate business. Therefore, it cannot be said that defendants mortgage fraud scheme was "sufficiently more complex" than the routine mortgage fraud scheme.

**III.    Gross Receipts**

Guideline § 2B1.15(A) provides, "if the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels. . ."  Here, the PSR provides no explanation as to how this each Defendant *personally* received more than $1,000,000  (as opposed to constructions companies) in gross receipts from this scheme. Therefore, it does not appear, by a preponderance of the evidence, that this enhancement applies.

## IV.    Loss Calculations[2]

*A.    The Government Must Prove Losses by Clear and Convincing Evidence.*

The Guidelines require a district court to calculate the amount of loss caused by fraud, and correlate the severity of the sentence to the amount of the loss.  *See* USSG § 2B1.1(b)(1).  "[T]he sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes....[L]oss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level...." *Id.* comment (backg'd.).

Ordinarily, a preponderance of the evidence is all the proof required when finding facts at sentencing, such as the amount of loss caused by a fraud.  *United States v. Armstead,* 552 F.3d 769, 776 (9th Cir.2008).  However, "where an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard." *United States v. Zolp,* 479 F.3d 715, 718 (9th Cir.2007).  In that case the Ninth Circuit standard mandated that the Government establish by "clear and convincing evidence" any "facts found in support of Guidelines enhancements that turn out to have a disproportionate impact on the ultimate sentence imposed." *United States v. Staten,* 466 F.3d 708, 720 (9th Cir. 2006); *see also United States v. Jordan,* 256 F.3d 922, 928 (9th Cir. 2001) (quoting *United States v. Valensia*, 222 F.3d 1173, 1182 (9th Cir. 2000)).

---

[2]  Defendants have provided the Maricopa and Yavapai County Recorder's Index of recorded documents for certain properties.  Defendants can provide copies  of the recorded documents at the hearing sent for 12/16/2014 or earlier if the Court or Government requests these to view these documents.

The requirement that certain sentencing facts be found by clear and convincing evidence is to ensure that criminal defendants receive adequate due process. *See United States v. Staten,* 466 F.3d 708, 717 (9th Cir.2006).   Where a severe sentencing enhancement is imposed on the basis of uncharged or acquitted conduct, due process may require clear and convincing evidence of that conduct. *See United States v. Harrison-Philpot,* 978 F.2d 1520, 1523 (9th Cir.1992).   This requirement to ensures that legislatures "cannot evade [the constitutionally required standard of proof] by reclassifying an element of a crime as a sentencing factor," *id.,* thereby depriving a defendant of important criminal procedural protections. "[W]here the enhancement represents the overwhelming proportion of the punishment imposed, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations." *Staten,* 466 F.3d at 720 (internal quotation marks omitted).   "To accommodate these concerns ... a district court is required to 'ratchet up certain, though not necessarily all, of the procedural protections afforded a defendant at sentencing, so as more closely to resemble those afforded at trial, by applying the clear and convincing evidence standard....' " *Id.* (internal quotation marks omitted). *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010).

B.   *The Government's Loss Calculation Methodology is Fundamentally Flawed.*

The Ninth Circuit recently held "that, in a mortgage fraud case, loss under U.S.S.G. § 2B1.1(b) is calculated in two steps": The "first step is to calculate the greater of actual or intended loss, where actual loss is the reasonably foreseeable pecuniary harm from the fraud," and the "second step is to apply the 'credits against loss' provision and

deduct from the initial measure of loss any amount recovered or recoverable by the

creditor from the sale of the collateral."  *United States v. Morris*, 744 F.3d 1373, 1375

(9th Cir. 2014).

However, a defendant's mortgage fraud cannot be considered the proximate cause

of a lender's loss when the lender makes a conscious choice to hold a property rather than

sell it promptly to recoup its losses.  *See Robers v. United States*, 134 S.Ct 1854, 1860

(2014) (J. Sotomayor, concurring);  *see also United States v. Hicks*, 217 F.3d 1038, 1049

(9th Cir. 2000) (defendant's conduct must be proximate cause of loss).

In the *Robers* concurrence, discussing the Government's concession, Justice

Sotomayor noted:

> [A] victim's choice to hold collateral -- rather than selling it in a reasonably
> expeditious manner -- breaks the chain of proximate causation. If the collateral
> loses value after the victim chooses to hold it, then that 'part of the victim's net
> los[s]' is 'attributable to' the victim's 'independent decisions.' " ... The defendant
> cannot be regarded as the 'proximate cause' of that part of the loss,... and so
> cannot be made to bear it.' *Robers*, 134 S.Ct. at 1860.[3] Thus, if a victim delayed
> unreasonably in selling collateral, it would manifest a choice to hold the collateral,
> breaking the causal connection between a defendant's fraud and the victim
> lender's loss. *See id.*

Here, the Government submitted a letter from the FDIC as to the Tier One

Properties.  **Ex. 1**. As to the M&I properties a chart of 45 transactions involving 43

properties. **Ex. 2**. [4]

---

[3]While the Court was addressing restitution in *Robers*, the issue of proximate cause
applies equally to loss calculation under the Guidelines. See Hicks, 217 F.3d at 1049.

[4] On the second page of the government's M&I chart labeled "Trend Analysis, under the
Column for "M&I Company", the government listed MIMC (M&I mortgage

The Defense objects to the Government's loss methodology as to all claimed losses. The methodology used by the Government appears to be:  (the loan amount – the net proceeds from the sale of the property (through foreclosure or otherwise)).  However, the Government's calculations did not consider that most of these loans were lot loans and construction loans for which no constructions draws were taken.  Rather ,the FBI used the principal amount as to the loan without taking into consideration that, if there are no construction draws, the principal amount due at the time of foreclosure is the funds advanced by the lender for refinancing the refinance of the lot loan or for the lot itself.[5]

The Government's methodology does not accurately reflect the accurate principal amount due at the time of the foreclosure sale.  For example, each M&I loan account for each of these foreclosures has deductions in the principal amount due on the loan after the foreclosure.  However, the deductions were blacked out in each file.  **c.f.,  Ex. 21; Ex. 22.**  Additionally, some of the M&I accounts reflect a credit called "lock box credit" in large amounts to certain accounts.  See Exhibit 21, bate 1C059-00007. (credit for $2,905,519.79  in Mr. Wagner's Loan Account),Exhibit 22, bate 1C059-21 and 22 (in Hayden's account).  M&I also made other internal deductions to each account that cannot

corporation). Defendants still contend that all M&I loans were through a non-FDIC entity.

[5] Most of the properties were for refinancing a prior lot loan or construction loan. Most of the properties had no constructions draws.  For example, there were no constructions draws for Count 7 (Zorra), Count 8 (Moonlight), Bailey (Count 9), Blemaster (Count 15), Count 32-20 (Acre 113th Place, Count 32-21 (Fang)  Count 32-22 (Acre 97th),Count 32-32 (Hayden), Count 32-34 (Rongstad), Count 32-25,  Jennett (Lost Circle), 32-2 Jennett (Juniper)

be reviewed or analyzed because those deductions or credits are also blacked out. A tedious review of the loan files and the REO files establishes a much lower amount of loss as to each of the M&I loans in additional to the arguments set forth below that many of these loans are unrelated to these Defendants.

If the Government cannot accurately state the loss using the appropriate methodology, then this Court cannot rely on Exhibit 2 as an accurate calculation (or even a reasonable calculation) of the loss to be attributed to Defendants.  Further, the Government calculated actual loss by a method (unknown to these defendants) that limited loss for unnamed properties as to co-conspirators Sanchez and Blemaster.  For Mr. Sanchez and cooperating witness for the government, the government limited the loss as part of Sanchez' plea agreement for this same conspiracy, the government stipulated that the loss (for 30 properties that he was involved in) was only between $30,000 and $70,000 and restitution is capped at $65,000. **See Ex. 3, Sanchez information and Plea Agreement ¶2 (a) and 3, filed in CR-13-1155-PHX-GMS, Dkt 6 and 10.**

For Mr. Blemaster, a loan officer that brokered many of the subject properties, as part of Blemaster' s cooperation agreement, the government stipulated that Blemaster' s loss to $70,000 but less than $120,000 and restitution was capped at $102,000 . **See Ex. 4, Plea Agreement, ¶2 (a) and 3 cooperation agreement filed in 13CR00982-DGC [Dkt 11].**  Mr. Blemaster testified at trial that his plea agreement reflected actual loss that he caused the lenders:

> We [the government and defendant] calculated the losses from the loans that foreclosed under my applications. The dollar amount of the loss fit within those

parameters is how we came up with my Plea Agreement." **Ex. 5 5/20/14, Blemaster Testimony, p.217, ll.14-17.**

The majority of those loans that I did were refinanced out by, I believe, another banker at M&I Bank, so there was no loss at all, which is how we [the defendant and the government] calculated it. **5/20/14, Blemaster Testimony, p.214, ll.11-13**

The Government cannot use a loss methodology for Mr. Anderson and Mr. Plany and another for Mr. Sanchez and Mr. Blemaster, when they are all guilty of conspiring to commit bank fraud arising from the same alleged conspiracy. Before calculating any loss to be attributed to these defendants, the court must inquire of the government as to the loss methodology utilized for Mr. Blemaster and Mr. Sanchez and apply the same methodology and limitations as relevant conduct or scope of responsibility for each alleged property loss to Mr. Anderson and Mr. Plany.

C.    *Tier One/FDIC Losses*

The Government, via the FDIC's leter, seeks $443,014.00 as loss for an unknown property**. Ex 1.** The further errors in the loss calculations as to this set of properties is set forth, as follows.

**Count 2 Tier One Lot 46 Coyote Way**

As to Count 2, 13684 for Lot 46 Coyote Way (Marti Anderson), the government has not provided any underlying documents in support of the alleged loss to the FDIC. Further the Maricopa County Recorder's office shows that the Tier One Loan was paid off on 2/14/2007 a new loan was secured by with Magnus Financial Corporation (non FDIC lender). There is no loss. **Ex. 6, Maricopa County Index.**

**Count 32 Overt Act 6 Lot 106 Zorra Way (Jeff Anderson)**

As to Count 32, Overt Act 6 for Lot 106 (14353 E. Zorra Way) the Government has not disclosed any documents as to whether there is a loss related to this property. In fact, this Tier One loan was paid off in January, 2008. **Ex. 7,** Government **bates 1C010-000179.**

**Alleged Loss for Desert Wash (Lot 11 Fire Rock)**

This property was not listed in the Indictment. The FDIC claims a loss of $393750. **Ex. 1.** The Government did not provide the actual construction loan file and provided no documents as to the REO resale of Desert Wash property or the loss methodology utilized. [6]

**Counts 6, 11-14, 16-19, 20-23 And 25, 32-(104th Place (Acre)**

As to Counts 6, 11-14, 16-19, 20-23 ,25 32-15 for 37465 (37475) Lot 28 N. 104th Place property, the Government disclosed Exhibit 817, Great Western file for this property. The government disclosed another FDIC letter dated 9/9/14 claiming $767,844 for 37475 104th Place. **Ex. 1.** The Government does not disclose the methodology for this calculation. Assuming the methodology is: (principal owed – net resale proceeds), the resulting loss is over-stated for two reasons.

First, the lender held this property for almost three years. The Maricopa County Recorder's office establishes the following liens and conveyances for this property Lot 28

_____

[6] After trial, the Government disclosed bates 5846-5852 unofficial Maricopa County recorded documents- Trustee Deed, Resale deed and affidavit of Property Value. It did not disclose the REO file for this property and it did not disclosed the actual principal amount due at the date of the trustee sale (deducting any amounts that were not used as construction draws).

Mirabel Village, 37475 N. 104th Place:

| | |
|---|---|
| 2/17/2006 | TIER ONE DEED OF TRUST MARK ACRE $1,467,944 |
| 3/5/2008 | TRUSTEE SALE OF TIER ONE DEED OF TRUST |
| 6/4/2008 | TRUSTEE DEED TO TIER ONE |
| 12/7/2010 | FDIC RECEIVER FOR TIER ONE BANK DEED GREAT WESTERN BANK |
| 04/1/2011 | GREAT WESTERN BANK DEED TO JAMES NUNN |

**Ex. 8, Maricopa County Recorder's Office index for Lot 28.**

Second, by keeping this property for so long, the lender caused the loss. Thus, Defendant's conduct is not the proximate cause of the lender's loss. See *Robers v. United States*, 134 S.Ct 1854, 1860 (2014) (J. Sotomayor, concurring); see *also United States v. Hicks*, 217 F.3d 1038, 1049 (9th Cir. 2000) (defendant's conduct must be proximate cause of loss).

On 6/2/2008, the principal amount owed at the time of the trustee sale is $1296171.28.[7] **Ex. 9.** In 2008, the property was valued at $1,452,500. If the property would have been sold in 2008, the bank would have a gain.

| | |
|---|---|
| 3/2008 MARKET VALUE | 1452500.00 |
| 6/2008 PRINCIPAL OWED | -129671.78 |
| **GAIN** | **1322828.22** |

**See Exhibit 9.**

In 2009 the property was valued at $975,000. If the lender had sold it, the potential loss would be:

| | |
|---|---|
| 6/2008 PRINCIPAL OWED | 1296171.78 |

---

[7] The principal balance is not the amount of the original construction loan, because some of the funds were not disbursed as construction loan at the time of the trustee sale.

8/2009 APPRAISAL AS-
IS                                           -975000
**LOSS                                    321171.78**

**Ex. 9**

In 2010, the property was valued at 875,000. If the lender had sold the property in

2010, the loss would be:

6/20/2008 PRINCIPAL
OWED                                     1296171.28
7/2010 APPRAISAL                     -875000
**LOSS                                    421171.28**

**Ex. 9.**

If Court refuses to attribute proximate cause of the loss solely to the lender, then

FDIC claimed loss is overstated.  On April 1, 2011, the property was sold for $700,000.

Assuming that the Government presented sufficient evidence of the loss, it is overstated.

The calculation is:

PRINCIPAL OWED ON
6/2008                                       1296171.78
NUNN PROCEEDS
4/1/2011                                    -641423.62
NET LOSS                                  654748.16
FDIC CLAIM                              -767844.00
LOSS TO BE
DEDUCTED                             -113095.84

**See Exhibit 9, 817 bates**

Further, even though Defendants were found guilty of fraudulent construction

draws, the loss should be limited to that contained in the indictment.  This lot was part of

a settlement agreement between Mr. Acre and Mr. Anderson.  **Ex. 10.**  In that agreement,

Mr. Anderson and Mr. Acre agreed: The "Carrying Costs" invested in the Projects (and

not reimbursed by any secured loans on the Projects) by Dynamite Custom Homes LLC and Paxton Anderson through February 28, 2007, are as follows: 1. Lot 28 Mirabel $-0- (footnote 1): Acre *I* Acre Parties agree that the sum of $609,000 has been properly spent (from loan proceeds) on this property through February 28, 2007.

Moreover, Mr. Acre, while he testified that the draw forms were forged, admitted that the home was 68-70% completed by Mr. Anderson and draw funds were paid to subcontractors. **Ex. 11, Acre Trial Testimony, 5/9/14,** pp. 178-189.  Therefore, the lender should bear the loss as kept the property for three years.  Alternatively, the actual loss that should be borne by the Defendants is the amounts of the construction draws, not the loss on the original loan.

D.     *M&I Alleged Losses and REO Resale Files*

The Government disclosed a loss chart for the M&I properties attached as **Exhibit 2.**  As stated above, the Government does not accurately state the principal amount owed for each of these loans at the time of foreclosure.  The chart lists 43 properties upon which M&I had a secured deed of trust.[8]  PSR M&I alleged loss is $9,021,294.09. [9]  The Government claims loss for M&I loans for not only properties named in the indictment, but also for the properties that were not in the indictment, dismissed by the Government, and/or related to Count 3 (acquittal).

---

[8] As shown infra, Acre had two loans related to Lot 148 Apache Peak Loans #4064307 and #415217

[9] In June, 2014 the government alleged the total loss to M&I to be 7,664,129.33. See Doc 189-1.

After trial, the Government also disclosed M&I REO resale files for 27 properties. Fourteen of 43 M&I loans were paid off prior to the indictment**.**  Further, ten of 43 M&I loans involve loss associated with Talking Ranch Properties belonging solely to Greg Sanchez, as these Defendants were not involved in the loan process and was not the builder.  **Ex. 12.**  Two of 43 M& I loans is loss attributed to Blemaster as defendants were not involved in the loan process or construction as testified to by Blemaster. **Ex. 13**. Five of the 43 properties the defendants were not part of the loan process or builder.  **See Ex. 14**. Additionally, four of 43 properties the government admitted uncertainty as to any fraud.  Last, the government could not find files for two of the properties listed in Exhibit 2. **Ex. 15.**

### 1. Sixteen Of 43 M&I Properties That Defendants Were not Associated With the Defendants

As to sixteen 43 M&I loans, the Government has insufficient evidence that Defendants were involved in the loan process and/or construction on these properties draws.  M&I took a deed in Lieu (DIL) or approved a short sale (Windrunner) for four of these properties.  As to all listed remaining properties, the Defendants were not the builder for these vacant lots.  The Government has no evidence of the Defendants involvement in the loan process for any of these properties.  **Ex. 14.**

### 2. Talking Rock Properties

As to nine M&I loans for Talking Rock vacant lots, the Defendants had nothing to do with the Loan applications and did not enter into any construction contracts for Talking Rock. Greg Sanchez was involved in these properties with Slater or Blemaster.

The Government solicited no specific testimony about Defendants with respect to these properties.  In fact, these properties were excluded from Sanchez' list of properties that he was involved in with Defendants.  **Ex. 16, Emails between Anderson and Sanchez regarding the properties together and Sanchez's Handwritten List of Properties given to the government.**[10]

As to Lot 65 Talking Rock, Three Forks, the government did not produce the REO file for this property to establish the loss. As to four other Talking Rock lots, the government wrote to the defense on 6/14/2013: "It is unclear, however, whether fraud was involved in the following loans . . . :

**1.** Desmet, Larry #3940722 Lot 24 Talking Rock $111,983.92(Count 32-9)
**2.** Hayden, Colin #35730266 7153 E. Summit Trail $305,716.13 (Count 32-32)
**3.** Woodson, Kerry #4067948 Lot 174, Talking Rock $226,917.35 (Count 32-19)
**4**. Woodson, Kerry # 4094161 Lot 4, Cottonwood Apache $306,908.45 (Count 32-27)"

Prior to trial, the Government expressed its own uncertainty of any fraud with these loans and it admitted no evidence relating to these properties at trial.[11]  Therefore, no loss should be attributed to these Defendants with respect to these properties.  See Exhibit 14.

**3.  Blemaster And P&B Properties**

As to Windrunner (Count 32-21) and Count 15 (31st Way) (dismissed by the government, Mr. Blemaster is solely responsible for any loss related to Windrunner.  The

---

[10] Government Discovery 1CO65-00001.

[11] See ECF Doc. 190, Government's Final Exhibit List.

government knew that Anderson had no involvement in these properties prior to the indictment. Blemaster and Anderson had severed their relationship by the beginning of 2006. Anderson was not involved in the Windrunner property. **Ex. 5 Blemaster 5/16/2014 trial testimony, p. 139-144.**

The Government knew prior to the indictment that Dynamite was not the builder. P&B enterprises consisted of Blemaster and his father in law William Perry, a construction company owner.  According to Blemaster, the loan applications contained no false information and the M&I loans on this property were well after Blemaster and Defendant severed their relationship (December 2005- January, 2006).  **Ex. 5 Blemaster Trial Testimony, 5/16/14 p. 139;  Ex. 17; Maricopa County Recorder Chain of title for recorded documents (M&I loans on 10/24/2005 and 1/14/2008)**;  Ex. 6, Govt Trend's Analysis for P&B which lists Landmark Building Consultants as the **Builder**.  M&I also agreed to a short sale of this property which Mr. Blemaster testified that was part of his loss calculation for his plea limiting his loss exposure between $70,000 and $120,000. **Ex. 5 5/20/14 p. 206, ll.1-5 trial testimony of Blemaster.**  The total loss of $1,145,624.28 (for both this property and the 39th property, *infra*) and associated costs should be deducted from the alleged loss against Defendants. **Ex. 13.**

The Defendants never met or contracted with owners Madore, Chen, or Leono. Defendant did not build Lot 4 Woodson.  **Ex. 14**.  The Government presented no evidence or testimony to connect the defendants to these properties or M&I loans on

these properties.[12]  Nothing in the Government's discovery or at trial established with sufficient evidence that the Defendants were involved in these loan applications, false statements or misrepresentations or Dynamite received any construction loan draws related to any of these properties.  The amount of $759, 539.25 and associated REO costs should be deducted from the government's loss calculation.

**4. Four M&I Properties That Were Dismissed by the Government or Resulted in Acquittal**

On May 29, 2014 the Government dismissed the following counts:

Count 7        14252 E. Zorra Way Fountain Hills (Marti Anderson)
Count 15       16802 S. 31st Way (Blemaster)
Count 28       15050 N. Four Mile Creek (Sandra Anderson)
Count 29       15050 N. Four Mile Creek (Sandra Anderson)

On June 4, 2014, the jury found both defendants not guilty of Count 3 (14485 N. Centennial Drive, Prescott AZ) (Sanchez) (M&I).  Yet, the Government still claims a $119,670.11 loss.  As to Count 3 (Centennial), Sanchez testified that he could not recall if Anderson was involved in the loan application and process, it is a vacant lot and he still owns it.

Mr. Sanchez also testified he could not recall if he had a discussion with Anderson about Sanchez' loan application.  He only received a lot loan, not a construction loan.  **Ex. 18, Trial Testimony of Greg Sanchez, 5/14/2014, p.18-22.**  Any alleged loss for Centennial or Talking Rock properties, should be borne by Mr. Sanchez.  According to

---

[12]   See Dkt 190, Government's Final Exhibit List.

the Government M&I charts, the loss for the Talking Rock properties is $1,297,921.88. Associated costs should be deducted from the government's loss calculation.  **Ex. 12.**

As to Count 7 (Zorra Way $501,000 loan) dismissed by the Government at trial, the Government presented no evidence that the specific loan application was materially false, that these defendants or other co-conspirators presented a false loan application or fraudulent draws.[13]  Sanchez testified that he had no knowledge about this lot or the construction loan and as a result, Government's Exhibit 705 (the URLA) was not admitted. **Ex. 18 Sanchez, 5/21/14, p.57, ll.6-13**. The Government claims a loss of $427,334.47, without taking into account that there were no draws on this construction loan that were anticipated in the loan amount.  This was also a refinance for a prior loan from a different lender.  The Government cannot prove any loss attributed to these defendants.

As to Count 15, ($300,000 loan) Mr. Blemaster testified that this property was to be his primary residence and had nothing to do with the Defendants**. Ex. 5 Blemaster Trial Testimony of Blemaster, 5/16/14, p. 133, p. ll.20-25.**  The M&I loan for $300,000 was May 17, 2006 long after Blemaster and Anderson severed their relationship in December 2005/January 2006 . **Ex. 19.**  The alleged loss of $232596.28 and related costs should belong solely to Blemaster.

As to Counts 28-29, Sandra Anderson never owned 15050 N. Four Mile Creek. The legal description of this property is Lot 74 MCR 45-62, Talking Rock Phase 1-A

---

[13] This Account 406523 shows no construction draws and a portion of it is blacked out by the government or the custodian of records.

Amended owned by Shane Murphy. **Ex. 20.**  This distinction is relevant, since the

Government, by information, charged Blemaster for conspiracy to commit bank fraud in

relation to Four Properties including 15050 N. Four Mile Creek Road, a property that

these defendants had anything to do with.  This is another example of the Government's

presentation of completely false evidence to a grand jury on certain counts in the

indictment.

The Court should also note as part of Blemaster's cooperation agreement, the

Government stipulated that Blemaster's loss to $70,000 but less than $120,000. **Ex. 5,**

**Plea Agreement, ¶2 (a) and cooperation agreement filed in 13CR00982-DGC [ECF**

**Doc. 11].**  The Government entered into this stipulation knowing full well that the loss

claimed as Windrunner alone exceeded $120,000.  In fact the information filed 7/15/13

[13cr-00982 Dkt 7] against Blemaster listed four properties, two of which the

government is claiming loss against these defendants: Count 8 –Moonlight Drive (Sandra

Anderson)( alleged loss is $382,026.26); Count 9-100th Way (Bailey) (alleged loss is

$379,411.06 and Count 15 31st Way ( Blemaster) (alleged loss is $232,596.28).

Mr. Blemaster testified that they (the Government and his attorney) arrived at an

actual loss that is less than $120,000 for five unnamed property transactions yet the

government continued to claims a loss against these defendants for the same properties.

**Ex. 5, Excerpts from Blemaster Trial Testimony, 5/20/14, p.203-206,216-219,222-223**

**and 227-228.**  The remaining property listed in the Blemaster information is 15050 N.

Four Creek Road a property that Sandra Anderson never owned.  **Ex. 20**.  Therefore,

Blemaster could not have assisted Sandra Anderson to qualify for an M&I loan for a

property that she never owned.  He never testified about the Moonlight property or Lot 74

Talking Rock related to Sandra Anderson and the government never presented any

additional evidence relating to these properties. The only remaining property from the

information is Bailey (100th). But Mr. Blemaster also testified that they (the government

and his attorney) calculated the losses for Bailey (1) Rongstad loan (1), Jennett loans (2)

Jason Woodward (3 Talking Rock loans), Marti Jo Anderson (if any) and for his own

fraudulent loans (31st and Windrunner). [14]  If the losses associated with those properties

have been calculated by the Government to be $70,000 to $120,000 for Blemaster, then

the same loss should be applied to these Defendants.

**5.  M&I Alleged Losses Relating To Other Properties:  Count 32 Overt Act 23 (Wagner) (Loss Claimed $231,985.41)**

The Government presented no evidence at trial relating to the Wagner M&I loan.

The Government has not established false construction loan draws by these defendants or

any involvement in Wagner's loan application with M&I.  In 2007, the house was

completed by Defendants.

In June 2002, Wagner purchased this property and obtained a loan from M&I

Bank in the amount of $272,700.  **Ex. 21 (MCR 2002-34418 and 33419).** On 12/21/2004

he obtained another loan from National Bank of Arizona in the amount of $924,000.

(MCR 2004-10465).  On 1/10/2006 he refinanced both loans with M&I for loan in the

---

[14] Blemaster starting testifying about Sandra Anderson but never stated which loan he did for her and he didn't know if it closed. Exhibit 5, 5/16/14, p.73. ll. 20-21  Then he stated he did not recall the loan amount for Marti Anderson and he did not identify the property to which the loan application applied.  Exhibit 5, 5/16/14, p.176, ll.19-22.

amount of $999,950.  On 7/24/2007 he obtained another loan from National City Bank in the amount of $350,000 (MCR 2007-84913).  On 8/29/2008 M&I noticed a trustee sale and obtained the property by trustee deed on 12/15/2008 (MCR-2008-119180).  There is no causal connection between M&I's loss and the defendants as to this property.

**6.  Count 32, Overt Act 32 (Hayden) (Loss Claimed $305,716.13)**

Mr. Colin (Bud) Hayden is Greg Sanchez' father in law.  On 1/29/2004 Hayden purchased this property with a loan from Express One Mortgage in the amount of $228,951. **Ex. 22**, (MCR 2004-92411).  On 4/18/2005 Hayden obtained a second loan from Chase Bank in the amount of $217,500. (MCR 2005-493104).  Mr. Hayden reported to a defense investigator that there was no fraud or wrongdoing involved and his home was completely finished.  Greg Sanchez, his son-in-law, stated that there was no misrepresentations on Hayden's loan application.

On 3/23/2007 Hayden refinanced the above loans with M&I banks with a loan for $990,500. (MCR 2007-34501).  This was not a construction loan.  The Government did not disclose any construction draws from M&I bank to the Defendants.  The Government presented evidence at trial relating to the Hayden M&I loan.  Mr. Hayden is Greg Sanchez' father-in-law.  Mr. Hayden obtained his M&I loan through loan officer Greg Slater.

The Government disclosed no evidence that these Defendants were involved in the loan application process or took unauthorized or any construction draws from M&I bank. The house was completed in 2007.  Additionally, on 6/14/2013 the government wrote to the defense "It is unclear, however fraud was involved in [Hayden Loan]." That is true -

there was no fraud.  Mr. Hayden obtained a legitimate loan from M&I as a refinance, not

a construction loan.  Any funds from this loan should be excluded from the

Government's loss estimate.

**7.  Acre M&I Loans**

From 2004 through 2006, Mr. Acre obtained 7 separate loans with M&I. M&I

refinanced its own loans on three separate properties owned by Mr. Acre.  **Ex. 23, Acre**

**properties.**  Mr. Acre owned at least three limited liability corporations that were

speculating and investing in real estate before and during the time that he was in business

with the defendants.

One of the properties alleged in the indictment (Sundance – Count 32, Overt Act

1) sustained no loss. As to the other three properties, the government and M&I alleges

that defendants are solely responsible for M&I alleged losses totaling $1,556,816.02 for

M&I Loans to Mr. Acre for specific properties.  As set forth below, Defendants maintain

they had nothing to do with the loans nor is there any causal connection between these

loans and any illegal conduct by the defendants.

**8.  Lot 148 Apache Peak -41606 N. 113th Place Mimc Loans #415217 And**
**4064307: Count 32- Overt Act 20 (11/22/2005) (Loss Claimed $595,000)**

The Government claims that Defendants are responsible for M&I loss of

$738905.79 for a second M&I loan to Mr. Acre for Lot 148 Apache Peak. None of the

evidence supports a causal link between Mr. Anderson's alleged conduct and the

foreclosure of this property by M&I on a 2006 M&I loan obtained by Mr. Acre not the

11/22/2005 loan alleged in Count 32 as overt act 20. M&I foreclosed on the 2006 Loan

#415217 (1.68 million) not the first paid off M&I loan (##4064307) alleged as part of the

Conspiracy for Count 32-20.  In sum, the 2006 second M&I loan is the loan that M&I

foreclosed on, creating its alleged loss. **Ex. 24.**

The Maricopa County Recorder's office establishes that Mr. Acre took out three

separate loans on this property, two from M&I bank. He also fired Mr. Anderson on

3/9/2007 as his builder. On 12/17/2004 Mr. Acre purchased this property with a loan

from National Bank of Arizona in the amount of $1,494.663.

On 11/22/2005 (recorded 11/30/2005) Mr. Acre took a loan #4064307 from M&I

in the amount of $595,000 (**referenced in Count 32-20**) (MCR 2005-1816029).  Mr.

Anderson had nothing to do with this loan as it was not a construction loan.  Linda

Pecanic, Investigator for M&I stated in her notes as to Loan #406307 for Lot 148 Apache

Peak:

> This loan is paid in full it was a cash out refinanced lot loan, Mr. Acre received
> $690.17 and we found no disbursements made to Paxton Anderson or any of his
> companies as this was not a construction loan. Mr. Acre closed 5 loans with M&I
> 2 of which have been paid off. The 3 remaining loan in our portfolio are
> performing with no late payments on two and one loan is currently 25 days past
> due. We also found undisclosed lot loans with other lenders. The 1003 states he
> does not intend to occupy the property. Mr. Acre has been interviewed by M&I
> and said all of the loans we closed for him was for investment.[15]

> This was a cash out refinanced lot loan. Mr. Acre received $690.17 (sic) and we
> found no disbursements made to Paxton Anderson or any of his companies as this
> was not a construction loan.  (Emphasis added)
> On 2/22/2006, The National Bank Loan was paid off (MCR 3006-239217).
> On 5/18/2006, Mr. Acre secured another loan #415217 from M&I in the amount
> of $1,680,000 (MCR 2006-677423).  M&I investigator Linda Pecanic notes as to

---

[15] 1C27-00004, government discovery, Pecanic report.

Loan # 4152417: *** Spec Loan. Draw funded at close for soft costs – 107,000 to builder. Lot payoff at close -$597,000+. No draw activity since close."

On this loan Mr. Acre did state on his 1003 that was an investment property. I do not know if the other four loans we closed are listed as investment or owner occupied.

This is the one and only draw that Dynamite received from this property was disbursed directly from escrow with Mr. Acre's knowledge and authorization.

On 6/6/2006 M&I paid off its own Loan #406307 (MCR 2006-763501). On 3/9/2007 Mr. Acre and his companies entered into a settlement agreement with Paxton Anderson and Dynamite Custom Homes LLC which was to terminate and finalize their business relationship.  The agreement included this property, LOT 148 APACHE PEAK - 41606 N. 113TH PLACE as well as others.  Mr. Acre also agreed in the settlement agreement, that defendants properly spent $97,840 from the 2006 M&I loan proceeds. **Ex. 10 Settlement Agreement, Exhibit A. Footnote 1; Ex. 25, $107,000 check disbursed from Escrow.**  As of March 9, 2007 Mr. Anderson was not going to build anything for Mr. Acre.

On June 25, 2008 Mr. Acre and Mr. Anderson entered into a First Supplement to the Settlement Agreement.  **Ex**. **10**  As part of this agreement, Mr. Anderson released all rights to Apache Peak and had no further liabilities to Apache Peak. On 6/28/2008 M&I noticed a trustee sale for Loan #415217 (MCR 2008-0567453).On 6/18/2009 a trustee deed was issued to M&I (MCR 2009-0554163). On 3/12/2012 BMO bank (successor to M&I) sold to the Troys (MCR 2012-0202745) As to the 11/22/2005 M&I loan (Count 32-20, there is no evidence to link defendants to M&I's loss on this property Defendants are not responsible for the 2005 M&I loan paid off by M&I when Mr. Acre alone

obtained a second loan from M&I in 2006. The government knew this going in to trial and therefore, avoided asking Mr. Acre about the 2005 Loan application or any specific facts regarding Mr. Anderson's involvement in the 2005 M&I loan application because this loan no longer existed.  As to the 2006 second M&I loan, there was absolutely no evidence presented about Mr. Acre's 2006 M&I loan application Loan #415217 (not part of the indictment), any alleged false statements therein.

Mr. Acre did not testify about any misconduct by these Defendants as to his 2006 M&I loan.  In fact, the 2006 URLA was never mentioned by anyone during this trial.  As established above, Defendants have no causal connection to M&I loss on this property. Mr. Acre broadly claimed told the jury that Mr. Anderson, Mr. Greg Slater (VP at MIMC mortgage and loan originator for all Acre M&I loans) and Mr. Blemaster told him "what to put on the loans, what not to put on the loans and to qualify for the projects".  He did not testify that Mr. Anderson had anything to do with *this* loan application for this property only that Mr. Acre wanted Mr. Paxton to build on it.   Further there was absolutely no testimony about Acre's loan application (or exhibit) for the second M&I loan (#415217).  Not only did Mr. Acre fail to establish during his testimony that Mr. Anderson did anything illegal with respect to his second M&I loan property, but also the government did not nothing to correct its erroneous facts to the grand jury, the defense or the Court as to Count 32, Overt Act 20.  The Government knew, however, Mr. Anderson had nothing to do with this first M&I loan (#406307).

**9.  Lot 98- 14245 E. White Fang Court (Real Address Is 14245 E. White Wing Court) 2 M&I Loans Mimc Loan #406263 Count 32, Overt Act 21 11/22/2005 M&I Loan**

M&I claims that defendants are responsible for $335,546.04 for the 11/22/2005 M&I loan given to Mr. Acre on Lot 98.  There is no causal connection with the alleged M&I loss and the Defendants.

The Maricopa County Recorder's Office Index and records, Exhibit 26 establishes the following transactions by Mr. Acre: On 1/6/2005 Mr. Acre purchased Lot 98. MCR 2005-24884.  On January 6, 2005, M&I records a deed of trust securing the loan to Acre for $319,593. MCR 2005-24886.  On November 30, 2005, M&I refinances and pays off its own first loan with Mr. Acre.  It records a deed of trust securing $500,000 loan to Mr. Acre. MCR 2005-24886.  M&I Investigator Linda Pecanic notes:

> This was a cash out refinanced lot loan. Mr. Acre received $174,638.42 and we found no disbursement to Paxton Anderson or any of his companies as this was not a construction loan.

On March 9, 2007 Mr. Acre and his companies entered into a settlement agreement with Paxton Anderson and Dynamite Custom Homes LLC, which was to terminate and finalize their business relationship.  Lot 98 was not included in this agreement, because Mr. Acre admitted that Mr. Anderson had nothing to do with this property because it was separate from any agreement with Mr. Anderson. **Exhibit 11 Acre 5/9/2014 trial testimony, p. 87, ll.16-26, pp.88, ll.1-12, 5/13/2014 Acre Testimony, p.162, ll.15-25, p.163-164**.  Additionally the Government provided no documents to determine the resale price when this property was sold as a bulk sale.[16]

---

[16] Government Reo files, bates 2576-2658.

**10.  Lot 57 – 40645 97th Street Desert Mountain, Loan #406296 Count 32, Overt Act 22 11/22/2005 M&I Loan**

M&I claims that Defendants are responsible for $482,364.19 for the 11/22/2005 M&I loan given to Mr. Acre on Lot 57. The Maricopa County Recorder's Office Index and records, Exhibit 26 establishes the following transactions by Mr. Acre:  On 12/17/2004 Mr. Acre purchased this property (MCR 2004-1483752). On 12/17/2004 M&I recorded a deed of trust in the amount of $616,000 (MCR 2004-148753). On 11/30/2005, M&I refinanced the first M&I loan, paid it off (MCR 2006-3388) and recorded a deed of trust for $875,000. (MCR 2005-1814986).  M&I Investigator Linda Pecanic notes:

> This was a cash-out refinanced lot loan. Mr. Acre received $243,533.00 and we found no disbursements to Paxton Anderson or any of his companies as this was not a construction loan.

Lot 57 was not included in the settlement agreement between Arce and Dynamite, because Mr. Acre admitted that Mr. Anderson had nothing to do with this property because it was separate from any agreement with Mr. Anderson.  **Exhibit 11, 5/9/2014 trial testimony, P. 87, ll.16-26, pp.88, ll.1-12, 5/13/2014 Acre Testimony, p.162, ll.15-25, p.163-164.**

Mr. Acre's relationship with Mr. Blemaster underscores the Defendants' contention that they had nothing to do with this property.  Shortly after receiving the M&I loan proceeds, on 12/6/2005 Mr. Acre conveyed this property to Saguaro Forest Properties LLC of which Marc Acre is or was a managing member.  **Ex. 27.**  On 8/17/2007 almost two years later, Saguaro Forest Properties LLC conveys the property to

itself and Sonoran Dream Development LLC.  **Id.**  MCR 2005-0929373. Mr. Michael

Blemaster is a member of Sonoran and Sonoran begins making payments on this loan.

See Exhibit 27. On 3/17/2008 M&I notices a trustee sale for loan 4064296.  On

4/14/2008 Sonoran deeds the property back to Saguaro.  **Id.** **MCR 2008-0326160.**  On

7/8/2008 the trustee deed conveys the property to M&I. on 4/10/2009 M&I conveys the

property to Bello.  MCR 2009-321011.  The Government offered no testimony about

these conveyances by Mr. Acre to other companies or the use of the loan proceeds by Mr.

Acre.  It is clear that these Defendants had nothing to do with the M&I loans or the

proceeds and therefore, no causal connection to the M&I alleged loss.

**11.  Counts 24, 26-27, 30-31 And Overt Act 15 (Henstein) (Loss Claimed $596,741.55)**

Defendants were found guilty of Counts 24, 2 6-27, 30-31.  However as to Count

32 overt Act 15 (M&I Loan) the Government elicited no testimony from Mrs. Henstein

that her loan application had any fraudulent misrepresentations (Count 32, Overt Act 15)

by Anderson or anyone else.  She did testify that certain draws were forged.  However,

these draws were paid to the subcontractors.  Count 24 (Draw for $62,000) was a draw

for civil engineering and footings and retaining.  Doug Payne testified he was paid.

Count 26 (Draw for $36,000) was a draw was for clearing, grading, footings.  Again,

Doug Payne testified that he was paid.  Count 27 (Draw for $24,000) was a draw was for

footings and Doug Payne testified that he was paid.  Count 30 (Draw for $13,750) draw

was cut from $13,750 to $5k by MIMC after they inspected the property.  She also

testified that she personally did not pay $50,000 but she did not know if it was paid from

the Regions Mortgage loan (refinanced by M&I loan).  **Henstein Testimony, 5/27/14 p.69-70.**  The discovery shows that Dynamite received $61,000 from the first loan on this property from Regions Mortgage. [17]  Any loss should be limited to the amounts for the forged construction draws that they were found guilty of in Counts in Counts 24, 26-27, 30-31.

E.      *Alleged Losses to Bank of America, Countrywide and Chase*

        As to Bank of America/Countrywide, the Government has not disclosed the specific properties to which it relates this loss or provided any documentation in support of this loss.[18]  As to Chase Bank, the Government has not disclosed the specific properties to which it assesses the above loss or any documentation in support of the alleged loss. [19]

F.      *The PSR Loss Calculation Includes Wholly Unproven Individual Losses.*

        As to Mr. Acre claimed personal losses, the draft PSR acknowledges that the calculation was given verbally, with no documentation to support this alleged loss.  (PSR ¶¶21, 32 AND 33)  Nonetheless, the PSR attempts to integrate Mr. Acre's losses into guidelines loss calculations, the restitution, and the basis for the PSR writer's sentencing

---

[17] Government Disclosure Dynamite Chase Statements 647, Bates 1 C005-000058sShows on 7-13-04 a check for 61,000 plus that was paid to Dynamite from the prior Regions loan on this property.

[18]  After trial, the government disclosed 5853-5875 unofficial Maricopa County recorded documents related to a Countrywide Home Loan Inc., a non-FDIC lender. Countrywide Home Loans is not FDIC- insured.  Bank of America took over Countrywide as an assignee of their loans.

[19]  None of these banks are listed in the indictment.

recommendation.  Mr. Acre's loss calculations should be afforded no credit in any

respect.  Likewise, Ms. Henstein asserts personal losses and demands restitution that is

unsupported.  (PSR ¶31 AND 33)  Her verbal estimate, supported by no facts or law,

also should not be included in any sentencing-related loss calculation.

**V.      A Guidelines Sentence Case is Reasonable in this Case is Unreasonable.**

The fraud sentencing guidelines have been subject to substantial scrutiny, because

they tend to over-punish non-violent conduct of defendants, who, like the Defendants,

often are first-time offenders.[20]  When the guidelines factor financial losses (real or

intended), the number of victims, the complexity of the scheme, and other factors

inherent in garden-variety financial crimes, they generate sentencing ranges

disproportionate with the defendants' risk of re-offense and their need for rehabilitation.

Justice Breyer has noted that the sentencing precision believed to be achieved with

the white collar guidelines is false.[21]  Sentencing courts have balked at these calculations

and their ludicrous sentencing results.  *See*, *United States v. Lauersen*, 362 F.3d 160 (2d

Cir. 2004)(with six additional sentencing factors, "the calculations under the guidelines

have so run amok that they are patently absurd on their face."  *United States v. Adelson*,

441 F. Supp. 2d 506 (S.D.N.Y 2006);  *United States v. Parris*, 573 F. Supp. 2d 744, 756

(E.D.N.Y. 2008)(heavy focus on loss and "one-size-fits-all approach for its number of

---

[20]  Mr. Plany's and Mr. Anderson's PSR asserts he has one prior criminal conviction for
DUI, for which he was assessed one criminal history point.

[21]   Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited,* 11 Fed. Sent. R.
180 (Jan./Feb. 1999).

victims, [and] officer and manager enhancements provide no reasonable guidance, *United States v. Watts*, 707 F.Supp.2d 149, 151 (Mass. 2010), the "Guidelines were of no help, if not for the statutory maximum, the Guidelines for an offense level 43 and a criminal history I would have called for a sentence of life imprisonment.").[22]

Indeed, in March 2012, U.S. District Court Judge Jed Rakoff called for the fraud guidelines to be "scrapped in their entirety."[23]   Senators Leahy and Paul also introduced bipartisan federal sentencing reform legislation.[24]   Speaking in the context of statutory mandatory minimums, Senator Leahy noted that long sentences for non-violent offenders, "is a significant factor in the ever-increasing federal prison population and the spiraling

_____

[22]   One review of white-collar sentences noted:

> Since *Booker,* virtually every judge faced with a top-level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives.

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

[23]   The Hon. Jed Radkoff, Keynote Speech, 27th Annual Institute on White Collar Crime, Las Vegas, Nevada, March 6, 2013, see report at http://newsandinsight.thomsonreuters.com/Securities/News/2013/03_-_March/Rakoff_says_sentencing_guidelines_should_be__scrapped_/Ju

[24]   March 20, 2013 Press Release from Senator Patrick Leahy regarding the Justice Safety Valve Act, available at http://www.leahy.senate.gov/press/bipartisan-legislation-to-give-judges-more-flexibility-for-federal-sentences-introduced.

costs that steer more and more of the justice budge toward keeping people in prison, rather than investing in programs that keep our communities safe."[25]

The case at bar illustrates how the sentencing factors compound to create sentence guidelines incommensurate with the crime, what has been called "factor creep" -- cumulative and overlapping increases – added in response to congressional directives with no empirical evidence.  The United States Sentencing Commission has acknowledged this problem.[26]

While we do not know precisely the trial court's guidelines calculations, we do know that the PSR hold the Defendants accountable for over $15 million in losses, adding twenty points to the offense level.  The PSR also increases the Defendants' offense levels for their perceived roles in the scheme.  They also received offense level enhancements for a complex scheme and for receipts greater than $1 million, increasing their offense levels another four levels.

An examination of whether or not a sentence that was based, initially, on inflated guidelines that do not correlate to recidivism or other 3553(a) factors is not frivolous – it is consistent with the concerns being raised by federal judges, senators, and the U.S. Attorney General.  The case at hand is appropriate for such a disagreement with the guidelines sentence proposed by the PSR.

---

[25] *Id.*

[26]    United States Sentencing Commission, *Fifteen Year Report* at 137, available at http://www.ussc.gov/15_year/15year.htm

This case is similar to other fraud cases, in which courts have found the sentences generated by a mechanical application of the guidelines absurd.  The massive sentence recommended by the PSR is the result of "factor creep" -- cumulative and overlapping increases – added in response to congressional directives with no empirical evidence.  The United States Sentencing Commission has acknowledged this problem.[27]  Justice Breyer has noted that the sentencing precision believed to be achieved with the white collar guidelines is false.[28]

Sentencing courts have balked at these calculations and their ludicrous sentencing results.  See, *United States v. Lauersen,* 362 F.3d 160 (2d Cir. 2004) (with six additional sentencing factors, "the calculations under the guidelines have  so run amok that they are patently absurd on their face." *United States v. Adelson,* 441 F.Supp.2d 506 (S.D.N.Y. 2006);  *United States v. Parris,* 573 F. Supp. 2d 744, 756 (E.D.N.Y. 2008)(heavy focus on loss and "one-size-fits-all approach for its number of victims, [and] officer and manager enhancements provide no reasonable guidance, *United States v. Watts*, 707 F.Supp.2d 149, 151 (Mass. 2010), the "Guidelines were of no help, if not for the statutory maximum, the Guidelines for an offense level 43 and a criminal history and would have called for a sentence of life imprisonment.").[29]

---

[27]  *Id.*

[28]  Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited,* 11 Fed. Sent. R. 180 (Jan./Feb. 1999).

[29]  One review of white-collar sentences noted:

Empirical evidence also shows that Guidelines-generated sentences also do not reflect community values.  In one study, for example, jurors found, on average, the proper sentence for mail fraud was seven months, while the Guidelines called for 37-46 months.[30]

Here, both Defendants present almost no risk of re-offending.  The 108-month sentence proposed for Mr. Plany and Mr. Anderson, in fact, contradicts several of the factors set forth in 18 U.S.C. § 3553(a).  For example, it does not consider that, due to defendants' age, education, employment history, and marital status, he is statistically unlikely to reoffend.  *Id*.  These factors will be discussed in detail in separate sentencing memoranda. The proposed guidelines sentences in this case, therefore, are unreasonable.

## VI.    Restitution

A court may only order restitution, in its discretion, to any victim of the criminal conduct directly related to the offense of conviction.  *Hughey v. United States*, 495 U.S.

---

Since *Booker,* virtually every judge faced with a top- level corporate fraud defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the fundamental requirement of Section 3553(a) that judges imposes sentences 'sufficient, but not greater than necessary' to comply with its objectives.

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,* 20 Fed. Sent. R. 167, 169, 2008 WL 2201039, at *4 (Feb. 2008).

[30]    Judge James S. Gwin, *Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?*, 4 Harvard Law & Policy Review 173 (2010).

411, 418 (1990).   The language of 18 U.S.C. § 3663 "suggests persuasively that

Congress intended restitution to be precisely tied to the loss caused by the offence [sic] of

conviction." *United States v. Menza*, 137 F.3d 533, 537 (7th Cir. 1998), citing *Hughey,*

495 U.S. at 418.  The Government bears the burden of showing, by a preponderance of

the evidence, the amount of loss sustained by a victim.  18 U.S.C. § 3664(a), (e).  A

restitution award cannot exceed a victim's loss. *See United States v. Boccagna,* 450 F.3d

107, 117 (2d Cir.2006).

      For crimes involving fraud or deceit, restitution is mandatory. *See United States v.*

*Gordon,* 393 F.3d 1044, 1048 (9th Cir.2004).  However, the Ninth Circuit has recognized

that restitution under the MVRA "'may be awarded only for losses for which the

defendant's conduct was an actual *and* proximate cause.' 'But for' cause is insufficient."

*United States v. Swor,* 728 F.3d 971, 974 (9th Cir.2013); *cf. Paroline v. United States,*

134 S.Ct. 1710, 1719 (2014) (holding, under a separate restitution statute, that

"[r]estitution is therefore proper ... only to the extent the defendant's offense proximately

caused a victim's losses").   The Government must "'show not only that a particular loss

would not have occurred but for the conduct underlying the offense of conviction, but

also that the causal nexus between the conduct and the loss is not too attenuated (either

factually or temporally).' " *Swor,* 728 F.3d at 974 (quoting *United States v. Gamma Tech*

*Indus., Inc.,* 265 F.3d 917, 928 (9th Cir.2001).  The Court will only award restitution for

those losses that were incurred as a "direct and foreseeable result" of the defendant's

wrongful conduct. *United States v. Phillips,* 367 F.3d 846, 863 (9th Cir.2003).

*A.*     *The PSR Restitution Calculations Fail to Distinguish the Losses.*

The individual account holders and the banks cannot both be counted as victims. *United States v. Yagar*, 404 F.3d 967, 971 (6th Cir. 2005).  To the extent that the PSR counts transactions that also apply to specific persons as victims, therefore, that counting is improper.  Because the PSR does not itemize the victims, it is difficult to provide more specificity with this objection.

B.      *The PSR Includes Restitution for Acts not Attributable to these Defendants.*

The restitution sought by the Government includes conduct outside the offenses of conviction.  It appears to include properties with which the Defendants had no involvement.  Because the restitution sought is not precisely tied to the Defendants' offenses of conviction, the restitution sought by the PSR is improper.  It must and be limited to the exact amount actually and proximately caused by the crime of which each Defendant was found guilty.

RESPECTFULLY SUBMITTED on December 8, 2014.

_s/Joy Bertrand_
*Joy Bertrand*
Attorney for Defendant


_/s Patricia A. Gitre_
Attorney for Anderson

## CERTIFICATE OF SERVICE

On December 8, 2014, I, Joy Bertrand, attorney for the Defendant, Joseph Plany , filed the foregoing with the Arizona District Court's electronic filing system.  Based on my training and experience with electronic filing in the federal courts, it is my understanding that a copy of this request will be electronically served upon opposing counsel, Kevin Rapp, and codefendant counsel, Patricia Gitre, upon its submission to the Court.

Respectfully submitted this Eighth day of December, 2014.


s/Joy Bertrand
Joy Bertrand
Attorney for Defendant