JOHN S. LEONARDO
United States Attorney
District of Arizona

KEVIN M. RAPP
Assistant U.S. Attorney
Arizona State Bar No. 014249
Email: kevin.rapp@usdoj.gov

MONICA B. KLAPPER
Assistant U. S. Attorney
Arizona State Bar No. 013755
E-mail: Monica.Klapper@usdoj.gov

Two Renaissance Square
40 N. Central Ave., Suite 1200
Phoenix, Arizona 85004
Telephone: 602-514-7500
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

vs.

1. Paxton Jeffrey Anderson,

2. Joseph John Plany,

Defendants.

CR-12-1606-PHX-SRB-(DKD)

**UNITED STATES' SUPPLEMENTAL RESPONSE TO DEFENDANTS' OBJECTION TO RESTITUTION (CR 323) AND RESPONSE TO SPECIFIC OFFENSE CHARACTERISTICS**

(Sentence date: February 2, 2015)

## I. Supplemental Response to Objection to Restitution Request

This response addresses restitution issues that remained unresolved following the hearing on December 15, 2014.

### A. Tier One Loan (Acre)

As the Court may recall, the Defendants were found guilty of counts 6, 11, 12, 14, 16-23, and 25 for obtaining fraudulent draw disbursements for the construction loan associated with 37475 N. 104th Place, Scottsdale, obtained by Mark and Dominique Acre. The property was approximately 70% complete at the time of foreclosure. Tier

One failed and the FDIC was the Receiver. (Ex. 1.) The property was sold to a third party for $700,000. (Ex. 2.) The FDIC calculated the loss on the property to be $767,844.00. (Ex. 3.) Accordingly, restitution is requested in that amount.

**B. JP Morgan Chase Bank (Adams)**

This restitution request is based on the loss associated with the loan obtained by Oliver and Chris Adams for Lot 25 Ponderosa Village, aka 6877 E. Gray Fox Court, Gold Canyon, AZ ("Lot 25"). As the Court may recall, Oliver Adams testified at trial he was approached by Defendant Anderson to invest in this property and did not discover until closing that he was purchasing Lot 25 from his brother, Vince. (Ex. 61; RT 29-32) Vince, among other things, was upset the property was in foreclosure proceedings, and there were unapproved draw disbursements from the loan fraudulently obtained by Anderson with no work completed, and as a result, threatened to go to the authorities. (*Id.*) (Ex. 4, ¶19; 5.)

Similar to the loans for Jason Rongstad, the Hensteins, and Kerry Woodson, the Adams' loan was brokered by Anderson. (Ex. 6.) The loan file listed pre-paids of $240,000 and Anderson used nominee company JR Custom Homes as the builder. (Ex. 7; p. 166.) Adams did not pay Anderson the pre-paids as represented in the loan file.

Addionally, Defendant Anderson received draw disbursements in excess of $164,000 with no work completed on the property. (Ex. 8.) The property foreclosed in June, 2009, and was resold to a third party for $38,500. (Ex. 5.) The loss on the loan was calculated according to recorded documents, which list the amount owed at foreclosure to be $714,772.31, less the amount of $38,500 acquired for the resale of the property. The loss is $676,272.31, which the United States requests in restitution. (Ex 9.)

**C. M & I Bank (Sandra Anderson)**

As the Court may recall this property was the subject of some discussion at the restitution hearing due to the confusion surrounding the address. The correct address for the property is 14185 N. Centennial Drive, Lot 74, Talking Rock Prescott, AZ, despite what was incorrectly listed (15050 N. Four Mile Creek) on S. Anderson's loan

application. (Ex. 10.)

Evidence at trial demonstrated that S. Anderson was a serial straw buyer in the Defendants' fraudulent scheme. The fraud associated with this particular loan was charged as Counts 28 (URLA); and 29 (Draw Consent Form) of the Indictment. At trial, these counts were dismissed because the United States chose not to introduce evidence regarding this transaction. Nevertheless, there was a loss associated with this loan due to fraud, and Defendants are responsible for it despite the dismissal at trial. There were numerous monthly payments made by Defendants to or on behalf of S. Anderson, unbeknownst to the lender. (Ex. 11.)

The incorrect address of 15050 N. Four Mile Creek was listed on S. Anderson's previous loan application with Tier One, signed on July 27, 2005**.** (Ex. 10.) In January 2007, the property was refinanced with M&I Bank, and the legal description on the Deed of Trust was listed as Lot 74, of Talking Rock Ranch Phase 8-C. (Ex. 12.) The property address was correctly referenced as 14185 N. Centennial Dr. at the Trustee's sale. Despite the change in subject property address, the legal description of the subject property - Lot 74, of Talking Rock Ranch Phase 8-C, has not changed. (Ex. 10, 12, 13.)

The property foreclosed on June 23, 2009. The property was resold to a third party for $56,427.41. The loss on the loan was calculated by M&I Bank as $381,288.15, and restitution is requested in that amount. (Ex. 14.)

**D. JP Morgan Chase Bank (Hensteins)**

The loan for Lot 249 Mirabel, 10361 E. Mirabel Club Drive, Scottsdale, was refinanced with First Magnus in February 2007 for $1,852,500. Emails provided by Shawna Gutierrez show the loan was brokered by Anderson. (Ex. 15.) Anderson directed Hensteins' signature to be "cut & pasted" on loan documents. (Ex. 16.) Anderson received a $113,680 fraudulent draw disbursement through his nominee-business JR Custom Homes, which the Hensteins repeatedly questioned. (Ex. 17.)

The property foreclosed on February 3, 2009. The property was sold to a third party for $239,500. (Ex. 18.) The loss on the loan was calculated according to recorded

documents which list the amount owed at the time of foreclosure to be $875,863.40, less the amount of $239,500 acquired for the resale of the property. Accordingly, the requested restitution is $636,363.40. (Ex. 9)

**E. JP Morgan Chase Bank (Rongstad)**

Rongstad's Chase loan was for a property located at Lot 19 Pinyon Village, 2743 S. Pinyon Village, Superstition Mountain. The Court may recall from trial testimony that Rongstad was a straw buyer for Anderson on two properties. Rongstad testified that Anderson would build the properties at cost and the property would then be sold and the profits split. Rongstad was also installed as the nominal president of JR Custom Homes by Anderson.

In January of 2005, Rongstad's bank account was "seasoned" by Defendants to acquire a mortgage loan for Lot 19 from M&I Bank. (Ex. 19; p. 100.) The loan file contains fraud in the form of prepaid invoices and a verification of deposit, among other things. (Ex. 20; p. 462.)

In March 2007, Lot 19 was refinanced by First Magnus Corporation for $1,449,360. According to emails provided by Gutierrez, Anderson brokered the loan with Loan Officer Tom Marcopulos. (Ex. 21.) The URLA attached to the email lists Rongstad as owning his friend's home on Flint St. and does not disclose Lot 9, 7390 E. Wildflower Lane Apache Junction, purchased in 2005. (Exs. 21, p. 237; and 22.) Additionally, Anderson made mortgage payments for straw buyer Rongstad, unbeknownst to the lender. (Ex. 23.)

In October 2007, a Warranty Deed is assigned from First Magnus to Washington Mutual (WAMU) for Lot 19. (Ex. 24.) Rongstad testified that Lot 19 was never finished, and in July 2011, Lot 19 foreclosed. The property was resold to a third party for $420,000. (Ex. 24.) The loss on the loan was calculated according to recorded documents, listing the amount owed at the time of foreclosure a $1,695,704.03, less the $420,000 acquired for the resale of the property resulting in a loss to Chase (the successor lender to WAMU) of $1,275,704.03, and restitution is requested in that amount. (Ex. 25.)

**F. M & I Bank( Wagner)**

The Court may recall that Defendants argued they should not be held responsible for the loss associated with the loan for 3414 S. Sycamore Gold Canyon because the home was completed. They argued they were not the proximate cause of the loss even though the house eventually foreclosed. Defendants are incorrect and miss the point for several reasons.

*First*, as background, Defendants devised a scheme to make money by utilizing straw buyers to acquire loans, build the home at "cost" and flip the property, splitting the profits between the straw buyer and Anderson. Here, Defendants urge the Court to find that they were not involved in a fraud on this loan because the home was built to completion and no draw requests were diverted for other purposes. The "flip" or sale of the finished house, however, was not completed. The home foreclosed in 2008, at a time when the Defendants' scheme had unraveled and the housing market in Arizona and the nation had imploded.

*Second*, Defendants conveniently overlook that they were involved in the fraud at the origination of the loan from borrower Wagner. Like many of the other frauds that occurred at the inception of the loan, it was brokered between Anderson and M&I Loan Officer Greg Slater. (Ex. 26.) The loan file contains fraudulent statements and false pre-paids. (Ex. 27.)

*Third*, during the building of the home, Defendants submitted Draw Consent Forms to M&I requesting funds be disbursed to fictitious/nominee companies - Flagship Development, JR Custom Homes, and JR Woodworking. (Ex. 28.)

*Fourth*, on 07/18/2007, Wagner received a 2nd loan on this property for $350,000 from National Bank. For reasons that are unclear, Wagner wired $100,000 to JR Custom Homes Chase Account #7551 on 07/25/2007. (Ex. 29.) Approximately one year later, a Substitute Trustee was assigned to complete foreclosure proceedings.

The property foreclosed on December 4, 2008. The property was resold to a third party for $672,947.41. The loss on the loan was calculated by M&I Bank as

$231,985.51, and restitution is requested in that amount. (Ex. 14.)

**G. JP Morgan Chase and M & I (Woodson)**

The two subject loans for Woodson are Lot 12 Lost Gold Estates, 8787 E. Lost Gold Cr, Gold Canyon, AZ, refinanced by Chase; and M & I Bank loan for Lot 4, Cottonwood, Apache Junction, AZ.

As background, Woodson has been involved with Defendant Anderson on numerous property deals, including the purchase of Lots 12 and 4 from Anderson straw buyers (Corey Christopher and Peter LaBarge, respectively). Woodson was a former professional baseball player and friend of Mark Acre. Defendants argue that Anderson did not build on Lot 4 and therefore should not be held accountable for any losses attributable to this loan. This argument is disingenuous because this was partially due to the fact that Anderson could not obtain financing for Woodson through another mortgage broker. (Ex. 38.)

The chronology of the loan is as follows:

- On 11/11/2005 Woodson purchased Lot 174 Talking Rock for $250,000 via M&I Bank financing. (Ex. 31.)
- On 01/14/2006, Woodson signed a loan application through M&I for Lot 4 Cottonwood and 5 days later on 01/19/2006 signs a loan application through M&I for 12 Lost Gold. Both loans were brokered by Anderson through Greg Slater. (Ex. 30.) Neither loan application discloses the other as well as Lot 174 Talking Rock. (Ex. 32, 33.)
- On 02/15/2006 Lot 12 is purchased by Woodson from straw buyer Corey Christopher for $480,500. Christopher's loan file contained fraudulent statements and his bank account was seasoned. Anderson received draw disbursements from this loan, although he did not do any work on the property. (Ex. 34, ¶ 5.)
- On 02/14/2006 Lot 4 was purchased by Woodson from straw buyer Peter LaBarge for $448,500. (Ex 35.) LaBarge's loan was brokered by Paxton Anderson. LaBarge was unhappy with Anderson and wanted out the arrangement. (Ex. 36.)

- On 01/04/2007, Lot 12 was refinanced through First Magnus Financial Corp in the amount of $1,520,000. This loan was brokered by Anderson. (Ex. 37.) Anderson received approximately $307,500 from Washington Mutual that was deposited in his bank account through JR Custom Homes. (Ex. 39.)

- Dates that detail the transfer of these properties:

    - October 11, 2007: Lot 12 Assignment of Deed of Trust from First Magnus to Washington Mutual. (Ex. 40.)
    - March 20, 2009: Lot 12 Notice of Substitute Trustee from Chase to California Conveyance Company. Notice of Trustee Sale. (Ex. 40.)
    - April 8, 2009: Lot 12 Notice of Trustee Sale. (Ex. 40.)
    - September 15, 2009: Lot 12 Foreclosure at auction on September 10, 2009. Highest bidder was M&R Financial, who paid $409,501. (Ex. 40.)
    - November 13, 2009: Lot 4 Foreclosure/Trustee Deed with M&I being the Grantee and winning bidder at $229,048.14. (Ex. 14.)
    - November 13, 2009: Lot 174 Trustee's Deed with M&I being the Grantee and winning bidder at $75,548.24. (Ex. 14.)

Lot 12 was sold to a 3rd party at foreclosure auction for $409,501. (Ex. 40.) The loss on the Lot 12 loan was calculated according to recorded documents which list the amount owed at the time of foreclosure to be $1,608,821.24, less the amount of $409,501 acquired for the auction of the property. The loss is $1,199,320.24 and restitution is requested in that amount. (Ex. 9.)

Lot 4 was resold to a 3rd party for $93,544.57. (Ex. 14.) The loss was calculated by M&I Bank as $306,908.45 and restitution is requested in that amount (Ex. 14.)

**H. M&I Bank, Lot 24 Ponderosa, aka 3505 S. Ponderosa, Gold Canyon, AZ (Lombardo) and Acre Restitution Request.**

The United States is neither seeking restitution or loss as a result of the foreclosure of Ponderosa, nor any restitution requested by the Acres.

**I. Restitution Granted**

Following the Restitution hearing on December 15, 2014 the Court found the restitution amounts detailed below as appropriate or was not challenged by the Defendants and will be ordered.

| Financial Institution | Borrower | Address | Restitution Amount |
| --- | --- | --- | --- |
| M & I Bank | Acre | 41606 N. 113th Place Scottsdale, AZ | $738,905.79 |
| M & I Bank | Henstein | 37595 N. 104th Pl. Scottsdale, AZ | $595,741.55 |
| M & I Bank | Anderson, MJ | 14252 E. Zorra Way Fountain Hills, AZ | $427,334.47 |
| M & I Bank | Anderson, S. | 2546 S. Moonlight Dr. Gold Canyon, AZ | $382,026.26 |
| M & I Bank | Bailey | 36365 N 100th Way Scottsdale, AZ | $379,411.06 |
| M & I Bank | Rongstad | 7390 E. Wildflower Ln Apache Junction, AZ | $281,176.42 |
| M & I Bank | Jennett | 7165 E. Juniper Village Gold Canyon, AZ | $258,340.63 |
| M & I Bank | Jennett | 8703 E. Lost Gold Apache Junction, AZ | $207,489.41 |

The total amount of restitution was previously $3,270,425.59. Based on the above the United States seeks additional restitution in the amount of $5,475,686.09. The total restitution sought is **$8,883,144.81**.

**II. Loss**

The Court may use a preponderance-of-the-evidence standard of proof, as opposed to a clear-and-convincing-evidence standard, in calculating loss under U.S.S.G. § 2B1.1(b) because the loss calculation was based on evidence presented at trial to support the conspiracy charge and Defendants received a lengthy restitution hearing. In sum, Defendants cannot contend that they were "denied adequate procedural protection in contesting that evidence." *United States v. Treadwell*, 593 F.3d 990, 1001 (9th Cir.2010).

Defendants argue that they are entitled to proof of loss by a clear and convincing standard. This argument is unavailing because Defendants were convicted beyond a reasonable doubt for a conspiracy charge and were additionally afforded a lengthy restitution hearing where the United States was required to prove restitution amounts with documents and other evidence.

Defendants' argument regarding the standard of proof for loss is flawed for a number of reasons. The requirement that certain sentencing facts be found by clear and

convincing evidence is to ensure that criminal defendants receive adequate due process. *See United States v. Staten*, 466 F.3d 708, 717 (9th Cir.2006). Thus, where a severe sentencing enhancement is imposed on the basis of *uncharged or acquitted conduct*, due process may require clear and convincing evidence of that conduct. *See United States v. Harrison-Philpot*, 978 F.2d 1520, 1523 (9th Cir. 1992). Courts impose this requirement to ensure that legislatures "cannot evade the constitutionally required standard of proof by reclassifying an element of a crime as a sentencing factor" thereby depriving a defendant of important criminal procedural protections. *Id.* "[W]here the enhancement represents the overwhelming proportion of the punishment imposed, a court cannot reflexively apply the truncated procedures that are perfectly adequate for all of the more mundane, familiar sentencing determinations." *Id.* (internal quotation marks omitted). "To accommodate these concerns . . . a district court is required to 'ratchet up certain, though not necessarily all, of the procedural protections afforded a defendant at sentencing, so as more closely to resemble those afforded at trial, by applying the clear and convincing evidence standard. . . .' " *Id.* (internal quotation marks omitted).

Whether a sentencing enhancement causes a disproportionate impact warranting clear and convincing proof necessitates a look at the "totality of the circumstances." *United States v. Jordan*, 256 F.3d 922, 928 (9th Cir. 2001). Circumstances considered include: (1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment; (2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment; (3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment; (4) whether the increase in sentence is based on the extent of a conspiracy; (5) whether an increase in the number of offense levels is less than or equal to four; and (6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence. *Id.*

The Courts have repeatedly held that sentencing determinations relating to the

extent of a criminal conspiracy, as is the case here, need not be established by clear and convincing evidence. *See, e.g., United States v. Berger*, 1038, 1048 (9th Cir. 2009). ("[A] number of our cases squarely address the factual situation presented here. Those cases involve a defendant's fraudulent conduct where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy. They hold that facts underlying the disputed enhancements need only be found by a preponderance of the evidence."); *United States v. Armstead*, 552 F.3d 769, 777 (9th Cir. 2008) ("[S]entencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof.").

In sum, Defendants were afforded a trial in which they were found guilty of the conspiracy by proof beyond a reasonable doubt and also received a lengthy restitution hearing. For those reasons, their argument that they are entitled to have loss proven by clear and convincing evidence fails.

The Guidelines require only a "reasonable estimate" of the pecuniary harm that resulted from the offense, both "monetary" as well as harm that "otherwise is readily measurable in money." U.S. Sentencing Guidelines Manual, § 2B1.1, app. notes 3(A)(i),(iii), 3(C)(2009). This case is no different from many of the many mortgage fraud cases that have been prosecuted in the District of Arizona where the losses fall within very broad loss ranges (for example, $7 million to $20 million). The Guidelines do not require a precise dollar calculation. The United States has addressed the balance of Defendants' arguments regarding loss in the restitution hearing and in this supplemental memorandum. The loss falls within a range of $7 million to $20 million and Defendants warrant a 20 level increase in their base offense level pursuant to U.S.S.G. §2B1.1(b)(1)(K).

In addition to the amount of restitution requested above, the United States believes the following loan transactions should also be included in the overall loss amount.

**A. Bank of America/Countrywide (Sandra Anderson)**

As the Court may recall, the Court was unwilling to order restitution for two Bank of America loans. ( Ex 61; RT pp. 97-103.) B of A was the successor lender for

Countrywide who originated two loans for straw buyer Sandra Anderson. The loans were a first and second mortgage (#98372141 and #166249484) for 10240 N. Fire Canyon Trail, Fountain Hills. The Court had difficulty with the characterization "ending scheduled balance" (*Id.*) Bank of America provided the the case agent with a definition of this term. advising that it is equivalent to the principal balance of the loan at the time that the property was foreclosed upon or when the loan was charged off, due to delinquency. (Ex. X.)

S. Anderson purchased this property from straw buyer Larry Desmet. Anderson made payments to/for Desmet. (Ex. 41; and Ex. 42, p. 10.) After the purchase of 10240 from Desmet by S. Anderson, Defendant Anderson made payments to Countrywide for the loan totaling $105,704.95. (Ex. 43.) When S. Anderson applied for this loan she also owned at least 3 other properties. The combined amount of mortgages for these 3 properties total more than $2.8 Million. (Ex. 44.) The loss on both of these loans is $1,312,258.52 and should be included in the loss amount. (Ex. 45.)

**B. M & I Bank (Jeff Anderson)**

Jeff Anderson is Defendant Anderson's father and a straw buyer. The Court did not award restitution for the loan for 14695 N. Kinishba Fire Prescott, AZ. It was unclear as to why restitution was not ordered but it may because the court believed that the loan file was not available and disclosed. (Ex. 61; RT pp. 15-16.) In fact, the United States had produced the loan file many months prior to trial as part of Disclosure 1 (See Bates 1C028-000001: 1C028-000145, 1C029-000001: 1C029-000346, 1C059-000001: 1C059-000034).

The loan file contained similar fraudulent misrepresentations by Defendant Anderson. The current balance is $403,283.00 based on J. Anderson's failure to make monthly mortgage payments. (Ex. 59.) This loan was brokered by Anderson and Greg Slater (Anderson-006378). The loan file lists pre-paids in the amount of $180,000 and did not disclose Lot 106, 14353 E. Zorra Way, Fountain Hills. (Ex. 47.) A $50,000 draw was taken shortly after closing for soft costs. There was no further loan activity or

construction on the property. Anderson has made payments to/on the behalf of J. Anderson totaling more than $500,000. (Ex. 48.) While Jeff owned this property, he also owned at least one other property, which was refinanced through Anderson. It should be noted neither loan applications for both properties disclosed the other. (Ex. 49.) The combined amount of mortgages for these properties total more than $2.8 Million. The Government believes the amount of loss in the amount of $403,283.00 stated by M&I Bank, should be included in the overall loss. (Ex. 14.)

**C. M & I (Marti Jo Anderson)**

The Court did not award restitution for the loan for Lot 44, Talking Rock Prescott, AZ ("Lot 44"). The Court may have thought that the United States had not produced the loan file for this property. In fact, the United States had produced the loan file many months prior to trial as part of Disclosure 1. The loan file contained fraudulent misrepresentations facilitated by Anderson. M&I Bank could not produce the REO file, which would list the resale of the property.

*First*, the property located at 13864 E. Coyote Way, Fountain Hills, AZ was not disclosed on the Lot 44 URLA. (Ex. 50.) The Coyote Way property was purchased on December 30, 2004 and ultimately refinance through Anderson for $1.8 Million. (Ex. 51.) The Lot 44 loan was brokered by Anderson. In order to be approved for the loan, Anderson seasoned Marti Jo's bank account. (Ex. 52.) Anderson has made payments on the behalf of Marti Jo totaling more than $500,000. (Ex. 53.)

*Second*, while Marti Jo owned this property, she also owned at least 4 other properties purchased at the direction of Anderson. The combined amount of mortgages for these properties total more than $2.7 Million. (Ex. 50 and Ex. 51.)

The United States urges that the amount of loss in the amount of $185,000 should be included in the overall loss calculation. (Ex. 60.)

**D. Tier One loan (Bill Bailey)**

Bailey was a straw buyer for Anderson on at least 2 properties; 9445 N. Desert Wash Trail and 36365 N. 100th Way, Scottsdale. The Court awarded restitution to M&I

Bank in the amount of $379,411.06 for 100th Way. The home foreclosed in 2008 at a time when the Anderson's scheme had unraveled and the housing market in Arizona had plummeted. The Court did not award restitution for Firerock 11, aka Desert Wash Trail because the United States did not have the loan file from Tier One.

As the Court will recall, Bailey testified that Anderson devised a scheme to make money by utilizing straw buyers to acquire loans, build the home at "cost" and flip the property, splitting the profits accordingly. Anderson was involved in this property as well as the M&I property. (Ex. 54.)

Anderson has made mortgage payments on behalf of Bailey totaling more than $200,000 and admitted to doing so in an email to Acre (*See* Ex. 57 and 58.) The combined amount of mortgages for Firerock 11 and 100th Way total more than $1.8 Million. (Ex. 55 and Ex. 56.)

Anderson solicited Bailey to acquire multiple loans, brokering both loans, seasoning Bailey's bank accounts, and making payments on the loans. Therefore, the amount of loss in the amount of $393,750.00 requested by the FDIC, should be included in the overall loss calculation.

**E. M & I Bank (Woodson)**

Woodson has been involved with Anderson on numerous property deals, including the purchase of Lots 12 and 4 from Anderson straw buyers. As stated earlier, the overall Anderson scheme relied upon loans for properties to be built at cost and then sold and profits split. Woodson's Lot 174 was the first loan acquired by Woodson in this scheme. On 11/11/2005, Woodson purchased Lot 174 for $250,000 via M&I Bank financing. (Ex. 31.) Woodson would later "shot-gun" 2 additional properties through the loan committee a short time later. Neither of those loan applications disclosed the other property as well as Lot 174. These loans were brokered between Anderson and unindicted co-conspirator Greg Slater.

The United States urges that this loan be included in the overall loss amount based upon being part of the Anderson scheme. Woodson acquired Lots 4 Cottonwood, 12 Lost

Gold and 174 Talking Rock within a 4-5 month period. The goal was the same for all properties – build the homes, sell and split the profits. All three properties went into foreclosure, with Lot 174 being foreclosed on 11/14/2009.

Because of the false representations on the loans for Lots 4 Cottonwood and Lot 12 Lost Gold, and the inability of Woodson to continuously pay monthly mortgages for vacant lots and uncompleted homes; the amount of loss in the amount of $226,917.35 is requested by M&I Bank, should be included in the overall loss calculation.

In sum, these additional properties for loss calculation purposes are detailed in the chart below:

| Financial Institution | Borrower | Property Address | Loss Amount |
|---|---|---|---|
| M & I Bank | Anderson, J. | 14695 N. Kinishba Fire Prescott, AZ | $403,283.00 |
| M & I Bank | Anderson, MJ | Lot 44, Talking Rock Prescott, AZ | $192,624.00 |
| Bank of America | Anderson, S. | 10240 N. Fire Canyon Trail, Fountain Hills | $353,681.21 |
| Bank of America | Anderson, S. | 10240 N. Fire Canyon Trail, Fountain Hills | $958,792.20 |
| Tier One | Bailey | 9445 N. Desert Wash Trail | $393,750.00 |
| M & I Bank | Woodson | Lot 174, Talking Rock Prescott, AZ | $226,917.35 |

The above losses in a total additional loss of $2,529,047.76. Restitution for financial institutions awarded following the December 15, 2014 restitution hearing is $3,270,425.59. The United States is seeking on behalf of the victims additional restitution for financial institutions in the amount of $5,475,686.09. Adding restitution granted for Hensteins of $137,033.13 results in total restitution of $8,883,144.81. The Court should add to that restitution amount the additional $2,529,047.76 above. The total loss attributable to Defendants is $**11,412,192.57**.

## III. Specific Offense Characteristics

### A. Role in the Offense

U.S.S.G. § 3B1.1 provides for the following enhancements when a Defendant is found to have an aggravating role:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

Here, the Presentence Report (PSR) correctly applies a four level enhancement for Defendant Anderson. (PSR ¶ 43[1].)

Defendants incorrectly argues that their role in the offenses requires proof by clear and convincing evidence. Because Defendant Anderson's role enhancement is based largely on evidence presented at trial to support the conspiracy charge and proven by beyond a reasonable doubt standard, Defendant cannot now contend that he is denied adequate procedural protection in contesting that evidence related to a role enhancement. *Treadwell*, 593 F.3d at 1001 ("We have repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence."); *Armstead*, 552 F.3d at 777 ("sentencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof").

Next, Defendants argue that they had equal roles to Sanchez, Blemaster and Slater in furthering the scheme. It is unclear what point Defendants are attempting to make with this comparison, but it is misplaced for several reasons. *First*, Blemaster would not receive both a role enhancement and an additional enhancement for specialized skill as a loan officer. *See* U.S.S. G §3B1.3.

*Second*, and more importantly, Defendant Anderson was clearly the leader of the scheme as he solicited family and friends, among others, to be straw buyers, coordinated the submission of loan applications containing false information with the *assistance* of Slater and Blemaster, and orchestrated the forged and altered loan draw requests, among

---

[1] Defendants incorrectly assert that the PSR found that Defendant Plany was a manager (Doc. 316, pp. 3-4.). No increase was attributed to Defendant Plany for his role.

other bogus documents. As previously argued, Blemaster and Sanchez were unaware of Defendants diverting the construction draw proceeds for horse-related expenses. This is underscored by both Sanchez and Blemaster learning about their own forged draw requests and confronting both Anderson and Plany.

*Third*, Anderson directed Plany, Gutierrez, numerous subcontractors and the straw buyers (*e.g.* Marti Jo and Sandra Anderson, Rongstad, Baily, Jennet, etc.) to further the scheme. He certainly was not, as Defendants argue, merely "a component of the fraud… with an independent role in the criminal activity." The criminal activity clearly involved five or more participants; but even if it did not, it was otherwise extensive warranting a four level increase for Defendant Anderson.

Plany should likewise receive a three level increase because he played a managerial role in the offense. U.S.S.G. §3B1.1(b). Unlike Anderson, Plany was a college graduate who was tasked with supervising Gutierrez and facilitating the more important components of the fraud on a daily basis (*e.g.* ensuring mortgages were paid on behalf of the straw buyers, forging and cutting and pasting the draw requests, mentoring Gutierrez on how to alter documents, and diverting construction draws for horse-related expenses) Indeed, in the final analysis, Plany was critical to the success of the fraud. Again, the criminal activity involved five or more participants and/or was otherwise extensive, justifying at least a three level enhancement for Defendant Plany.

**B. Sophisticated Scheme**

Defendants' arguments that a two-level enhancement pursuant to §2B1.1(b)(10)(C) for sophisticated scheme should not be imposed is unavailing. In sum, both Defendants perpetrated a sophisticated scheme that required numerous complex deceptions including substantial planning, fraudulent documents, forged and cut-and-pasted borrower signatures, bogus companies, numerous instances of misrepresenting a straw buyers' assets, income, intent to occupy properties as primary residences, the source of mortgage payments, and false prepaid invoices for construction loans. Additionally, both Defendants willingly betrayed friends and family members to

accomplish the objects of the scheme. The enhancement is warranted.

The commentary to the Guidelines defines sophisticated means as “especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.” §2B1.1(b)(10)(C), comment (n. 10). In arguing that the scheme was not complex, Defendants rely on the scheme set forth in the indictment rather than what was presented at a 14-day trial that involved the testimony of over fourteen witnesses**,** including expert witnesses**,** the admission of over 200 exhibits**,** and evidence of countless real estate transactions**.**

Defendants’ reliance on *United States v. Tanke*, 743 F.3d 1296, 1307-08 (9th Cir. 2014), as support for not applying the sophisticated scheme enhancement is misplaced. The Court in *Tanke* upheld the imposition of the enhancement for sophisticated scheme based on conduct that is identical to the instant case. The district court in *Tanke* found that this enhancement applied because “the trial testimony clearly showed a high level of planning and concealment of defendant's theft, much more than simply diverting business checks into the defendant's company's bank accounts for his personal use as the defendant argues.” *Id.* The court imposed the sophisticated scheme enhancement noting that Tanke, “as vice president of Azteca, carefully engaged in dozens of various acts over a period of over 16 months to execute and conceal three separate types of fraud on the victim and his two business entities.” *Id.*

As in *Tanke*, Defendants here engaged in numerous acts for a period of four years to accomplish the two components of the fraud: loan origination fraud and diversion of construction draw proceeds by forging documents. Defendant Anderson was president of the various entities, and Defendant Plany was his right-hand man.

Defendants’ related argument that no evidence was presented for certain overt acts and therefore “it is unknown which overt acts the [jury] convicted defendants on” is just an incorrect statement of the law. (*See* doc. 316, fn 1.) It is well-established that the United States is not limited to overt acts in the indictment for proof, nor does the United States even have to prove an alleged overt act to secure a conviction. *United States v.*

*Rogers*, 769 F.3d 372 (6th Cir. 2014) ; *See also, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 219 (2005) ("[W]e hold that conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy."); *Salinas v. United States*, 522 U.S. 52, 63 (1997) ("There is no requirement of some overt act or specific act in the [RICO] statute before us, unlike the general conspiracy provision applicable to federal crimes. . . .").

Here, Defendants Anderson and Plany devised and executed a four year scheme that began in late 2004 and extended through 2008. The scheme involved soliciting buyers for properties with the promise that Anderson would build a custom home to completion, and it took multiple steps.

*First*, Anderson and Plany had to ensure that the buyers qualified for a loan. Defendants did this by working with loan officers to misrepresent material information to lenders. As the Court may recall, some of the information that was falsified included assets that did not belong to the buyers because Anderson, with the assistance of Plany, "seasoned" the buyers' accounts by depositing money in their bank accounts for a short period of time. Anderson also falsified employment and income information by obtaining letters that demonstrated that the buyer worked for a certain company and/or received income when in fact they did not. In order to qualify the straw buyers for construction loans, Defendants falsified pre-paid receipts so that it appeared the buyers provided money toward the construction loan when they did not. Additionally, some of buyers purchased multiple properties, and Anderson ensured that liabilities were omitted on their loan applications in an effort to minimize the buyers' debt to income ratio. Because the buyers did not have the income to make the mortgage payments, Defendants used loan proceeds to make their mortgage payments unbeknownst to the lender.

*Second*, once the loan was obtained Defendants obtained construction draws by forging or cut-and-pasting the signatures of the borrowers. In some cases, to justify the draw requests, they submitted bogus invoices for receipts for material and/or work that was never completed. Ultimately, the construction draws that were meant to pay

subcontractors and obtain material to complete home construction were diverted for personal and horse racing related expenses.

Although each fraudulent act committed by Defendants may not have been especially sophisticated in totality the scheme was sufficiently complex to warrant a two level enhancement. *See United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003) ("[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together. . . ."); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996) (holding, in tax case, that the sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return."). The two-level enhancement is justified in this case.

**C. Gross Receipts**

The PSR writer did not err in increasing Defendants' offense level by two levels under U.S.S.G. § 2B1.1(b)(14)(A) (2009) as there is ample evidence in the record that both Defendants received directly or indirectly more than one million dollars from one or more financial institutions based on the offenses of conviction.

*First*, Defendants obtained properties for straw buyers that they could foresee would inevitably go into foreclosure because they knew the buyers could not afford the properties in the first instance and/or they were diverting funds meant to complete the homes for other purposes, resulting in a loss to the financial institution that financed the loan. By doing so, Defendants indirectly profited at the expense of the institutions.

*Second*, Defendants also derived funds from financial institutions indirectly when they fraudulently obtained loans for straw buyers to purchase properties for their own purposes, namely to obtain construction draws that were diverted for their unintended purpose. *United States v. Gharbi*, 510 F.3d 550, 557 (5th Cir. 2007) ("Whether Gharbi fraudulently borrowed money to 'buy' a property from a "straw" seller, or whether he fraudulently obtained a loan for a straw buyer to 'purchase' a property from him, the legal result is the same. Gharbi derived the funds and used them for his purposes."). Whether

Defendants ever had the funds pass through their hands does not matter. *Id.* at 555-56. Defendants falsely procured these funds from banks to perpetuate the criminal conspiracy.

Evidence at trial demonstrated that the Defendants diverted at least $850,000 from construction draws directly to horse related expenses. (*See* trial Ex. 800) This does not take into account the nearly $28,000,000 in loans that that were based on fraudulent loan applications (e.g. Sandra and Marti Jo Anderson (Exs. 727, 820.) Jason Rongstad (Ex. 711) Paul Jennet (Trial Exs. 708, 714.) *See United States v. Kohli,* 110 F.3d 1475, 1477–78 (9th Cir.1997). The Court can properly include as "gross receipts" the fraudulently obtained loan proceeds that passed through the bank accounts for Anderson's various entities (*e.g.* Dynamite Custom Homes, JR Custom Homes and Flagship). In sum, Defendants derived over $1 million in gross receipts from one or more financial institutions "directly or indirectly as a result of [their] offense[s]." U.S.S.G. § 2B1.1 app. n. 11(B).

Respectfully submitted this 12th day of January, 2015.

JOHN S. LEONARDO
United States Attorney
District of Arizona

*s/Kevin M. Rapp*
KEVIN M. RAPP
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that on the 12th day of January, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants:

Patricia Gitre, attorney for Paxton Anderson

Joy Bertrand, attorney for Joseph Plany

*s/Zachry Stoebe*
U.S. Attorney's Office